IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

APR 2 5 2005 WH

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 75 C 3295 |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | Judge Gottschall |
| | ) | |
| Defendants. | ) | |

## AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS AND AMERICAN FRIENDS SERVICE COMMITTEE'S PETITION TO ENFORCE MODIFIED CONSENT DECREE

Petitioners and original named Plaintiffs American Friends Service Committee ("AFSC") and American Civil Liberties Union of Illinois ("ACLU"), by their attorneys, respectfully petition the Court to enforce the Modified Consent Decree ("MCD") because of actual and potential violations of the MCD described below, and to interpret the MCD to permit Plaintiffs access to documents in the possession of City police employees who perform internal audits required by the MCD. In support of this Petition, Petitioners advise the Court as follows:

### Introduction

On March 23, 2001, this Court entered a Proposed Modified Consent Decree regulating the manner in which the City of Chicago conducts investigations of First Amendment activities [Attached as Exhibit A]. Under the terms of the MCD, the City of Chicago is required to conduct annual internal audits of its compliance with the MCD and is also obligated to have a national public accounting firm conduct an independent external audit of its compliance with the

MCD within five years of its entry.[1]  Plaintiffs became aware of apparent violations of the MCD and Plaintiffs' First Amendment rights when the City, in February 2004, filed its 2002 Internal Audit with the Court.  As described below, the conduct of the City of Chicago violated the Modified Consent Decree in three instances:

(1)     In its publicly released internal audit of 2002, the City identified the AFSC as a proper subject of a police investigation and infiltration.  The MCD does not require identification in mandated audits of groups investigated and the City had never publicized the identity of the subject of an investigation before.[2]  This publication stigmatized the AFSC, thus interfering with

---

[1] The MCD provides, in relevant part:

    3.       In each of the next five years, the Superintendent of Police shall conduct a departmental audit of the Police Department's compliance with this Decree, and submit copies of the audit report to the Mayor, the Police Board, and this court for filing as a public record.  The annual report shall include a summary of any internal disciplinary complains concerning compliance with this Decree and the findings made and the actions taken on such complaints.

    4.       The Chicago Police Board shall review the Superintendent's audit annually, and may request such additional information as it deems necessary to monitor compliance with this Decree, and shall report to the Mayor, the Superintendent of Police, and the public concerning its findings.

    5.       The Chicago Police Board shall also cause an audit of the City's compliance with the terms of this Decree to be performed by a national independent public accounting firm within five years of the entry of the order adopting this modified Decree.  The audit report shall contain a description and evaluation of any conduct believed by the auditors to constitute a probable violation of the Decree.  The Police Board may require further investigation of any such possible violations.  The audit report, together with any additional findings or recommendations made by the Board, the Superintendent of Police, or the Mayor shall be made public.  For the purpose of these audits, or for any other investigation that the Board may wish to conduct to investigate compliance with this Decree, the Board and the auditors engaged by the Board shall have access to all relevant data in the possession of the City except that the auditors shall not have access to information specifically identifying confidential informants or to current criminal investigations that the Superintendent of Police states might be compromised by disclosure to the auditors.  The auditors shall not disclose any information to anyone but the Board, the Superintendent of Police, or (upon his request) the Mayor.  The Board shall not disclose in any manner details that specifically identify any investigations except as otherwise permitted by law, nor shall it disclose in any manner information that would reveal the identity of a confidential informant, compromise an ongoing criminal, regulatory, or employee disciplinary investigation, or constitute an invasion of a person's privacy.  See Exhibit A, MCD, ¶3, 4, 5, p. 2.

[2] In fact, the MCD precludes the Board from such disclosure. "The Board shall not disclose in any manner details that specifically identifies any investigation except as otherwise permitted by law, nor shall it disclose in any manner information that would reveal the identity of a confidential informant, compromise an ongoing criminal, regulatory, or employee disciplinary investigation, or constitute an invasion of a person's privacy. See Exhibit A, MCD, ¶5, p. 2.

2

its future protected First Amendment activities.[3]

(2)    The City of Chicago's apparent destruction of documents pertaining to the investigation of the AFSC prior to the performance of the external audit prevents this Court from obtaining a full and adequate independent audit of the Defendant City of Chicago's compliance with the MCD for the year 2002.

(3)    The City has now codified a policy of allowing the police department to destroy records of duly approved investigations of First Amendment activities prior to being audited by both internal and external independent auditors, thus preventing the Court from obtaining full and adequate audits in the future.

In addition to these three clear violations of the MCD, the conduct of the Defendant City of Chicago indicates that it may have violated the MCD by engaging in an investigation of Plaintiff AFSC without a sufficient basis and in an overly intrusive manner in violation of the MCD and the First Amendment.

Finally, the City has indicated that it has in its possession a copy of "portions" of the file of the investigation of Plaintiff AFSC. The City has taken the position that, because that copy of portions of the investigation is now in the possession of an employee who performed the 2002 Internal Audit, the file has become confidential under the MCD, and, therefore, counsel for the City may not review the file or produce a copy of the file to Plaintiff AFSC's counsel. This interpretation of the MCD is overly restrictive and misinterprets the MCD.

---

[3]The MCD provides:
    1.    No agency or agent of the City of Chicago shall:
        a)    investigate, prosecute, disrupt, interfere with, or harass any person for the purpose of punishing or retaliating against that person for engaging in conduct protected by the First Amendment, or for the purpose of preventing them from engaging in such conduct, although nothing in this Decree shall enjoin reasonably investigative or law enforcement activities that are permitted by the First Amendment. See Exhibit A, MCD, p. 3

In light of the Defendant City of Chicago's conduct, Plaintiffs respectfully petition this Court to:

(1) Find that the City has violated the Modified Consent Decree by:

    a. publishing the identity of AFSC as the subject of an intelligence investigation, and

    b. intentionally destroying the investigative file concerning Petitioner AFSC, and

    c. promulgating a General Order allowing destruction, before audit, of First Amendment investigations;

(2) Enjoin Defendant from:

    a. publishing to third parties in the absence of compelling justification the names of subjects of First Amendment investigations, and

    b. destroying documents of First Amendment investigations prior to the internal and independent audit required by the MCD and order Defendant to amend General Order 02-10 accordingly;

(3) Interpret the MCD to:

    a. Not bar the City's attorneys from reviewing files of First Amendment investigations because the file is in the possession of police department employees who perform the internal audit; and

    b. Not bar the City from producing such files to Plaintiffs' counsel; and

(4) Permit discovery on the issues relating to the basis and manner of the investigation of the First Amendment activities of Petitioner AFSC and, in particular, order the City to produce all documents relating to said investigation.

**Discussion**

## I. Investigation of the AFSC's First Amendment Activities

1.     Plaintiff AFSC is a Nobel Peace Prize-winning international organization dedicated to securing peace and social justice throughout the world.

2.     From November 7, 2002 until November 9, 2002, the City of Chicago hosted the Trans-Atlantic Business Dialogue ("TABD").

3.     Plaintiff AFSC intended to engage in lawful, non-violent expressive activities in conjunction with the TABD, including but not limited to a peaceful march on the streets of Chicago.

4.     To that end, members of the AFSC staff met with officers of the Chicago Police Department, including the General Counsel, on or about October 24, 2002 and November 6, 2002, for the purpose of making arrangements for a lawful, non-violent parade to be staged in the Chicago Loop on November 7, 2002.

5.     On December 1, 2003, the Chicago Police Department ("CPD") completed its 2002 annual internal audit of the CPD's implementation of and compliance with the First Amendment Judgment Order and the MCD concerning investigations directed toward the exercise of First Amendment rights. [2002 Audit, relevant portions, attached as Exhibit B].

6.     Pursuant to the MCD, the 2002 Audit was made public by filing with this Court on February 9, 2004.

7.     The internal audit states that the CPD Intelligence Section ("Intelligence") had conducted Investigation 193-2002-01. Based on the file submitted to the auditor, Investigation 193-2002-01 was an investigation into protest activity associated with the TABD.  As part of this investigation, Intelligence infiltrated several organizations, including AFSC, by sending

5

undercover Intelligence officers to meetings, rallies, and/or fundraisers. Moreover, the infiltrating officers participated in small group sessions organized by AFSC and attended by AFSC staff during which the bulk of the planning and development of the First Amendment protest activities associated with the TABD took place. AFSC did not invite government agents to attend these meetings and at all times reasonably considered staff communications to be confidential to the non-governmental persons attending the sessions. At no time during these small group planning sessions did the infiltrators reveal their identities as police officers. See Exhibit B, 2002 Audit, relevant portions, at pp. 27-30, 54-58.

8.     Although past CPD audits of First Amendment compliance have noted the existence of First Amendment investigations, none of the past audits ever disclosed the identity of any organization or individual that was the subject of the First Amendment investigations.

9.     As a result of the court filing of the 2002 Audit, the AFSC was expressly revealed to be the subject of a police investigation, including the use of undercover agents. See, eg.— Frank Main, Police Infiltration of Protest Groups Has Civil Rights Activists Fuming, Chicago Sun-Times, February 19, 1994, at p. 26, attached hereto as Exhibit C. As a consequence, the AFSC has been stigmatized and harmed in its future association with individuals and other organizations.

II.     **The Irregularities of the AFSC Investigation**

10.     After completing its review of Investigation 193-2002-01, the CPD's internal auditor expressed a number of concerns about the manner in which the investigation was conducted. See Exhibit B, 2002 Audit, at pp. 27-30, 55-58.

11.    Pursuant to the then-existing (and subsequently superceded) General Order 02-10 regarding First Amendment intelligence gathering, which implements the MCD, officers initiating a First Amendment-related investigation must complete and prepare a First Amendment Worksheet describing the basis, purpose, and methods of the investigation. [Former General Order, Addendum 1A, at p. 10, attached hereto as Exhibit D]

12.    From its review of the investigative file, the auditor determined that Intelligence had failed to properly document the basis, purpose, and methods of the investigation on the First Amendment Worksheet. See Exhibit B, 2002 Audit, relevant portions, at p. 28.

13.    The auditor also found that the First Amendment Worksheet in the file did not have supporting documentation and failed to identify the source of information relied upon to justify the investigation. Similarly, the auditor further found that there was no evidence that an organization named Chicago DAN – the only group expressly identified in the worksheet for investigation – intended to engage in unlawful conduct. See Exhibit B, 2002 Audit, relevant portions, at pp. 28, 55-57.

14.    Importantly, the auditor noted that although Chicago DAN was the only group approved in writing to be investigated, personnel assigned to the Intelligence Section investigated groups other than Chicago DAN in preparation for the TABD, including the AFSC, in an undercover capacity. Moreover, the auditors stated that no documentation had been provided identifying the legitimate police purpose served by investigating the other groups, including the AFSC, and that there was no evidence that the other groups intended to engage in any unlawful conduct. See Exhibit B, 2002 Audit, relevant portions, at pp. 55-56.

15.    Although the General Counsel for the Superintendent had recommended that the Intelligence Section conduct further investigation to justify the infiltration – including attempting

overt communication with the group, establishing that the group was engaged in unlawful activity, documenting the presence of the group at public gatherings, substantiating the group meetings are not public gatherings, and establishing the group's relationship to other groups intent on breaking the law for police – the auditor found no indication that the recommendations for further investigation were carried out. See Exhibit B, 2002 Audit, relevant portions, at p. 56.

16.     The auditor expressed concern about the role the infiltrating officers played in the TABD small group planning sessions. The auditor indicated that nothing in the reports reviewed by the auditors demonstrated the infiltrators did not participate in the planning of the TABD protests and, moreover, the officers' participation in small group planning sessions could be construed as an effort by the CPD to inhibit, interfere with or redirect First Amendment conduct. The auditor concluded that the documentation in the file failed to articulate minimization procedures to be used in the investigation to ensure that the investigation did not disrupt or interfere with First Amendment conduct and to articulate the justification for the use of undercover attendance of protest preparation meetings, as required to do so pursuant to General Order 02-10. See Exhibit B, 2002 Audit, relevant portions, at p. 28-29, 56-57.

17.     The auditor concluded the infiltration took place without written authorization by the Superintendent, despite the fact that General Order 02-10 requires such an authorization. See Exhibit B, 2002 Audit, relevant portions, at p. 29.

18.     The auditor further determined the Intelligence Unit had failed to provide the General Counsel with periodic progress reports or any other materials generated in connection with the investigation, as required under General Order 02-10, preventing the General Counsel from effectively monitoring the investigation for compliance with the MCD and Department directives. See Exhibit B, 2002 Audit, relevant portions, at p. 29.

19.     The auditor observed the Investigation 193-2002-01 file contained a box of 12 VHS tapes, 42 8 mm tapes, 19 DVD+R discs and 1 CD+R disc.  All of the filming reviewed by the auditor depicted public gatherings taking place on the public way.  Despite the fact that General Order 02-10 requires filming or photographing at a public gathering to be approved by a unit commanding officer of exempt rank, the auditor found no documentation of an exempt member's authorization.  See Exhibit B, 2002 Audit, relevant portions, at p. 55.

20.     Although the General Counsel for the Superintendent submitted a statement to the auditors that the Superintendent of Police did not approve any infiltrations, the auditor was informed that the General Counsel to the Superintendent, the Chief, and the Deputy Chief of the Organized Crime Division had a meeting during which it was decided that meetings of Chicago DAN and other groups working in cooperation with Chicago DAN, including the AFSC, could be infiltrated.  See Exhibit B, 2002 Audit, relevant portions, at pp. 57-58.

21.     (A)     Notwithstanding all of the irregularities and concerns of the auditor as stated above, the audit concludes, apparently solely on the basis of an interview with the commander of the Intelligence Section, that the investigation complies with the MCD.  See, Exhibit B, 2002 Audit, relevant portions, at pp. 57-58.

However, some of the more critical explanations and purported justifications for initiating and conducting the intrusive infiltration and investigation of the AFSC appear to be without documentary support, despite representations that such documents should have existed.  See Exhibit B, 2002 Audit, relevant portions, p. 57 ("the General Counsel to the Superintendent would document the agreed change in policy with a note to the file") and id. at p. 58 ("The officers were debriefed immediately following each meeting by a supervisor who was required to submit a report to the commander within 24 hours.").

9

(B)     Additionally, there is insufficient explanation for the infiltration of the AFSC in light of the fact that this long-established peaceful organization was contemporaneously involved in face-to-face discussions with the CPD and its General Counsel. AFSC has always been truthful and straightforward in all of its dealings with governmental authorities.

(C)     Finally, not only did the investigation fail to conform to the documentation requirements of the original General Order and the oral modification of the order as reported by the commander of the Intelligence Section (See Exhibit B, 2002 Audit, relevant portions, pp. 57-58), but as set forth below, the investigative file itself has now been fully or partially destroyed without sufficient justification and no documentation.

(D)     In view of these circumstances, plaintiffs submit there is sufficient basis to allow for discovery into the adequacy and nature of the basis for as well as the scope of the investigation and infiltration of plaintiff AFSC.

III.    **The Improper Destruction (or "Partial Destruction") of the First Amendment Investigative File, and the City's Position that the MCD Bars Review of the File by Defense Counsel and Release of the Investigative File to Plaintiffs' Counsel**

22.     On February 19, 2004, Michael McConnell, Regional Director of Plaintiff AFSC, sent a letter to Police Superintendent Cline regarding the investigation and infiltration of the AFSC in relation to the TABD. In his letter, McConnell requested the release of all information pertaining to the surveillance operation of his organization. [2/19/04 letter, attached as Exhibit E].

23.     On April 12, 2004, Sheri Mecklenburg, General Counsel to the Superintendent, replied to McConnell's letter. Although the General Counsel did acknowledge the existence of

documentation relevant to the AFSC investigation, she did not respond to McConnell's request for release of the documents. [4/12/04, letter attached as Exhibit F].

24.     On July 14, 2004, counsel for plaintiffs wrote to Assistant Corporation Counsel ("ACC") Sharon Baldwin and requested the production of all documents, including audio and video records, relating to the CPD's investigation concerning the AFSC, its officers, agents, or employees.

25.     After failing to receive a response from ACC Baldwin, counsel for plaintiffs sent a follow-up request for the release of information on August 3, 2004.

26.     In late August or early September, ACC Tom Forgue contacted counsel for plaintiffs and stated that he was new to the case, and was looking into the matter.

27.     On October 26, 2004, ACC Forgue left a message on the voicemail of plaintiffs' counsel. In that message, ACC Forgue indicated that he had sent all of the information regarding the AFSC's requests for information to a sergeant at CPD on September 10, 2004. ACC Forgue also indicated that the sergeant would be out of the office until November 1, 2004, but that Forgue would follow up with the sergeant at that time.

28.     Counsel for plaintiffs received a subsequent phone message from ACC Forgue in December 2004. The message was confusing regarding whether any documents relating to the AFSC investigation continued to exist.

29.     On January 11, 2005, plaintiffs' counsel wrote ACC Forgue and stated his intention to seek a remedy from the Court if counsel did not receive responsive materials or a formal response from the City. Counsel for the Plaintiffs noted that six months had passed since his initial request for materials. [1/11/05 letter, attached as Exhibit G]

30.     On January 20, 2005, ACC Forgue left another message on the voicemail of plaintiffs' counsel. During that message, ACC Forgue indicated that the information sought by plaintiffs had been destroyed pursuant to a police order.

31.     On February 2, 2005, ACC Forgue left another message on the voicemail of plaintiffs' counsel. In that message, ACC Forgue indicated that he had learned that one of the police department internal auditors had "at least parts of the paper portions of that audit." ACC Forgue did not, however, produce those materials to plaintiffs' counsel.

32.     Finally, on February 4, 2005, ACC Forgue sent a letter to counsel for Plaintiffs, stating that an attorney representing the City in the unrelated case of **Vodak, et. al. v. City of Chicago**, Case No. 03 C 2463 (N.D. Ill.), had discovered a portion of the Investigation File 193-2002-01 in the possession of a police auditor who worked on the 2002 Audit. However, ACC Forgue refused to examine or produce the documents to counsel for the Plaintiffs, stating his belief that to do so would result in a violation of the MCD. [2/4/05 letter, attached hereto as Exhibit H]. Notwithstanding ACC Forgue's expressed concerns, on information and belief, the City has recently turned over to the attorneys for the plaintiffs in the Vodak case, a copy of the newly discovered portion of Investigative File 193-2002-01.[4]

33.     Attached to ACC Forgue's letter dated February 4, 2005 was an October 22, 2004 letter from an attorney, Terrance Sheahan, a private attorney representing the City in Vodak to plaintiff's counsel in that case. See Exhibit H, Sheahan correspondence, at pp. 3-4. In his letter, Sheahan states that the Investigation File 193-2002-01 had been destroyed on or about September 2003. In detail, Shehan reports that "soon after" a meeting between a CPD internal auditor, Inspector Donald J. O'Neil, and Constantine Andrews, Commander of CPD's

---

[4] Magistrate Judge Nolan, over the City's objection, ordered the production of First Amendment Investigations relating to plaintiffs in Vodak by order dated September 8, 2004, attached as Exhibit I.

Intelligence Section concerning Investigative File #193-2002-01, a sergeant in the Intelligence Section, Sergeant Biefldt, requested that Andrews approve destruction of the investigative file. Andrews is reported by Sheahan to have authorized destruction of the file (with the exception of the three documents attached to the Sheahan letter, Exhibit H, pp. 5-7). However, according to Sheahan, the document requesting the authorization for destruction could not be located by CPD and Sheahan does not address the existence of any records documenting the order for destruction or the actual destruction of the file. Sheahan also states that the file was destroyed pursuant to General Order 02-10 Addendum 1A Section (H)(2)(a). See Exhibit H, Sheahan letter, at pp. 3-4. That revised General Order requires that both the order for destruction of files and the actual destruction be documented. [Attached as Exhibit J, Amended General Order 02-10 Addendum 1A, Section VI, H.2.b. and c.1].

34.     However, Sheahan also attached to his letter to counsel in Vodak, three pages of documents from Investigation File 193-2002-01, which ACC Forgue, in turn, forwarded to counsel for the AFSC and the ACLU. Thus, counsel for the City has already produced documents from Investigation File 193-2002-01 to Petitioners.

35.     In his letter to counsel in Vodak, Sheahan included a copy of revised General Order 02-10 which regulates investigations directed at First Amendment-Related Intelligence. See Exhibit J, Amended General Order Addendum 1A. General Order 02-10 was revised in September 2003, the same month in which the CPD internal auditors interviewed officers in the Intelligence section about Investigation File 193-2002-01, and also the same period during which Investigation File 193-2002-01 was destroyed.

36.     Prior to revision, General Order 02-10 Addendum 1A, provided that copies of all reports, files, or other materials generated in connection with any investigation directed toward

13

First Amendment-related intelligence would be maintained in the unit from which the investigation originated or, if the investigation was transferred to another unit, by the unit which conducts the investigation for a period of ten years. <u>See</u> Exhibit D, Former General Order 02-10, Addendum 1, at p. 11.

37.    Under the Revised General Order 02-10 Addendum 1A, the Intelligence Section is responsible for the analysis of all materials generated in investigations directed at First Amendment-related intelligence. Pursuant to the revised regulations, the Intelligence Section will return materials deemed to have "no First Amendment relationship" to the unit of creation. After return of the materials, the Revised General Order only requires the unit of creation consult with members of the Education and Training Division to determine if they may be suited for training purposes. <u>See</u> Exhibit J, Revised General Order 02-10, Addendum 1A, Section VI, H.2.a. at p. 13. The Revised General Order neither commands nor prohibits the destruction of materials deemed to have "no First Amendment relationship."

38.    Pursuant to the Revised General Order 02-10 Addendum 1A, if the Intelligence Section determines materials generated in investigations directed at First Amendment-related intelligence have a "First Amendment relationship" but no "continuing police purpose," the materials are to be destroyed and the destruction order and documentation of actual destruction must be retained for five years. <u>See</u> Exhibit J, Revised General Order 02-10, Addendum 1A, Section VI, H.2.6 at p. 13.

39.    Pursuant to the Revised General Order 02-10 Addendum, materials deemed to have both a "First Amendment relationship" and a "continuing police purpose" are to be retained for a period not to exceed five years and are subject to periodic review, on pain of destruction, if they no longer have a "continuing police purpose." Both the destruction order and the actual

destruction are to be documented.  See Exhibit J, Revised General Order 02-10, Addendum 1A, Section VI, H.2.c. at 13.

40.     On its face and as applied by the City in reference to Investigative File 193-2002-01, the current General Order 02-10 does not require that even those files identified by the Chicago Police Deaprtment itself as First Amendment investigations be retained for regular review by independent auditors who are to perform an audit for compliance as required by the MCD.  Destruction of such files prior to audit violates the MCD in that it obstructs and prevents the Court from obtaining a complete and accurate assessment of the City's compliance with the MCD.

41.     Under the identical audit requirement in the original decree, the City always had preserved records of approved First Amendment investigations for audit by the external auditors.

42.     Plaintiffs seek access to Investigation File 193-2002-01, or what remains of the file, in an effort to:

    (a)     Determine whether the investigation of plaintiff AFSC violated the MCD; and

    (b)     Ameliorate the harm done to the reputation and standing of plaintiff AFSC, and demonstrate:

        a.    Plaintiff AFSC was subjected to investigation and infiltration without a sufficient basis;

        b.   there was no finding that Plaintiff AFSC was guilty of any wrongdoing; and

c. AFSC engaged in no conduct which would provide a lawful basis for continued or future infiltrations and investigations, which would deter others from prospective association with Plaintiff AFSC.

## IV. The MCD Does Not Prohibit Disclosure of Investigation File 193-2002-01 to counsel for the City or Plaintiffs' Counsel

43. As a review of the MCD demonstrates, contrary to ACC Forgue's assertions, the MCD does not prevent counsel for the City of Chicago from either reviewing the documents in question, or producing the documents to Plaintiffs' counsel. The only limitation on the disclosure of information articulated in the MCD may be found in paragraph 5 of the MCD and specifically concerns the external audit performed by a national independent public accounting firm; as such, the substance of that paragraph is inapplicable to internal audits conducted by the CPD and its own auditors. See, supra, note 1 and MCD, Exhibit A, at ¶ 5.

44. Furthermore, a review of paragraphs 3 and 4 of the decree, which dictate the manner in which the City of Chicago must conduct its annual internal audits, reveals no similar prohibition regarding disclosure of information in the hands of a member of the CPD Audit division to either an original named plaintiff or to an Assistant Corporation Counsel, or other counsel acting on behalf of the City.

45. Finally, an interpretation of the MCD that would prohibit counsel for the City from reviewing the documents would prevent counsel for the Defendant from ensuring the Defendant is in compliance with the MCD, and from advising the Defendant of the propriety (and legality) of its actions. Such a result is not found, nor intended by, the terms of the MCD.

## V. **Violations and Potential Violations of the Decree**

46.     The above-stated conduct of the City of Chicago violates the MCD in that the public identification of the AFSC as a subject of investigation stigmatized AFSC, interfering with its future protected First Amendment activities.   Furthermore, the destruction or partial destruction of the documents pertaining to the investigation of the AFSC prior to examination of the documents by external auditors violates the MCD because it prevents this Court from obtaining a full and adequate independent audit of the Defendant City of Chicago's compliance with the MCD.  In addition, the newly codified policy permitting the destruction of records of First Amendment investigations prior to review by independent officers violates the MCD by facilitating incomplete future audits.  Finally, the conduct of the Defendant City of Chicago indicates that it may have violated the MCD by engaging in an investigation of Plaintiff without a sufficient basis and in an overly intrusive manner in violation of the Decree.

47.     The Retention of Jurisdiction provision of the MCD provides that the Court retains jurisdiction "[t]o enable the parties to the Decree to apply to this court for the enforcement of compliance with the provisions contained herein, and for the punishment of any violation of such provisions."  This provision also requires that seven days' prior notice of any enforcement action be given to the City.  Plaintiff provided the City such notice by correspondence on February 18, 2005.

WHEREFORE, Plaintiffs respectfully request that the Court:

(1)     Declare that the City has violated the Modified Consent Decree by:

   a.     publishing the identity of AFSC as the subject of an intelligence investigation, and

b.      intentionally destroying the investigative file concerning Petitioner AFSC, and

    c.      promulgating a General Order allowing destruction, before audit, of First Amendment investigations;

(2)     Enjoin Defendant from:

    a.      publishing to third parties in the absence of compelling justification the names of subjects of First Amendment investigations, and

    b.      destroying documents of First Amendment investigations prior to the internal and independent audit required by the MCD and order Defendant to amend General Order 02-10 accordingly;

(3)     Interpret the MCD to:

    c.      Not bar the City's attorneys from reviewing files of First Amendment investigations because the file is in the possession of police department employees who perform the internal audit; and

    d.      Not bar the City from producing such files to Plaintiffs' counsel;

(4)     Permit discovery on the issues relating to the basis and manner of the investigation of the First Amendment activities of Petitioner AFSC and, in particular, order the City to produce all documents relating to said investigation;

(5)     Provide any and all additional relief as may be appropriate; and

(6)     Award plaintiffs reasonable attorney fees, costs and expenses.

Respectfully submitted,

AMERICAN CIVIL LIBERTIES UNION and
AMERICAN FRIENDS SERVICE COMMITTEE

April 25, 2005                   By: _____

One of their attorneys

Harvey Grossman
Adam Schwartz
Shannon P. Bartlett
Roger Baldwin Foundation of ACLU, Inc.
180 N. Michigan Avenue
Suite 2300
Chicago, Illinois 60601
(312) 201-9740

Edward W. Feldman
Jennifer Smiley
Miller, Shakman & Hamilton, LLP
180 North LaSalle Street, Suite 3600
Chicago, Illinois 60601
(312) 263-3700

EXHIBIT A

Alliance to End Repression v. City of Chicago, No. 74 C 3268

American Civil Liberties Union v. City of Chicago, No. 75 C 3295

## MODIFIED CONSENT DECREE

### STATEMENT OF JURISDICTION

This court has jurisdiction over the parties to these consolidated cases and over the subject matter of these actions pursuant to 28 U.S.C. §1331 and 1343(3).

### STATEMENT OF PRINCIPLES

1. The First Amendment of the United States Constitution protects the rights of every person to freedom of speech, press, assembly, petition, and religion, including, without limitation, the rights to hold, communicate and receive ideas and beliefs, to speak and dissent freely, to associate for the advancement of litigation, to write and publish, to advocate and organize concerning public policy and social issues and to associate publicly and privately with other persons concerning political and social issues. These rights are subject to reasonable time, place, and manner regulations supported by an appropriate governmental interest, and, with a few exceptions, conduct that is forbidden without reference to whether it is being used for expression may be forbidden even when used for the purpose of expression.

2. The Fourth Amendment of the United States Constitution protects the rights of every person to be secure in person, house, papers and effects against unreasonable searches and seizures, including the right to be secure in communications which are engaged in with a reasonable expectation of privacy. This Amendment protects the innocent and the guilty alike against government intrusion not justified by an appropriate governmental interest or function.

3. The Fourteenth Amendment guarantees to every person equal treatment under the law unless an appropriate governmental interest justifies a difference in treatment.

### INJUNCTION

The City of Chicago, its officers, employees, and agents, and all persons in active concert or participation with them who receive actual notice of this Decree, are hereby enjoined as follows:

1. No agency or agent of the City of Chicago shall

    a) investigate, prosecute, disrupt, interfere with, or harass any person for the purpose of punishing or retaliating against that person for engaging in conduct protected by the First Amendment, or for the purpose of preventing them from engaging in such conduct, although nothing in this Decree shall enjoin reasonable investigative or law enforcement activities that are permitted by the First Amendment;

    b) discriminate against any person on the basis of their conduct protected by the First Amendment, except as may be permitted by law;

    c) authorize, assist, or encourage any person to violate this Decree, or to commit an act that would violate this Decree if committed by a City agent.

2. All current employees of the City of Chicago, and all future employees at the time of their hiring, shall be served with a copy of this Decree.

3. In each of the next five years, the Superintendent of Police shall conduct a departmental audit of the Police Department's compliance with this Decree, and submit copies of the audit report to the Mayor, the Police Board, and this court for

filing as a public record. The annual report shall include a summary of any internal disciplinary complaints concerning compliance with this Decree and the findings made and the actions taken on such complaints.

4. The Chicago Police Board shall review the Superintendent's audit annually, and may request such additional information as it deems necessary to monitor compliance with this Decree, and shall report to the Mayor, the Superintendent of Police, and the public concerning its findings.

5. The Chicago Police Board shall also cause an audit of the City's compliance with the terms of this Decree to be performed by a national independent public accounting firm within five years of the entry of the order adopting this modified Decree. The audit report shall contain a description and evaluation of any conduct believed by the auditors to constitute a probable violation of the Decree. The Police Board may require further investigation of any such possible violations. The audit report, together with any additional findings or recommendations made by the Board, the Superintendent of Police, or the Mayor shall be made public. For the purpose of these audits, or for any other investigation that the Board may wish to conduct to investigate compliance with this Decree, the Board and the auditors engaged by the Board shall have access to all relevant data in the possession of the City except that the auditors shall not have access to information specifically identifying confidential informants or to current criminal investigations that the Superintendent of Police states might be compromised by disclosure to the auditors. The auditors shall not disclose any information to anyone but the Board, the Superintendent of Police, or (upon his request) the Mayor. The Board shall not disclose in any manner details that specifically identify any investigations except as otherwise permitted by law, nor shall it disclose in any manner information that would reveal the identity of a confidential informant, compromise an ongoing criminal, regulatory, or employee disciplinary investigation, or constitute an invasion of a person's privacy.

6. If the Board, the Superintendent of Police, or the head of any other City Department learns of any probable substantial violation of this Decree, the matter shall be promptly referred to the Superintendent of Police (or, if the matter involves personnel of a City agency other than the Police Department, to the Inspector General). The Superintendent of Police or the Inspector General, as the case may be, shall cause an investigation to be made and shall report to the Board, the Superintendent, and the head of the agency who made the report the results of the investigation. Where the result of the investigation supports the finding of a violation, the Superintendent or other agency head shall in turn report to the Board what corrective action has been taken, including what disciplinary proceedings have been instituted or completed.

## RETENTION OF JURISDICTION

The court expressly retains jurisdiction to enable the parties to the Decree to apply to this court for the enforcement of compliance with the provisions contained herein, and for the punishment of any violation of such provisions. Application to enforce the provisions or to impose punishment for any such violation may be presented to the court by any person affected by the conduct complained of. Prior written notice of all such applications shall be given to counsel for the named parties to this action. Except where emergency relief is sought, seven days written notice shall be given.

## TERM OF DECREE

Upon completion of the independent audit called for in this order, and its submission to the court, the court will consider whether further modification or dissolution of this Decree is warranted at that time.

END OF TEXT OF MODIFIED CONSENT DECREE

The First Amendment and Police Actions

# EXHIBIT B

# AUDIT 2003-1



## 2002 Annual First Amendment Compliance Audit

## EXECUTIVE SUMMARY

The audit team examined thousands of documents and interviewed command, supervisory and operational personnel. These efforts were directed toward determining the degree of compliance with the modified Consent Decree.

The examination has identified weaknesses in certain procedures and, in certain instances, noncompliance with Department directives. Although the documented practices do not violate the modified Consent Decree, these practices could contribute to a violation of the Decree.

## TRANS-ATLANTIC BUSINESS DIALOGUE (TABD)

In 2002 the City of Chicago hosted the Trans-Atlantic Business Dialogue (TABD). The presence of world business leaders and the threats of protesters to disrupt the Dialogue established the need for an intelligence gathering investigation. The Intelligence Section requested authorization to conduct a First Amendment-related investigation. The General Counsel to the Superintendent determined that the investigation was appropriate. The examination of Intelligence Section records and the General Counsel's investigative file revealed numerous violations of Department directives.

## NOTICE TO ALL EMPLOYEES

The Personnel Division has instituted procedures to ensure that all current employees and all future employees at the time of their hire are served with a copy of the modified Consent Decree. The Personnel Division documents the service of the modified Consent Decree with a sworn affidavit which serves as a receipt to be maintained in personnel jackets. The audit indicates that documentation of the service of the modified Consent Decree is available for sixty percent of Department employees. The remaining affidavits have not been returned to the Personnel Division.

## CRIMINAL SURVEILLANCE VEHICLE

The Information and Strategic Services Division is responsible for the operation of the Criminal Surveillance Vehicle (CSV). The Division has failed to establish a Standard Operating Procedure (SOP) and is currently operating under a proposed draft. The proposed SOP fails to establish how requests for the deployment of the CSV are documented, filed and retained. There are no records available for examination to indicate where the CSV was deployed, who authorized the deployment and what legitimate police purpose was served.

# CHAPTER V

## OFFICE OF THE SUPERINTENDENT OF POLICE

### General Counsel to the Superintendent

### Internal Affairs Division

# OFFICE OF THE SUPERINTENDENT
## Superintendent of Police

The Superintendent of Police is the chief executive officer of the Chicago Police Department. He is appointed by the Mayor upon recommendation of the Police Board and with approval from the City Council. The Superintendent is responsible for the general management and control of the Police Department and maintains full authority to direct the Department governed by the ordinances of the City, the laws of the State, and the rules and regulations of the Police Board. The Superintendent retains the ultimate authority for the approval of all investigations directed toward First Amendment-related intelligence. The Superintendent personally approves or denies any infiltration request.

In a letter dated July 25, 2003, the Superintendent reported that for the year 2002 one First Amendment Investigation was approved. The approved investigation was initiated by the Intelligence Section on October 13, 2002 in anticipation of the Trans-Atlantic Business Dialogue (TABD). This investigation was assigned a tracking number of Investigation 193-2002-01. According to the Superintendent's General Counsel, the Superintendent did not approve any infiltrations for the year 2002.

## General Counsel to the Superintendent

The General Counsel to the Superintendent advises the Superintendent about legal and legislative matters and various labor agreements as they relate to the administration of the Department. The General Counsel also serves as the liaison among the Department, legislative bodies and other agencies.

In addition, according to General Order 02-10, The First Amendment and Police Actions,

The General Counsel will review all submitted First Amendment Worksheets and indicates either a concurrence or non-concurrence with the investigation. If the General Counsel does not concur with the authorization of an investigation directed at First Amendment intelligence-gathering, the General Counsel will document the reasons for such non-concurrence in a To-From-Subject report directed to the appropriate Deputy Superintendent and/or the Superintendent.

The General Counsel receives periodic progress reports and all other reports generated in connection with the investigation. The General Counsel provides advice to the Superintendent regarding the compliance of such investigations with the modified Consent Decree and related Department directives.

## EXAMINATION:

To ensure a comprehensive review of any First Amendment investigation, all original First Amendment Worksheets and subsequent related reports forwarded to the General Counsel for determination were examined.

## FINDINGS:

The auditor reviewed the sole file, Investigation 193-2002-01, submitted by the Intelligence Section, which contained one First Amendment Worksheet and one To-From-Subject report. The examination raised the following six (6) issues:

1. The First Amendment Worksheet does not properly document the basis, purpose and methods of the investigation. The worksheet indicates that TABD is similar to the International Monetary Fund (IMF) and that the IMF protests led to property damage, obstruction of traffic and multiple arrests. There is no basis given to reach the conclusion that TABD is similar to IMF. The stated purpose of preventing threat to safety of all persons involved and assorted properties is not supported by documentation beyond the writer's contention.

2. The First Amendment Worksheet does not have supporting documentation and fails to identify the source of information relied upon to justify the investigation. There is no evidence that the Chicago DAN (Direct Action Network) group has specifically addressed a need to incorporate illegal tactics and guerilla tactics during protests against the TABD. The First Amendment Worksheet lacks the required substantiation to support this conclusion.

3. The First Amendment Worksheet does not articulate the justification for Level II Investigative Techniques. There is a description of the Level II technique of "undercover attendance of protest preparation meetings," but there is no justification for undercover methods.

These findings are based on General Order 02-10, The First Amendment and Police Actions, which establishes the procedure for initiating an investigation directed toward First Amendment-related intelligence gathering.

Department General Order 02-10, Addendum 1, Investigations Directed At First Amendment-Related Intelligence, Item VI-A-1-a, states in relevant part:

> Any sworn member may initiate and conduct an investigation which is known or suspected to be directed toward First Amendment-related intelligence, without prior exempt Department member approval, by notifying a supervisor, for a period not to exceed 24 consecutive hours from the time the investigation started. The initiating member will notify his or her unit commanding officer of exempt rank of the initiation of such investigation by submitting a To-From-Subject report as soon as possible but no later than 24 hours from the initiation of the investigation. The To-From-Subject report will be addressed to the Superintendent of Police, Attention: General Counsel, and will contain an approval line for the member's district or unit commanding officer. The report will contain the following information:

(2) the basis, purpose, and methods of the investigation, including the source of the information which prompted the investigation, and the anticipated use of any Level II investigative techniques;

4. The request on the First Amendment Worksheet for undercover attendance at protest meetings constitutes an infiltration. General Order 02-10, The First Amendment And Police Actions, provides the following definition:

Infiltrator - An infiltrator is an informant or authorized Department member who is, poses or acts as a member or participant in a group or organization without disclosing to the group or organization or to its members his or her function as an agent.

The General Order does not differentiate between an undercover officer and an infiltrator. The roll of the undercover officer in this investigation can only be construed as an infiltrator. The Superintendent did not authorize an infiltration.

5. The First Amendment Worksheet fails to articulate minimization procedures to be used in the investigation and fails to identify steps taken to ensure that the investigation does not disrupt or interfere with First Amendment conduct.

This finding is based on General Order 02-10, Addendum 1, Investigations Directed At First Amendment-Related Intelligence, Item II- F, which defines "Minimization Procedures."

Minimization procedures are reasonable precautions taken to ensure a proportionate response to a perceived threat which will not be likely to materially impair the success of the investigation but which will avoid interfering with the rights of all individuals, groups, and entities to speak, worship, write, and otherwise communicate free from governmental interference. Minimization procedures will be employed in all investigations directed toward First Amendment-related intelligence and the need to minimize governmental interference will be considered in such decisions as selecting an investigative technique, when disseminating information, and when retaining intelligence data.

6. The file labeled Investigation193-2002-01, maintained by the General Counsel, does not contain periodic progress reports or any other materials generated in connection with the investigation. An interview with the General Counsel indicates the reports were not forwarded by the Intelligence Section as required. The failure of the Intelligence Section to provide the General Counsel with the reports prevents the General Counsel from effectively monitoring the investigation for compliance with the modified Consent Decree and Department directives.

This finding is based on General Order 02-10, Addendum 1, Investigations Directed at First Amendment-Related Intelligence, Item VI- B- 6, which identifies the responsibility of the unit commanding officer of exempt rank as it relates to report protocol.

Department General Order 02-10, Addendum 1, Investigations Directed At First Amendment-Related Intelligence, Item VI- B- 4 reads in relevant part:

Upon determining that the investigation will be authorized, the unit commanding officer of exempt rank will:

c. prepare a First Amendment Worksheet report describing the basis, purpose, and methods of the investigation.

e. attach copies of the initiating member's report to the First Amendment Worksheet.

f. forward these reports and copies of any other reports or materials generated in connection with the investigation to the Superintendent, Attention: General Counsel in a sealed file by messenger.

and Item VI- B- 6- c, which reads in relevant part:

The unit commanding officer of exempt rank will forward:

(1) originals of all First Amendment Worksheets and periodic progress reports to the General Counsel to the Superintendent.

**CONCLUSION:**

The records maintained by the General Counsel to the Superintendent concerning First Amendment Investigation 193-2002-01 indicate certain procedures delineated in General Order 02-10 were not followed. However, the investigation is in compliance with the modified Consent Decree.

# Organized Crime Division

## Intelligence Section

## Narcotics and Gang Investigation Section

## Vice Control Section

The Organized Crime Division (OCD) is commanded by a chief who reports directly to the Deputy Superintendent, Bureau of Investigative Services. A deputy chief assists in managing the Division's functions and reports directly to the Chief of the OCD. This Division initiates and conducts investigations of certain types of organized crime and possible terrorist activity. It provides information and investigative assistance to all units of the Department and to outside agencies.

## Intelligence Section

The Intelligence Section of the Organized Crime Division, commanded by a commander, has the responsibility for conducting investigations of any individual, group or organization reasonably believed to be engaging in criminal or terrorist activity. This Section gathers, evaluates and disseminates this information in accordance with Department directives, constitutional protections and statutory requirements.

The Analytical Unit provides staff assistance to the commander of the Intelligence Section by ensuring an orderly flow of information to the other subunits of the Intelligence Section. They review, analyze and summarize information developed by tactical or special operations teams. In addition, the unit ensures that information distributed to other Department units and outside agencies is in compliance with Criminal Justice Information Systems Guidelines and the provisions of the modified Consent Decree.

Requests for Intelligence Section information are processed in the Analytical Unit by a sergeant who acts as the verifying officer. The sergeant contacts the agency employing the requester to verify that the information requested is needed in a criminal investigation. The request is then sent to the Computer File Unit where the information is retrieved and forwarded to the Analytical Unit for dissemination.

Requests by mail from authorized agencies are answered on official Chicago Police Department stationery or directly faxed with the commander's signature. The response is addressed to the head of the requesting agency with "attention" to the requester. The request letter and response are forwarded to the Computer File Unit for processing. Dissemination bears the following notation:

The information contained herein is the property of the Chicago Police Department and is deemed confidential. It is provided for the purpose of law enforcement only and is not to be disclosed to any person or organization outside of your agency

without the prior approval of the Superintendent, Chicago Police Department, and if the information relates to First Amendment conduct it must be destroyed or returned when no longer needed.

When information is developed, which could aid in the prevention of a crime or the apprehension of a person who has committed a crime outside the jurisdiction of the Chicago Police Department, it is transmitted to the law enforcement agency having jurisdiction either by telephone or in writing. The same policy of command approval and written reply to the Computer File Unit is followed.

The Computer File Unit is located in a controlled access area of the Intelligence Section and the system is designed to restrict access by unauthorized personnel. The unit's hardware consists of "stand alone" computers located within the secure room and contains all the files and backups. There are no external connections utilized by this system.

The Computer File Unit is responsible for the secure storage of approved Intelligence Section information. The unit submits a printed form daily to the commander of the Intelligence Section with an accounting of all activity that took place in the unit during the previous twenty-four (24) hours. This form supplies the time, date and initials of the terminal operator and the names and assignment of the persons requesting information. The forms are filed by date and are retained for five (5) years. In the event no form is submitted (i.e., due to a holiday or computer shutdown), a notation is inserted in the file in place of the absent form to account for that date. This file is stored in a locked cabinet in the Intelligence Section commander's office. The audit source created by this reporting format permits review of inquiries, input, modifications and/or deletions of the data base.

When it is found that the information requested is not in file, the requester is notified by the Analytical Unit and documentation of the request is returned to the Computer File Unit. Requests for information by the news media are referred to an administrative aide who follows the provisions of existing Department directives.

## EXAMINATION:

The audit of the Intelligence Section focused on interviews with command and operational personnel and an examination of file content to ascertain compliance with the modified Consent Decree and General Order 02-10, The First Amendment and Police Actions. The following files and records were examined:

> Cooperating Individual Agreement
> Correspondence Control Log & Files
> Electronic Surveillance Files
> First Amendment Investigation 193-2002-01
> First Amendment Worksheet
> Infiltration Files
> Request for File Information

## Cooperating Individual Agreement

Before gathering information, confidential informants or cooperating individuals must indicate that their participation is voluntary and lawful. The informant must sign a "Cooperating Individual Agreement" (CPD-43.408). This agreement contains nine (9) specific provisions regulating the informant's conduct. These provisions include familiarization with the modified Consent Decree and the prohibition on gathering information relative to First Amendment conduct. The signed agreement then becomes a permanent document in each informant's file.

## Correspondence Control Log & Files

The Correspondence Control Log is a book used to record facsimile messages or written requests for file information from outside agencies. A number is assigned to each of these requests. The results of the searches are listed only as positive or negative.

## Electronic Surveillance Files

Electronic surveillance is used in criminal investigations only. Approval of an Assistant State's Attorney and the proper judicial authority is required. The files are maintained in the commander's office and are retained, with approvals, for three (3) years. Documented First Amendment information or conduct is retained for ten (10) years by the Deputy Superintendent, Bureau of Investigative Services.

## First Amendment Investigation 193-2002-01

The First Amendment Investigation 02-193-001 file contains all records, reports and documents related to the authorized investigation conducted in anticipation of the Trans-Atlantic Business Dialogue (TABD).

## First Amendment Worksheet

The First Amendment Worksheet (CPD- 11.440) was introduced October 25, 2002 by General Order 02-10. This worksheet is prepared by an exempt member to describe the basis, purpose and methods for a First Amendment Investigation.

## Infiltration Files

All investigations involving infiltrations and their respective approvals are maintained in a confidential file in the commander's office and are retained for three (3) years. First Amendment investigations are retained for ten (10) years by the Deputy Superintendent Bureau of Investigative Services.

## Request for File Information

Information maintained in computerized files is only disseminated to law enforcement agencies who identify a specific criminal investigative purpose for the information. Requests for information must be made in person by completing a Request for File Information form (CPD-41.655) or on the official stationery of the requesting agency. The requests are maintained by police period and are stored in the Computer File Unit.

## FINDINGS:

Cooperating Individual Agreement  The entire Confidential Informant/Cooperating Individual Binder was examined. The required agreement which contained a statement prohibiting the gathering of First Amendment related information was found in each file. The agreements were completed and signed. The Confidential Informant/Cooperating Individual Binder is in compliance with the modified Consent Decree and related Department directives.

Correspondence Control Log  There were seven (7) entries. All were examined and reconciled with the corresponding Requests for File Information (CPD- 41.655). There was no First Amendment conduct noted. All were in compliance with Department directives.

Electronic Surveillance Files  There were fifty-four (54) Electronic Surveillance Files. All were examined. There was no First Amendment conduct noted. Each file was criminal in nature and was reviewed and approved by a criminal courts judge. All files were in compliance with Department directives.

First Amendment Investigation 193-2002-01  The file contained a box of twelve (12) VHS tapes, forty-two (42) 8mm tapes, nineteen (19) DVD+R discs and one (1) CD+R disc. A sample was reviewed. All filming depicted public gatherings taking place on the public way. This does not constitute an investigation directed toward First Amendment-related intelligence within the meaning of General Order 02-10. However, the General Order requires that filming or photographing at a public gathering must be approved by a unit commanding officer of exempt rank. There is no documentation of an exempt member's authorization. In addition, several VHS tapes contained audio recording of the protests. General Order 02-10 specifically  provides, "filming and/or photographing of public gatherings shall not include audio recording, unless specifically authorized by the approving command member or court order." There is no record of a court order or authorization by an exempt member.

The First Amendment Worksheet identifies one group to be investigated, Chicago Direct Action Network (Chicago DAN). Auditors discovered documents in file that indicate personnel assigned to the Intelligence Section investigated groups other than Chicago DAN in preparation for the TABD. Officers were assigned to attend meetings, rallies and/or fund raisers of the following self-described organizations, in an undercover capacity:

Not In Our Name - an antiwar group
Anarchist Black Cross (ABC) - an anti-police brutality/anti-prison group
American Friends Service Committee - a group that seeks social justice, peace
and humanitarian service.
The Autonomous Zone (A ZONE) - an anti-authority group oriented toward social
liberation and creative communities.

Auditors were unable to locate supporting documentation to indicate a connection between these organizations and Chicago DAN. No documentation has been provided identifying the legitimate police purpose served by investigating these groups.

General Order 02-10, Addendum 1, Item II-D, defines an infiltrator as "an informant or authorized Department member who, is, poses, or acts as a member or participant in a group or organization without disclosing to the group or organization, or to its members his or her function as an agent."

The presence of undercover officers at meetings of people engaged in First Amendment conduct constitutes an infiltration as defined in the General Order. Auditors discovered a report to the Superintendent from the Intelligence Section requesting an infiltration. The General Counsel to the Superintendent recommended further investigation to justify the infiltration. These recommendations were:

1.      Attempt at overt communication with the group;

2.      Establish the group is engaged in unlawful activity;

3.      Document the presence of the group at public gatherings;

4.      Substantiate the group meetings are not public gatherings;

5.      Establish the group's relationship to other groups intent on breaking the law
        for peace.

There is no indication that the recommendations for further investigation were followed. Instead, the Intelligence Section withdrew their request for infiltration.

Auditors discovered reports submitted by Intelligence Section personnel documenting their undercover attendance at TABD protest planning sessions. Two (2) reports indicate that at such meetings of approximately twenty (20) people, the attendees broke up into small planning groups. In one report, the undercover officer stated:

R/O's were in a smaller group where a subject who identified himself as Jerry acted as the coordinator for the group. During this setting, Jerry asked about how they should go about beginning the protest. The questions asked consisted of where they should start the march. For example, should they start at the Sheraton Hotel,

Boeing Corporation, City Hall or the State of Illinois Building. Also mentioned during this time was, what should the conduct of the protesters be. Where should the march take place, on the sidewalk or the streets. Should they attempt to take the streets and block traffic during rush hour. All this came up during the smaller group meeting but there was no clear answer to any of the questions.

There is nothing in the reports to indicate the undercover officers did not participate in the planning. Participation in small group planning sessions could be construed as an effort by the Chicago Police Department to inhibit, interfere with or redirect First Amendment conduct.

Infiltration Files    According to information received from the commander, there were no infiltration requests in file for the year 2002.

Request for File Information    There were sixty-three (63) requests in file. All were examined. The files did not contain any First Amendment related information.

A personal interview was conducted with the commander of the Intelligence Section. The interview consisted of a review of the audit findings relative to deviations from certain policies and procedures contained in General Order 02-10. The following is a summary of the interview with the commander.

The first issue concerns the inclusion of films, videotapes and other electronic image retention media contained in Investigative File 193-2002-01. The commander related that the filming and videotaping were not conducted by or at the direction of Intelligence Section personnel. All filming and videotaping was conducted by personnel from the Information and Strategic Services Division utilizing the Criminal Surveillance Vehicle. The Intelligence Section is the designated repository for all investigative materials related to the TABD investigation. The commander does not have documentation to indicate which exempt member approved the filming or photographing.

The second issue concerns the manner in which First Amendment Investigation 193-2002-01 was conducted. The commander related that prior to initiating the TABD Investigation, a meeting was held to discuss potential problems and solutions concerning the implementation of General Order 02-10 and its impact on the investigation. The meeting was attended by the General Counsel to the Superintendent, Attorneys from the Office of Legal Affairs, the Deputy Corporation Counsel for Appeals and Constitutional Issues, the Chief and Deputy Chief of the Organized Crime Division, the Commander of Intelligence and members of the Intelligence Section. It was determined that General Order 02-10 needed a number of revisions. One revision clarifies the distinction between an infiltrator and an undercover officer.

The Superintendent was informed of the results of this meeting. As a result, the Commander of the Intelligence Section was instructed by the Superintendent to operate under the agreed to revised policy and that The General Counsel to the Superintendent would document the agreed change in policy with a note to the file. The agreed revisions

are the basis for establishing Addendum 1A which was issued on September 3, 2003.

The third issue concerns the investigation of groups, other than Chicago DAN, included as part of First Amendment Investigation 193-2002-01. The commander related that the groups were identified on the Chicago DAN website as participating in the planned TABD protests. In addition, the associated groups had representatives at Chicago DAN meetings.

At a meeting attended by the Chief and Deputy Chief of the Organized Crime Division and the General Counsel to the Superintendent, it was decided that undercover officers would be assigned to the meetings. The basis for this decision was grounded in the information indicating the other groups were working in cooperation with Chicago DAN. Therefore, the assignment of undercover officers was warranted and consistent with the authorized First Amendment Investigation 193-2002-01.

The final issue concerns the role of undercover officers at small group planning sessions and the possibility that the officers mere presence could be construed as an effort by the Department to inhibit, interfere with or redirect First Amendment conduct. The commander related that the Intelligence Section personnel selected to attend protest planning meetings received First Amendment training. The undercover officers were familiar with the modified Consent decree and General Order 02-10. A supervisor briefed each officer prior to attendance at meetings to ensure that they were cognizant of the limitations imposed on their participation and to ensure they did nothing to inhibit, interfere with or redirect First Amendment conduct. The officers were debriefed immediately following each meeting by a supervisor who was required to submit a report to the commander within 24 hours. The specific actions of the undercover officers were reviewed and discussed at command staff meetings to ensure compliance with the modified Consent Decree.

## CONCLUSION:

The records maintained by the Intelligence Section concerning First Amendment Investigation 193-2002-01 indicate that certain procedures delineated in General Order 02-10 were not followed. The interview of the commander indicates that the deviation from the Order was authorized by the Superintendent with the advice of the General Counsel to the Superintendent and the Deputy Corporation Counsel for Appeals and Constitutional Issues. Investigation 193-2002-01 complies with the modified Consent Decree.

EXHIBIT C

# CHICAGO SUN-TIMES
### suntimes.com

[ Search again ]

**About your archives purchase:** Your purchase of **5** articles expires on **02/16/2005 0:54 PM**. You have viewed **1** articles and have **4** articles remaining.

## Police infiltration of protest groups has civil rights activists fuming

**Author(s):** Frank Main  **Date:** February 19, 2004 **Page:** 26 **Section:** NEWS

Chicago Police officers infiltrated five protest groups in 2002 and launched four other spying operations in 2003 -- actions that civil rights activists are calling outrageous.

The investigations have come in the wake of a court decision that expanded the department's intelligence-gathering powers.

In 2002, undercover officers were assigned to attend meetings, rallies and fund-raisers of the Chicago Direct Action Network, the American Friends Service Committee, The Autonomous Zone, Not in Our Name, and Anarchist Black Cross.

Police zeroed in on the groups because protesters were threatening to disrupt the Trans-Atlantic Business Dialogue -- a meeting of international business leaders held in Chicago in 2002 -- according to an internal police audit obtained by the Sun-Times. The department made video and audio recordings of the protests, the audit said.

The department would not describe what organizations were targeted in 2003.

Ed Yohnka, spokesman for the American Civil Liberties Union, criticized the police for targeting the American Friends Service Committee in 2002.

"We cannot imagine any circumstance that would justify the intrusive infiltration of such a peaceful group, and we hope that the city will open up all of the relevant files related to this matter to explain this disturbing action," Yohnka said.

Michael McConnell, regional director of the American Friends Service Committee, said he was outraged that police infiltrated the anti-war group, founded in 1917.

"What was the officer's participation and did it affect the group?" McConnell asked. "This is a disturbing pattern throughout the country of infiltration of peace groups that are doing nothing more than fulfilling their rights of freedom of speech."

In Denver last year, he noted, the police agreed to investigate only people "reasonably suspected" of criminal activity after American Friends Service Committee members and others wound up in police spy files.

Chicago's new spying activity stems from the 7th Circuit U.S. Court of Appeals decision in 2001 to modify the so-called **Red Squad** consent decree.

The federal decree, which dated to 1982, barred the city from gathering information on suspected terrorist and hate groups because it violated their First Amendment right to free speech.

In 2001, though, Chief Judge Richard A. Posner wrote that the decree "rendered the police helpless to do anything to protect the public." The court approved a modified decree that allows police to snoop on demonstrators and other groups.

"The department has demonstrated compliance with the consent decree on every level," said Sheri Mecklenburg, general counsel to police Supt. Phil Cline.

Under the modified decree, intelligence gathering must be documented. And internal and external audits are required to make sure the department is complying with the decree.

---

**Techical problems**: If you have a technical problem with your account please contact Newsbank at 1-800-896-5587 or by e-mail at newslibrary@newsbank.com.

Return to the
Chicago Sun-Times
**? Digital Chicago Inc.**

EXHIBIT D



| **GENERAL ORDER** | DATE OF ISSUE | EFFECTIVE DATE | NO. |
|---|---|---|---|
| | 11 October 2002 | 25 October 2002 | 02-10 |

| SUBJECT | DISTRI-BUTION | RESCINDS |
|---|---|---|
| THE FIRST AMENDMENT AND POLICE ACTIONS | C | General Order 88-17, General Order 92-1, Addendum 2 |

RELATED DIRECTIVES **General Orders:** Complaint and Disciplinary Procedures; Human Rights and Human Resources; Preliminary Investigations. **Department Special Orders:** Eavesdropping Devices.

I.   PURPOSE

This directive:

A.   states Department policy relating to citizens engaged in First Amendment conduct.

B.   states Department policy relating to First Amendment-related investigations.

C.   establishes responsibilities and procedures relative to all police action and investigations which may affect conduct protected by the First Amendment, including First Amendment-related intelligence.

D.   informs members that the consent decree regarding First Amendment investigations entered into in 1982 by the City of Chicago has been wholly superceded by a modified consent decree [*Alliance to End Repression v. City of Chicago*, 237 F.3d 799 (7th Cir. 2001)] and is included in this directive as Attachment No. 1.

E.   reestablishes the consent decree entered in case 76 C 1982 relating to attorney-client relationships. The text of this judgment order is included as Attachment No. 2.

F.   reestablishes the consent decree entered in case 88 C 5434 relating to the protection of persons' First Amendment rights in the presence of a hostile audience. The text of this judgment order is included as Attachment No. 3.

II.   POLICY

It is the policy of the Chicago Police Department to conduct all investigations for a proper law enforcement purpose. Each and every investigation must safeguard the constitutional liberties of all persons. Police conduct which may affect the exercise of First Amendment rights will be conducted in accordance with this directive and the modified consent decree which is included as Attachment No. 1. Pursuant to the modified consent decree, Department members may not investigate, prosecute, disrupt, interfere with, harass, or discriminate against any person engaged in First Amendment conduct for the purpose of punishing, retaliating, or preventing the person from exercising his or her First Amendment rights.

III.   UNITED STATES CONSTITUTI.

A.   The First Amendment

1.   "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

2.   First Amendment conduct means speech or activity related to the freedom of speech, free exercise of religion, freedom of the press, the right to assemble, and the right to petition the government. The First Amendment protects, but is not limited to, the following rights:

a.    The right to hold ideas or beliefs concerning public or social policy, or political, educational, cultural, economic, philosophical or religious matters;

b.    The right to communicate or receive such ideas or beliefs, publicly or privately, orally, in writing or by symbolic means;

c.    The right to associate and assemble publicly or privately with other persons concerning ideas or beliefs about public or social policy, or political, educational, cultural, economic, philosophical or religious matters (but not a right to associate or assemble for purposes unrelated to the right to hold and express such ideas or beliefs);

d.    The right to advocate ideas or beliefs, including the right to advocate an alternative system of government and to advocate "the use of force or of law violation, except where such advocacy is directed to inciting or producing imminent lawless conduct and is likely to incite or produce such action";

e.    The right to petition the government or governmental officials for redress of grievances;

f.    The right to associate for the purpose of seeking and giving legal advice as well as advancing litigation.

3.    First Amendment rights exercised in public forums may be subject to content-neutral time, place, and manner regulations that support an appropriate governmental interest.

B.    The Fourth Amendment

1.    "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

2.    What a person seeks to preserve as private, including oral communications, even in an area accessible to the public, may be constitutionally protected under the Fourth Amendment.

3.    The Fourth Amendment protects against governmental intrusion not justified by an appropriate governmental interest.

IV.    FIRST AMENDMENT RIGHTS UPON THE PUBLIC WAY

A.    The public way generally includes public property held open to the public such as city parks, public streets, and sidewalks. The public way does not include privately-owned property, such as the United Center, and publicly-owned property not open to the public, such as the working area of a police facility.

B.    Persons on the public way have a right to:

1.    express their views through any form of communication, including distribution or sale of newspapers, magazines, handbills or other printed matter; and

2.    solicit financial contributions.

2

C. The rights protected by the First Amendment and exercised on the public way are not absolute and are subject to time, place, and manner restrictions, as well as any and all other applicable laws.

For example: persons expressing views protected by the First Amendment on the public way are required to comply with laws prohibiting physical obstruction of the movement of persons and vehicles on the public way or place, and damage to public or private property.

D. Persons on the public way may freely distribute, without charge to others, material or messages containing First Amendment protected ideas.

NOTE: Generally, persons giving away items containing First Amendment protected messages are not considered peddlers or itinerant merchants and ordinances applicable to itinerant merchants and peddlers do not apply to persons freely distributing First Amendment protected messages. For example, campaign literature.

E. Speech Peddling: Persons Selling a Protected Message

1. Section 4-244-141 of the Municipal Code of Chicago (MCC) defines speech peddling as a licensed peddler who sells or exchanges for value anything containing words, printing, or pictures that predominantly communicate a non-commercial message. Generally, this means a message relating to political, religious, artistic, and/or other non-commercial ideas and the message is the primary purpose of the item being sold. For example, a person who sells or exchanges for value a T-shirt which reads "Legalize Marijuana," or bumper stickers reading "Stop the Death Penalty" are engaged in speech peddling.

2. Persons engaged in speech peddling are subject to geographic restrictions and permit requirements contained in the MCC. For example, no person shall be allowed to engage in speech peddling within the Central District without a speech peddling permit (4-244-141 (b)).

V. ADDENDA

The following addenda and attachments are contained in this directive:

A. "Investigations Directed At First Amendment-Related Intelligence."

B. "Other Police Action Which May Impact First Amendment Conduct."

C. Text of Modified Consent Decree for case nos. 74 C 3268 and 75 C 3295.

D. Text of Consent Decree for case no. 76 C 1982.

E. Text of Consent Decree for case no. 88 C 5434.

Superintendent of Police

01-006 LMT



| **ADDENDUM TO:** General Order 02-10 | DATE OF ISSUE 11 October 2002 | EFFECTIVE DATE 25 October 2002 | NO. 1 |
|---|---|---|---|

| SUBJECT INVESTIGATIONS DIRECTED AT FIRST AMENDMENT-RELATED INTELLIGENCE | DISTRI- BUTION C | RESCINDS |
|---|---|---|

I.   **PURPOSE**

This addendum:

A.   identifies and explains types of investigations which trigger First Amendment considerations and implicate the modified First Amendment consent decree.

B.   establishes responsibilities and procedures relative to investigations directed toward First Amendment-related intelligence.

C.   discontinues the use of the:

   1.   Authorization for First Amendment Investigation (CPD-11.437).

   2.   Request for Authorization for First Amendment Investigation (CPD-11.438).

D.   introduces the First Amendment Worksheet Form (CPD-11.440).

E.   provides members with a copy of the modified consent decree which is included as Attachment No. 1 to this directive.

II.   **DEFINITIONS AND EXPLANATIONS**

A.   Criminal Investigation

   1.   A criminal investigation is any police action which is intended to determine, through the use of any lawful technique including criminal intelligence gathering, whether an individual or entity has violated, is violating, or is intent on imminently violating any federal, state, or local law based on an articulable reason. Therefore, even though First Amendment-related activity may be involved, such investigation is not directed toward First Amendment-related intelligence within the meaning of this directive and all conventional investigations of criminal conduct will proceed as directed by relevant Department directives.

   2.   Examples

      a.   Pursuant to an investigation of a bombing of a church whose members are predominately of one race, members of a race-based hate group active in Chicago are interviewed to determine if they have any knowledge that may assist in the investigation. These interviews are undertaken as part of an investigation of a violation of law and are not directed toward First Amendment-related intelligence.

      b.   An undercover police officer enters a bar at which music and dancing occurs to determine if underage persons are obtaining alcoholic beverages. This investigation is intended to determine if a violation of law has occurred and is not directed toward First Amendment-related intelligence.

B. **First Amendment-Related Intelligence**

First Amendment-related intelligence is the process of information gathering and analysis which is:

1. undertaken on the basis of the political, religious, social, or other views expressed by any individual or group either verbally, in writing, or otherwise, or any artistic or musical expression and;

2. not directly part of a criminal investigation.

C. **Informant**

An informant is an agent who collects information without disclosing to the source of the information his or her function as an agent.

D. **Infiltrator**

An infiltrator is an informant or authorized Department member who is, poses, or acts as a member or participant in a group or organization without disclosing to the group, or organization, or to its members his or her function as an agent.

E. **Mail cover**

Mail cover is the acquisition of information from the outside surface of mail.

F. **Minimization Procedures**

Minimization procedures are reasonable precautions taken to ensure a proportionate response to a perceived threat which will not be likely to materially impair the success of the investigation but which will avoid interfering with the rights of all individuals, groups, and entities to speak, worship, write, and otherwise communicate free from governmental interference. Minimization procedures will be employed in all investigations directed toward First Amendment-related intelligence and the need to minimize governmental interference will be considered in such decisions as selecting an investigative technique, when disseminating information, and when retaining intelligence data.

G. **Proper Law Enforcement Purpose**

1. A proper law enforcement purpose varies with each situation, and different facts may justify either an investigation, a detention, a search, an arrest, or no action at all. Proper law enforcement purpose means that, in every situation, officers will act reasonably within the limits of their authority as defined by statute and judicial interpretation.

2. An improper police purpose is explicitly prohibited by the modified consent decree and is a police investigation, prosecution, interference, disruption, or harassment intended to punish, retaliate, or discriminate against persons based upon First Amendment conduct.

H. **Unit**

For purposes of this directive, a unit is any subdivision of the Department which is commanded by a member of exempt rank.

A. All Police Action

All police action will be conducted for a proper law enforcement purpose and in accordance with the modified consent decree, a copy of which is included as Attachment No. 1 to this directive. The consent decree provides that no agent or agency of the City of Chicago will:

1. investigate, prosecute, disrupt, interfere with, or harass any person for the purpose of punishing or retaliating against that person for engaging in conduct protected by the First Amendment or for the purpose of preventing them from engaging in such conduct;

2. discriminate against any person on the basis of conduct protected by the First Amendment, except as may be permitted by law;

3. authorize, assist, or encourage any person to violate the modified consent decree, or to commit an act that would violate it if committed by a City agent.

B. Public Gatherings and First Amendment Conduct

1. An event or gathering in public may be held for the purpose of or concerning ideas or beliefs about public or social policy, or political, educational, cultural, economic, philosophical, or religious matters. However, the First Amendment does not necessarily apply to gatherings or public assemblies unrelated to the right to hold and express the above ideas and beliefs. For example, a public fireworks display need not have any First Amendment significance but Department members must be aware that an individual or group choosing to attend a public gathering may spontaneously engage in First Amendment conduct.

2. All Department members present at public gatherings will be courteous and respectful. Members will not harass, intimidate, or make comments about the views expressed by persons attending public gatherings. Members will not interrogate or otherwise question participants concerning their views unless essential to an investigation of an apparent violation of law, or as part of an investigation directed toward First Amendment-related intelligence that has been authorized as provided below.

3. Any sworn Department member may initiate a preliminary investigation of a public gathering, for public safety purposes, without authorization, as follows:

   a. Members may gather published announcements of future public gatherings and review permit applications.

   b. Members may investigate and communicate overtly with the organizers of a public gathering or any other person concerning the number of persons expected to participate and similar information regarding the time, place, and manner of a public gathering.

   c. Members may investigate prior public gatherings when useful to determine what police resources will be necessary to adequately protect demonstrators, bystanders, the general public, and to enforce all applicable laws.

   d. Information obtained during the course of such a preliminary investigation will be made the subject of an Information Report

(CPD-11.461). That report, along with pertinent attachments, will be forwarded to the First Deputy Superintendent.

4. Filming and photographing at public gatherings is appropriate.

    a. Filming and photographing of events on the public way is generally appropriate and may be conducted for any proper law enforcement purpose. For example, filming and photographing events on the public way is generally appropriate in order to document violations of law and police misconduct, to defend against baseless allegations of police misconduct, as an aid in the future coordination and deployment of multiple police units, and for training purposes.

    b. Filming or photographing at a public gathering is not an investigation directed toward First Amendment-related intelligence within the meaning of this directive.

    c. Filming or photographing at a public gathering must be approved by a unit commanding officer of exempt rank.

    d. The officer in charge at the public gathering will:

        (1) ensure that film and photographic equipment are available and are used as appropriate under this and other Department directives.

        (2) determine, based on the operational needs, whether the Organized Crime Division or the Education and Training Division shall conduct the filming and/or photographing.

        (3) will consult with the Department of Law, Municipal Prosecutions Division, for guidance when practical.

            NOTE: If the officer in charge has not been predetermined in a Department directive pertaining to the public gathering/event, the highest ranking member of the Patrol Division assigned to the public gathering will be the officer in charge.

    e. Filming and/or photographing of public gatherings shall not include audio recording, unless specifically authorized by the approving command member or court order.

5. After a public gathering has been concluded, the unit commanding officer of exempt rank will direct a report to the First Deputy Superintendent describing:

    a. the nature of the event,

    b. the number of participants,

    c. any violations of law or police misconduct during the course of the event, and

    d. any additional information that may be useful in planning police response to similar public gatherings in the future.

    NOTE: Copies of such reports may be provided to the Department of Transportation from the First Deputy Superintendent's Office (after being edited for sensitive law enforcement-only information) for its use in acting upon future applications for permits for public gatherings.

6.  The Coordinator of Special Events may:

    a.  provide a staff review of all proposed public gathering and dignitary protection matters brought to his or her attention.

    b.  perform and provide staff supervision of all such authorized activities which may require resources beyond those available at the unit level.

C.  Any Department member having knowledge that another member is engaged in activity prohibited under the modified consent decree will have the duty to report such activity to his or her supervisor. All supervisory and command personnel will ensure that the complaint register process as prescribed in the Department directive entitled "Complaint and Disciplinary Procedures" is followed when activity by a Department member involves a violation of any First or Fourth Amendment right or consent decree.

IV.  THE FIRST AMENDMENT AND INTELLIGENCE GATHERING

A.  The United States Constitution, as well as applicable federal, state, and municipal law, permit investigations of individuals for any proper governmental purpose, even when:

    1.  those individuals are engaged in political, social, or religious advocacy, or other communicative activities protected by the United States and Illinois Constitutions, and

    2.  there is no reason to believe that those individuals have as yet committed a crime.

Advocacy of violence or unlawful acts is protected by the First Amendment until such advocacy presents an imminent and credible threat. However, law enforcement has a duty to gather information about groups and individuals that advocate violence or that have been associated with violence or unlawful conduct, even absent evidence of an imminent and credible threat. Intelligence gathering is thus a legitimate law enforcement function as long as it is conducted for proper purposes, such as preventing crimes or providing potential investigative leads.

Investigations directed toward activities protected by the First Amendment which are undertaken solely for intelligence gathering will violate the First Amendment if undertaken for anything other than a proper law enforcement purpose.

Investigations directed toward activities protected by the First Amendment which are undertaken solely to gather intelligence will require a proper law enforcement purpose and authorization as provided in this directive. However, even authorized First-Amendment investigations will not be used to punish, retaliate, or discriminate against any person based upon the content of any person's views, speech, or writings, nor will the investigations disrupt, interfere with, or harass any person or group engaged in First Amendment conduct.

Examples:

    1.  A person is standing on a street corner in the Loop, violating no laws, but is offering passers-by literature supporting the bombing of targets in the United States. A plainclothes officer accepts the literature. An ensuing investigation of the source of the literature is directed toward First Amendment-related intelligence and for a proper law enforcement purpose.

2. An officer monitors a website promoting the views of a pro-life group which seems to approve of the use of violence in pursuit of its goals. Members of the group have not been suspected of committing any crimes, but the officer nevertheless wishes to monitor the number of hits the website receives. Such an investigation of the website is directed toward First Amendment-related intelligence, and may be continued for a proper law enforcement purpose.

E. If an investigation that gathers information with intelligence value is conducted for a proper purpose and is not more extensive or intrusive than is justified by its proper purpose, the investigation is consistent with the First Amendment and the modified consent decree.

## V. AUTHORIZATION FOR INVESTIGATIONS DIRECTED TOWARD FIRST AMENDMENT-RELATED INTELLIGENCE

A. Authorization to conduct First Amendment-related intelligence gathering that is not part of a criminal investigation must be obtained from a unit commanding officer of exempt rank. Such authorization will be for a period not to exceed 120 days and may be approved in increments of less than 120 days in order to ensure minimization and a proportionate response to the basis and purpose of the investigation. Prior to the expiration of the initial or succeeding period, application may be made for an additional period of up to 120 days, beginning upon the expiration of the preceding period.

B. No member may conduct an investigation which is directed toward First Amendment-related intelligence without authorization except as provided in this addendum.

C. Investigative Techniques

1. The investigative techniques used in any particular instance shall use minimization procedures proportional to the anticipated gravity of the crime or potential threat to public safety, the evidence of past or present criminal activity, and the likely effectiveness of a particular investigative technique.

2. For purposes of this directive, the following levels of techniques are established.

   a. Level I Techniques:

      (1) Examination of public records and other sources of information available to the general public;

      (2) Examination of Chicago Police Department files and records;

      (3) Examination of records and files of other government or law enforcement agencies;

      (4) Interviews of any person;

      (5) Physical surveillance from places open to the public or otherwise legally made available.

      (6) Department members are authorized to visit any place and attend any event that is open to the public, on the same terms and conditions as members of the public generally are and as long as members have a proper law enforcement purpose, such as detecting threats to public safety, and

for the purpose of detecting or preventing unlawful activity.

   b.   Level II Techniques:

        (1)   Lawful electronic surveillance of persons not on the public way such as the use of covert videotape, body wire, or audiotape.

        (2)   The use of mail covers, informants, undercover officers, or infiltrators.

3.   Department members may use Level I investigative techniques in an authorized investigation directed toward First Amendment-related intelligence as long as the investigation is being conducted for a proper purpose.

4.   The use of a Level II investigative technique in an authorized investigation directed toward First Amendment-related intelligence will be requested and approved by the unit commanding officer of exempt rank prior to the use of any such technique.

     NOTE: Level II techniques may require a judicial order prior to implementation.

5.   The use of an infiltrator in an authorized investigation directed toward First Amendment-related intelligence will be requested from and approved by the Superintendent prior to the use of the infiltrator in increments of time to be determined by the Superintendent. Progress reports will be filled out and sent to the Superintendent, Attention: General Counsel for each segment granted. Any infiltration request approved for 30 days or greater shall be the subject of a progress report directed to the Superintendent every 30 days.

VI.   PROCEDURES FOR AUTHORIZING THE INITIATION OR CONTINUATION OF INVESTIGATIONS DIRECTED TOWARD FIRST AMENDMENT-RELATED INTELLIGENCE

   A.   Department Member's Procedures to Initiate or Continue an Investigation

        1.   Initiating an Investigation

             a.   Any sworn member may initiate and conduct an investigation which is known or suspected to be directed toward First Amendment-related intelligence, without prior exempt Department member approval, by notifying a supervisor, for a period not to exceed 24 consecutive hours from the time the investigation is started. The initiating member will notify his or her unit commanding officer of exempt rank of the initiation of such an investigation by submitting a To-From-Subject report as soon as possible but no later than 24 hours from the time of initiation of the investigation. The To-From-Subject report will be addressed to the Superintendent of Police, Attention: General Counsel, and will contain an approval line for the member's district or unit commanding officer. The report will contain the following information:

                  (1)   the date and time the investigation was initiated;

                  (2)   the basis, purpose, and methods of the investigation, including the source of the information which prompted the investigation, and the anticipated use of any Level II investigative techniques;

(3)    a description of the investigation's impact on the ability of the subject or any other person to freely speak, write, worship, or exercise any other right protected by the First Amendment;

(4)    a recommendation to continue or terminate the investigation.

2.    Continuation of an Investigation

a.    Members must continually assess authorized First Amendment intelligence gathering investigations and determine if the investigation has evolved into a criminal investigation.

b.    Members conducting the investigation will submit to their unit commanding officer of exempt rank To-From-Subject reports detailing the progress of the investigation at 30 day intervals or at shorter intervals as directed by the commanding officer. Such reports will include details regarding:

(1)    information uncovered, investigative methods employed (including the use of Level II techniques);

(2)    the minimization procedures followed;

(3)    any impact on First Amendment rights, and;

(4)    a recommendation to continue or terminate the investigation based upon an analysis of information gathered.

c.    Requests by members to continue investigations directed toward First Amendment-related intelligence will be reviewed by their unit commanding officer of exempt rank consistent with Item VI-B-2-a. and b of this directive.

(1)    If continuation is authorized, it will be conducted within the parameters set forth in the report of the exempt unit commanding officer authorizing the investigation and in accordance with this directive.

(2)    If the investigation is to be reassigned to another unit, the initiating member will make notifications as instructed and will forward all materials collected or generated in connection with the matter to his unit commanding officer of exempt rank.

(3)    If the investigation is terminated, the initiating member will refrain from further investigation and will forward all materials collected or generated in connection with the matter to his unit commanding officer of exempt rank.

B.    District/Unit Commanding Officer of Exempt Rank

1.    The responsibility of unit commanding officers of exempt rank for investigations directed at First Amendment-related intelligence begins at the time they receive a To-From-Subject report from a member of their command who is or was conducting such an investigation or otherwise learns that such an investigation is under way or has been conducted.

NOTE:    In the absence of a unit commanding officer of exempt rank, the on-duty Assistant Deputy Superintendent, Operations Command, will assume this responsibility.

2. Upon receipt of the To-From-Subject report requesting the initiation of an investigation known or suspected to be directed toward First Amendment-related intelligence, the unit commanding officer of exempt rank will personally and promptly:

   a. review the report to determine whether to authorize the investigation.

   b. consult with the Office of Legal Affairs, which will assist the commanding officer to determine whether the contemplated action is related to First Amendment-related intelligence or merely to a criminal investigation.

      (1) If the determination made at this point is that the contemplated action is related to a criminal investigation, the constraints outlined in this addendum do not apply. The investigation may proceed according to normal investigative procedures as outlined in relevant Department directives.

      (2) If the determination is made at this point that the contemplated action is directed at First Amendment-related intelligence, the unit commanding officer of exempt rank will consult with the Commander of the Intelligence Section of the Organized Crime Division for the purpose of conducting further analysis of the information which prompted the investigation as well as determining whether reassignment of the investigation should be recommended.

3. Examples of First Amendment-related investigations and appropriate authorizations:

   a. Literature is distributed supporting the bombing of targets in this country. An investigation identifying those responsible for this literature may have intelligence value and may be authorized.

   b. A race-based hate group associated with unlawful acts in other jurisdictions opens a chapter in Chicago. An investigation that identifies its members and their goals and means of support may have intelligence value and may be authorized.

   c. An organization advocating worldwide disarmament opens an office in Chicago and a sworn member suggests raiding its office to determine if it advocates violence. This raid could not be authorized, as there is no evidence to even suggest that a violation of any law has or will occur. Additionally, if literature reflecting the group's views can be obtained through other means, the raid would violate this directive's requirement of minimization procedures. Any search of nonpublic areas would also violate the Fourth Amendment if performed without a warrant and in the absence of consent or exigent circumstances.

4. Upon determining that the investigation will be authorized, the unit commanding officer of exempt rank will:

   a. ensure that the investigation will employ minimization procedures.

   b. ensure that there is no indication that the investigation is being conducted for a purpose other than a proper law enforcement purpose.

c. prepare a First Amendment Worksheet report describing the basis, purpose, and methods of the investigation. This report will include a First Amendment Investigation Tracking Number to be generated using the following formula:

   (1) the requesting unit's number will appear first, followed by a dash;

   (2) the calendar year will appear second, followed by a dash;

   (3) the last number in the series will be the sequential number of the investigation for that unit. For example, a number of 188-2002-03 (unit: OCD, calendar year, investigation number for that year within that unit). This number will be logged on the First Amendment Worksheet in the upper right-hand corner in the box marked "First Amendment Investigation Tracking No."

d. provide written authorization for the investigation to the initiating member in the form of a copy of the completed First Amendment Worksheet which will include:

   (1) the date on which authorization for the investigation will expire;

   (2) the required minimization procedures;

   (3) authorization or non-authorization of Level II investigative techniques, other than the use of an infiltrator.

e. attach copies of the initiating member's report to the First Amendment Worksheet.

f. forward these reports and copies of any other reports or materials generated in connection with the investigation to the Superintendent, Attention: General Counsel in a sealed file by messenger.

5. If the investigation is not authorized by the unit commanding officer of exempt rank, that officer will cross out the word "Approved" above the signature line on the To-From-Subject report and write "Disapproved" over it, sign his or her name, and order the initiating member to terminate the investigation. The order to terminate will be documented by the return of a copy of the disapproved To-From-Subject report to the initiating member. The commanding officer will forward the disapproved initiating member's To-From-Subject report and any materials received from the initiating member to the General Counsel to the Superintendent by messenger in a sealed file.

6. District/unit commanding officers of exempt rank will review all progress reports submitted to them and make determinations whether to continue, terminate, or possibly reassign the investigation to another Department unit.

   a. Such determination will be documented on a new First Amendment Worksheet in the narrative section entitled "Factual Basis for Investigation."

   b. District/unit commanding officers of exempt rank must:

      (1) be mindful of the sensitive nature of First Amendment related intelligence gathering investigations and their ongoing obligation to remain fully informed and assured that the nature, scope, and conduct of the investigators is

within the limitations of the investigation as authorized and;

    (2)    reassess the investigation in consultation with the Office of Legal Affairs and the Intelligence Unit when receiving progress reports and on an as needed basis.

    c.    The unit commanding officer of exempt rank will forward:

    (1)    originals of all First Amendment Worksheets and periodic progress reports to the General Counsel to the Superintendent.

    (2)    copies of all materials pertaining to any investigation directed toward First Amendment-related intelligence which arises from a threat to the physical safety of a dignitary or from a public gathering to the Coordinator of Special Events, regardless of whether initiation of any such investigation has been authorized.

7.    Copies of all reports, files, or other materials generated in connection with any investigation directed toward First Amendment-related intelligence will be maintained in the unit from which the investigation originated or, if the investigation was transferred to another unit, by the unit which conducts the investigation for a period of ten years. Such reports, files, or other materials will be retained in accordance with Department record-retention procedures.

C.    If any unit commanding officer of exempt rank determines that the continuation of a First Amendment-related investigation should be assigned to a unit within the Bureau of Investigative Services other than the unit currently conducting the investigation, the exempt member will forward a report recommending such action, along with the First Amendment Worksheet and any materials received from the initiating member, to the Deputy Superintendent of the Bureau of Investigative Services.

D.    Deputy Superintendent, Bureau of Investigative Services

Upon becoming aware of an investigation directed toward First Amendment-related intelligence and determining that such investigation may more appropriately reside within the responsibilities of the Bureau of Investigative Services, the Deputy Superintendent, Bureau of Investigative Services will, in consultation with the General Counsel to the Superintendent, make a written recommendation to the Superintendent of Police as to the assignment of that investigation.

E.    General Counsel to the Superintendent

1.    The General Counsel will review all submitted First Amendment Worksheets and indicate a concurrence or non-concurrence with the investigation. If the General Counsel does not concur with the authorization of an investigation directed at First Amendment intelligence-gathering, the General Counsel will document the reasons for such non-concurrence in a To-From-Subject report directed to the appropriate Deputy Superintendent and/or the Superintendent.

2.    The General Counsel will provide advice to the Superintendent regarding the compliance of such investigations with the modified consent decree and this directive.

F.    All Deputy Superintendents

Upon receiving a report from the General Counsel detailing reasons for the non-concurrence with a district or unit investigation directed at First

Amendment intelligence-gathering, the affected Deputy Superintendent will make a determination to continue or terminate the investigation, and will document the decision in a To-From-Subject report to the General Counsel with a copy of said report going to the commanding officer of the unit conducting the investigation.

G.    Superintendent of Police

The Superintendent of Police:

1.    retains the ultimate authority for the approval of all investigations directed toward First Amendment-related intelligence and may:

    a.    notify other Department members of the existence of an investigation which is directed toward First Amendment-related intelligence,

    b.    direct Department members to participate in or to monitor an investigation which is directed toward First Amendment-related intelligence,

    c.    cause such an investigation to be reassigned to another unit, or

    d.    direct the termination of such an investigation.

2.    will personally approve or deny in writing any infiltration request for a period of time to be determined by the Superintendent. After approval of an investigation, progress reports to the Superintendent are required for each investigation segment granted. Any infiltration request approved for 30 days or greater shall be the subject of a progress report directed to the Superintendent every 30 days or sooner, as the Superintendent deems necessary.

3.    will specifically authorize and limit access to information kept in files maintained by the General Counsel which pertain to investigations directed toward First Amendment-related intelligence.

4.    will ensure that the Commander of the Auditing and Internal Control Division conducts an annual Departmental audit of investigations directed toward First Amendment-related intelligence.

5.    will submit copies of the audit report to the Mayor, the Police Board, and the court with jurisdiction over the cases in which the modified consent decree was entered.

6.    will ensure that proper training and supervision is provided to members in accordance with the provisions of the modified consent decree.

B.

Superintendent of Police

| ADDENDUM TO: | DATE OF ISSUE | EFFECTIVE DATE | NO. |
|---|---|---|---|
| General Order 02-10 | 11 October 2002 | 25 October 2002 | 2 |

| SUBJECT | DISTRI-BUTION | RESCINDS |
|---|---|---|
| OTHER POLICE ACTION WHICH MAY IMPACT FIRST AMENDMENT CONDUCT | C | |

I.  PURPOSE

This addendum:

A.  describes the prohibitions on police action when the attorney-client relationship is involved, as described in the judgment order entered in case 76 C 1982.

B.  informs members of their obligations to protect the First Amendment rights of law-abiding individuals who encounter a hostile audience threatening to create public disorder, as described in the judgment order entered in Nelson v. Streeter, et.al., No. 88 C 5434.

C.  provides members with the text of the judgment orders, as required by provisions of each order, as Attachments No. 2 and 3 of this directive.

II. FIRST AMENDMENT PROHIBITIONS CONCERNING ATTORNEY-CLIENT RELATIONSHIPS (CASE 76 C 1982)

A.  Judgment Order 76 C 1982 prohibits certain actions by Department members in relation to the exercise of First Amendment rights by arrested persons. The entire text of the judgment order is included as Attachment No. 2.

B.  Department members will not conduct surveillance at, gather information or compile reports on, or maintain files or records regarding meetings or communications if:

1.  during the meeting or communication, there is a reasonable expectation of privacy and that the attorney-client privilege will attach; and

2.  the meeting or communication is between:

a.  attorneys discussing the giving of legal advice or assistance in anticipated or pending litigation; or

b.  an attorney and an individual seeking legal advice or assistance in anticipated or pending litigation; or

c.  an attorney or attorneys and one or more individuals engaged in assisting the attorney in the rendering of such advice or the giving of such assistance and involves:

(1)  the giving or seeking of legal advice; or

(2)  anticipated or pending litigation.

C.  This prohibition will not apply:

1.  if the attorney, attorneys, or their assistants are, by such meetings or communications, participating in criminal activity; or

2.  to a person who is a police officer, if such a person:

a.  is known to the other participants in the meeting or conversation as a police officer; OR

b.    is both of the following:

(1)  attending the meeting or participating in the conversation as a private individual AND

(2)  will not be reporting in his or her capacity as a police officer on the meeting or conversation to any other defendant, unless such persons are participating in criminal activity.

III.  PROTECTIONS OF FIRST AMENDMENT RIGHTS IN A HOSTILE AUDIENCE ENVIRONMENT (CASE 88C5434)

A.  Judgment Order 88 C 5434, *Nelson v. Streeter*, et.al., relates to Department members' responsibilities at public exhibitions of ideas which may result in hostile reactions from those viewing or hearing the exhibition.  The entire text of the judgment order is included as Attachment No. 3.

B.  Department members will protect the free speech rights of all persons, no matter what the particular message, position, or philosophy espoused, and even if other people are offended by it, as long as the person expressing that message, position, or philosophy is not violating the law and has abided by any reasonable time, place, and manner restrictions placed on the expression of such ideas.

C.  In an incident where a hostile audience threatens a speaker, artist, exhibitor or art work or where there is a danger of harm to persons or property, members will:

1.  if art work or other expressive material is involved, attempt to ascertain who owns or has right of custody of the material;

2.  advise the speaker, artist, or exhibitor, if present, of his or her right to continue their expression at the current site;

3.  begin or continue police protection so as to allow the speaker, artist, or exhibitor to continue his or her expression of speech or art;

4.  request that their supervisor respond to the scene.

D.  A supervisor who responds to the scene where an expression of speech or art is threatened by a hostile audience will determine if the assignment of additional police personnel will allow for the continuation of the expression.

E.  If members determine that the expression cannot continue at the original site due to the activities of persons hostile to the expression, the highest ranking sworn member on the scene will determine that:

1.  all police resources reasonably available have been deployed to maintain the peace and allow the expression to take place;

2.  police efforts to take direct action against those violating the law have not been successful, and;

3.  there remains a threat of imminent violence that police personnel are unable to control.

NOTE: If reasonably possible, members should consult with Department or City of Chicago legal advisors prior to taking action to discontinue a public expression of speech or art.

F. The expression may be discontinued at the original site when the highest ranking member on the scene determines that:

1. order can be restored:

    a. only by taking the expressive material into custody or

    b. otherwise discontinuing the expression.

2. available alternatives of continuing private custody have been considered but cannot be deployed.

3. when expression is discontinued, it should be permitted to resume as soon as the highest ranking member on the scene determines that order has been restored and can be maintained if the expression resumes.

G. Any expressive material taken into protective custody will be inventoried according to general inventory procedures. The owner of the material will be advised of his or her right to immediately reclaim the material at the unit of inventory.

Superintendent of Police

01-006 LMT

EXHIBIT E

February 19, 2004

Superintendent Philip J. Cline
3510 S. Michigan
Chicago, IL 60653

Dear Superintendent Cline,

Yesterday the American Civil Liberties Union faxed us an executive summary of a 2002 internal audit of the Chicago Police Department. The report indicated that the American Friends Service Committee was one of five groups infiltrated by Chicago police "personnel assigned to the Intelligence Section."

These activities were in relation to the Trans Atlantic Business Dialogue occurring in Chicago in November 2002.

The audit mentions in several places that the required authorization for undercover surveillance and the filming and audio taping of public activities was not present. And the audit concludes that: "certain procedures delineated in General Order 02-10 were not followed."

We want to register our profound protest that this occurred. The American Friends Service Committee has an eighty-seven year history of commitment to nonviolence and pacifism. We are also concerned that other groups associated with this particular event were targeted and that this type of police conduct has a chilling effect on citizens' rights of freedom of speech and assembly.

The audit states that there exists a file box of twelve VHS tapes, forty-two 8mm tapes, nineteen DVD+R discs and one CD+R disc of video and audio information collected by the Chicago police. We respectfully request the release of all information pertaining to this Surveillance operation.

In addition, we have a number of questions. Was this operation undertaken in connection with the FBI's Joint Terrorism Task Force? Has any information collected been shared with any federal agencies? Did undercover officers interfere or inhibit the first amendment rights of any participants? What groups, if any, were under surveillance in 2003 and at the present time? Has the American Friends Service Committee been under surveillance since this 2002 incident?

We do not believe that the police are our enemy. We do believe, however, that any conduct that undermines the rights of freedom of speech and assembly of individuals and groups is an enemy of democracy.

I look forward to a mutually beneficial resolution of this matter.

Please contact me with any questions you may have.


Sincerely,

Michael McConnell
Regional Director
American Friends Service Committee

# EXHIBIT F



**Richard M. Daley**
Mayor

**Department of Police • City of Chicago**
3510 S. Michigan Avenue • Chicago, Illinois 60653

**Philip J. Cline**
Superintendent of Police

April 12, 2004

Mr. Michael McConnell
Regional Director
American Friends Service Committee
637 S. Dearborn Street, Third Floor
Chicago, IL 60605

　　　　Re: <u>Superintendent's Correspondence #0473</u>

Dear Mr. McConnell:

The Superintendent of Police had forwarded your letter of February 19, 2004 to me for a response. Although I had immediately contacted you to inform you that my response would be delayed due to other commitments, I still apologize for the delay.

Your letter expressed concern over the executive summary of a 2002 internal audit of the Chicago Police Department, which you state indicated that the American Friends Service Committee was one of five groups "infiltrated" by the Chicago Police Department. It is unfortunate that you have had an opportunity to read only the executive summary faxed to you by the ACLU, because the report itself shows that no such infiltration occurred. In fact, the report shows that the Chicago Police Department personnel attended only public meetings of groups involved in planning certain protests and attended meetings only of groups which expressed intent to engage in unlawful conduct or of groups linked through websites or other information to those expressing such intent. The Constitution does not prevent legitimate law enforcement investigation for the safety of our citizens. I am sure that you understand that it is our duty as law enforcement to investigate all threats of unlawful conduct and that attending public meetings is a legitimate manner of investigation.

The Chicago Police Department has labored under a First Amendment consent decree for more than twenty years. I am sure that you are aware that the Federal Court modified that consent decree several years ago, noting the onerous provisions of the decree which prevented legitimate

law enforcement activity and further noting that the Chicago Police Department had not violated those onerous provisions in the two decades that it was in effect.   Even more recently, the Seventh Circuit noted again the excellent record of the Chicago Police Department on First Amendment Rights and invited us to conduct a final audit and seek termination of the modified consent decree.

The consent decree requires an internal audit to determine whether the department has remained in compliance with the consent decree.  The audit to which you refer found no violations of the consent decree or the Constitution.  Your letter instead expresses concerns over whether certain documentation required by our internal General Orders existed.  The audit shows that the documentation did exist, just not always in the internal form required by the General Orders. Moreover, noncompliance with the forms required by the General Orders can in no way be equated to a violation of the Constitutional rights of free speech and assembly.

The Chicago Police Department has an outstanding record for more than twenty years on First Amendment rights.  Having recently been involved in planning for the Anti-war demonstrations, I can tell you that I observed first-hand that the Chicago Police Department has conducted itself in a manner designed to facilitate, rather than chill, the citizens' First Amendment rights. Therefore, rest assured that the concerns expressed in your letter are unfounded and that consent decree or no consent decree, we will continue our proud record of respect for the First Amendment rights of all of our citizens.

Sincerely,

*SHMecklenburg*

Sheri H. Mecklenburg
General Counsel to the Superintendent

EXHIBIT G

THE
ROGER
BALDWIN
FOUNDATION
OF ACLU,
INC.

Suite 2300
180 North Michigan Avenue
Chicago, Illinois 60601-1287
(312) 201-9740
Fax (312) 201-9760
www.aclu-il.org

**GOVERNING COMMITTEE**

Marc O. Beem
**President**

Mary E. Brandon
Michael C. Cook
Paul J. Gaynor
Diane Geraghty
Rabbi Gary S. Gerson
Harriet Hausman
F. Thomas Hecht
Clifford P. Kelley
Diane F. Klotnia
Jennifer Minor Lansing
Jill M. Metz
Roger Pascal
Audrey R. Peeples
Mort Rosen
Noel Salinger
Carlene M. Sawyer
William N. Weaver, Jr.
Cleo F. Wilson
Bernard Zant

**STAFF**

Colleen K. Connell
**Executive Director**

Edwin C. Yohnka
**Director of
Communications**

K.T. Sullivan
**Development Director**

Marcia Liss
**Associate Development
Director**

Tanya Havell
**Director of Foundation
Relations**

Althea Thomas
**Director of Administration**

Damien A. Joyner
**High School Civil Liberties Education
Project Director**

Harvey Grossman
**Legal Director**

Benjamin S. Wolf
**Associate Legal Director**

Lorie Chaiten
Connie Y. Chung
Dwayne A. Nash
Barbara P. O'Toole
Adam D. Schwartz
Jane M. Whicher
Christopher T. Varas
**Staff Counsel**

Eric Salcedo
**Intake Director**

Contributions to
The Roger Baldwin
Foundation
are tax deductible
as provided by law.



January 11, 2005

Mr. Tom Forgue
Assistant Corporation Counsel
City of Chicago Law Department
30 N. LaSalle
Suite 900
Chicago, Illinois 60602

Re: ACLU v. City of Chicago

Dear Mr. Forque:

On July 14, 2004, approximately six months ago, I requested on behalf
of my client, the American Friends Service Committee (AFSC), all
materials relating to the police department's investigation regarding
AFSC as referenced in the department's annual internal audit filed in
this case. (Letter attached)

While I have received numerous voice mail messages from you
recognizing my request and letter, I have yet to receive any materials or
formal response from the City. In view of the significant time that has
passed, I intend to raise this matter with Judge Gottschall if the City
does not respond to our request by January 18, 2005.

Sincerely,

Harvey Grossman

# EXHIBIT H



**BY FIRST CLASS MAIL**

February 4, 2005

City of Chicago
Richard M. Daley, Mayor

**Department of Law**

Mara S. Georges
Corporation Counsel

Commercial and Policy Litigation
Suite 900
30 North LaSalle Street
Chicago, Illinois 60602
(312) 744-9010
(312) 744-6912 (FAX)
(312) 744-9104 (TTY)

http://www.cityofchicago.org

Harvey Grossman
Roger Baldwin Foundation of ACLU, Inc.
Suite 2300
180 North Michigan Avenue
Chicago, Illinois 60601-1287

### Re: <u>ACLU v. City of Chicago</u> (N.D. Ill.)

Dear Mr. Grossman:

      Thank you for your inquiry on the American Friends Services Committee and First Amendment Investigation 193-2002-01, 2002 Annual First Amendment Compliance Audit at 55-58. As I mentioned to you in my telephone messages, I was unable to locate this file. As some of my other telephone messages indicated, I later spoke to one of the City's attorneys in <u>Vodak v. City of Chicago</u> (N.D. Ill.), and he confirmed that his investigation revealed that this investigatory file had been destroyed. I have enclosed a copy of his letter, which explains his investigation, the results, and details the circumstances surrounding the file and its destruction.

      Very recently, the City's attorney in <u>Vodak</u> informed me that he had located a copy of at least a part of the paper portion of Investigation File 193-2002-01 in the possession of a police auditor who worked on the 2002 Audit. I have not reviewed this material because of the language in pararaph 5 of the Modified Agreed Order, Judgment and Decree entered in this case. In particular, that paragraph states that,

> The auditors shall not disclose any information to anyone but the [Chicago Police] Board, the Superintendent of Police, or (upon his request) the Mayor. The Board shall not disclose in any manner details that specifically identify any investigations except as otherwise permited by law, nor shall it disclose in any manner information that would reveal the identity of a confidential informant, compromise an ongoing criminal, regulatory, or employee disciplinary investigation, or constitute an invasion of a person's privacy.





Paragraph 6 requires that "any probably substantial violation of this Decree . . . shall be promptly referred to [the Inspector General] if the matter involves personnel of a City agency other than the Police Department." The Court also retained jurisdiction to punish violations of the Decree. Although technically only directed at auditor disclosure, given the breadth of this language, and the possibility I may face investigation and discipline for violations of the Decree, I think you can understand why I have been reluctant to examine, much less obtain a copy of the auditor's file since I learned of it a few days ago. In any event, based on the plain language of Paragraph 5, it seems that the auditor's file cannot be disclosed.

Although we seem to keep missing each other, I would be happy to discuss this matter with you and your interpretation of the language of the Decree regarding auditor disclosure.

Sincerely,

Tom Forgue

Tom Forgue
Assistant Corporation Counsel

Enclosure

2

# Freeborn & Peters LLP

October 22, 2004

## VIA HAND DELIVERY

Janine L. Hoft, Esq.
People's Law Office
1180 N. Milwaukee Avenue
Chicago, IL 60622

*Attorneys at Law*

311 South Wacker Drive
Suite 3000
Chicago, Illinois
60606-6677
Tel 312.360.6000

Terrence J. Sheahan
Direct 312.360.6728
Fax 312.360.6571
tsheahan
@freebornpeters.com

. *Chicago*

*Springfield*

Re:   *Kevin Vodak, et al. v. City of Chicago, et al.*
      Case No. 03 C 2463

Dear Janine:

Per Judge Nolan's instructions given at the October 15, 2004 status hearing, enclosed please find the following contents of the 2002 First Amendment Investigation File # 193-2002-01:

1.   Memo from a Lieutenant in the Intelligence Section to the Commander of the Intelligence Section requesting authorization for a First Amendment Investigation. (VODAK/CITY 009099);

2.   Memo from the Commander of Intelligence Section to the Superintendent and General Counsel regarding the initial authorization to conduct a First Amendment Investigation relating to intelligence gathering. (VODAK/CITY 009100);

3.   Memo from the Commander of Intelligence Section to the Superintendent and General Counsel regarding an order to terminate the First Amendment Investigation relating to intelligence gathering. (VODAK/CITY 009101).

As you are aware, the remaining contents of the file were destroyed pursuant to Chicago Police Department General Order 02-10 Addendum 1A Section H(2)(a), a copy of which is attached for your review. (VODAK/CITY 009102 - VODAK/CITY 009115).

During the Summer and Fall of 2003, Inspector Donald J. O'Neil of CPD's Auditing and Internal Control Division was conducting interviews with CPD operational, supervisory and command personnel in preparation for the drafting of the Department's 2002 Annual First Amendment Compliance Audit. This Audit focused on the implementation of and compliance with the First Amendment Judgement Order and Modified Consent Decree entered in cases 74 C 3268 and 75 C 3295.

In September, 2003, Inspector O'Neil interviewed Constantine Andrews, Commander of the Intelligence Section, regarding First Amendment Investigation File #

3

193-2002-01. During that interview, Inspector O'Neil also reviewed the contents of the file in preparation for the 2002 Audit. Soon after the meeting between Commander Andrews and Inspector O'Neil, Sergeant Biefeldt of the Intelligence Section submitted a memo to Commander Andrews requesting a destruction order for the contents of File # 193-2002-01 in order to be in compliance with General Order 02-01. In response to this request and pursuant to General Order 02-01, Commander Andrews authorized Sergeant Biefeldt to destroy all the contents of the file except those which are enclosed herewith.

Over the past several weeks, CPD has been attempting to locate a copy of the memo drafted by Sergeant Biefeldt requesting a destruction order. Unfortunately, CPD has been unable to locate the document. Please note, however, that neither Commander Andrews nor Sergeant Biefeldt are currently assigned to the Intelligence Section. Commander Andrews is now the Commander of Area 5 and Sergeant Biefeldt has retired. Apparently, the document was misplaced during their respective transitions. Nevertheless, I have been assured by both Commander Andrews and CPD Legal Affairs that a thorough search for the missing document has been conducted. If the document is located, I will promptly produce it for your review.

I trust that the enclosed documents and the contents of this letter satisfies our obligation to you with regard to Judge Nolan's instructions given at the October 15, 2004 status hearing. If you have any question regarding this matter, do not hesitate to contact me.

Very truly yours,

Terrence J. Sheahan

cc:    James Fennerty (w/o enclosures)
       Melinda Power (w/o enclosures)
       Christopher V. Langone (w/o enclosures)

#636835

Bureau of Investigative Services
Organized Crime Division
Intelligence Section

TO:                    Constantine G. Andrews
                       Commander
                       Intelligence Section

FROM:                  Lieutenant David Sobczyk
                       Intelligence Section

SUBJECT:               First Amendment Investigation Request

        Pursuant to the impending Trans-Atlantic Business Dialogue (TABD) Conference which is scheduled to take place in Chicago from 5 through 8 NOVEMBER 2002, R/Lt is requesting that a First Amendment Investigation be initiated. The reason for this request is based upon research of this specific event's history, anti-globalist protestor arrests at similar events such as the recent IMF meetings in Washington D.C. and the stated plans of local protestors. In particular, the focus of the investigation would be placed upon the Chicago DAN (Direct Action Network). This group openly favors "illegal tactics" and "guerilla warfare" in their pursuits of protesting this specific local TABD event. If approved, the investigation would help to ensure the safety of both the public and the involved protestors as well as, the protection of property.

Lt. David Sobczyk #486

APPROVAL:

Constantine G. Andrews
Commander
Intelligence Section

5

# FIRST AMENDMENT WORKSHEET

Chicago Police Department

Date and Time of Request

| 11OCT 02 | 1100 |

First Amendment Invest. Tracking No.
193-2002-01

Superintendent of Police
Attention: General Counsel

From: District Commander/ Unit Commanding Officer  **Constantine Andrews**
                                                                                    Name and star number

Initial Authorization to Conduct    }
Authorization to Continue           }  a First Amendment investigation    ☒ Intelligence Gathering
Order to Terminate                  }  relating to:                       ☐ Public Gathering

Investigation Initiated: (Date) __13 OCT 02__    (Time) __1600 Hours__ Date Authorization Expires: __30 Days__

**FACTUAL BASIS FOR INVESTIGATION** - For authorization to initiate or continue an investigation, indicate how the investigation will serve/ continue to serve a proper law enforcement purpose and source of information relied upon to justify the investigation; for termination of an investigation, indicate rationale for that determination (attach continuation sheet, if necessary):

Chicago is hosting the Trans-Atlantic Business Dialogue Conference (TABD) from 5 through 8 NOV 02. Similar events such as the recent IMF meetings in D.C. have led to anti-globalist protests involving damage to property, obstruction of traffic and multiple arrests. The Chicago DAN (Direct Action Network) group has specifically addressed a need to incorporate "illegal tactics" and "guerilla tactics" during protests against the TABD. This type of protest poses a threat to the safety of all persons involved and assorted properties.

Indicate Investigative Techniques and Minimization Procedures to be used (attach continuation sheet, if necessary):
Collection of hand-out materials and review of pertinent internet web sites.

☐ Request authorization to use Level II Investigative Techniques (electronic surveillance, undercover methods) based on the following justification:
Undercover attendance of protest preparation meetings.

## PERSONS OR GROUPS TO BE INVESTIGATED

| Name | Address | Affiliation, If Any | I.R. No. |
|---|---|---|---|
| Chicago DAN Group | Meeting at 1046 W. Polk St. (Agape House) | DNA | DNA |

| Signature of District Commander/ Unit Commanding Officer | Signature of General Counsel | Date | General Counsel's Determination: |
|---|---|---|---|
| *(signature)* | *Karen Rowan* | 11 Oct 02 | Concur ☒<br>Do Not Concur ☐ |

6

RST AMENDMENT WORKSHEET

icago Police Department

:     Superintendent of Police

      Attention: General Counsel

om:   District Commander/ Unit Commanding Officer _____

                                            Name and star number

Initial Authorization to Conduct   ⎫

Authorization to Continue         ⎬ a First Amendment investigation   xx☐ Intelligence Gathering

Order to Terminate            ⎭ relating to:                   ☐ Public Gathering

vestigation Initiated: (Date)  13 OCT 02     (Time)   1600     Date Authorization Expires: 30 Days

ACTUAL BASIS FOR INVESTIGATION - For authorization to initiate or continue an investigation, indicate how the
vestigation will serve/ continue to serve a proper law enforcement purpose and source of information relied upon to justify the
vestigation; for termination of an investigation, indicate rationale for that determination (attach continuation sheet, if necessary):

The above-referenced investigation was predicated on the protest against the Trans-

Atlantic Business Dialogue Conference (TABD). This event has ended. Subsequently,

this related investigation requires termination.

_____

_____

_____

dicate Investigative Techniques and Minimization Procedures to be used (attach continuation sheet, if necessary):

DNA

_____

_____

] Request authorization to use Level II Investigative Techniques (electronic surveillance, undercover
methods) based on the following justification:

DNA

_____

_____

ERSONS OR GROUPS TO BE INVESTIGATED

| Name | Address | Affiliation, If Any | I.R. No. |
|---|---|---|---|
| DNA | | | |
| | | | |
| | | | |
| | | | |

| Signature of District Commander/ Unit Commanding Officer | Signature of General Counsel | Date | General Counsel's Determination: |
|---|---|---|---|
| *[signature]* | Karen Rowan | 11 Nov 02 | Concur ☑  Do Not Concur ☐ |

DD 11 440 (10/02)

7

# EXHIBIT I

Minute Order Form (06/97)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | Nan R. Nolan |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2463 | **DATE** | 9/8/2004 |
| **CASE TITLE** | Kevin Vodak vs. City of Chicago, et al. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   For the reasons stated in the attached Memorandum Opinion and Order, plaintiff's second motion to compel [91-1] is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | SEP 0 9 2004 | |
| | Notified counsel by telephone. | date docketed | 121 |
| ✓ | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | date mailed notice | |

| hmb | courtroom deputy's initials | 2004 SEP -8 PM 4: 27 CLERK U.S. DISTRICT COURT | Date/time received in central Clerk's Office | mailing deputy initials |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

SEP 0 9 2004

KEVIN VODAK, et al., individually and on
behalf of others similarly situated,

     Plaintiffs,

     vs.

CITY OF CHICAGO, et. al.,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

No. 03 C 2463

Judge David H. Coar

Magistrate Judge Nan R. Nolan

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiffs' Second Motion to Compel Discovery. The Court has reviewed the contested documents and grants in part and denies in part plaintiffs' motion for the following reasons.

## BACKGROUND

On March 20, 2003, thousands of persons gathered at the Federal Plaza located at Jackson Avenue and Dearborn Street in Chicago to express concern and protest the commencement of the United States war on Iraq. Over 500 persons were arrested and approximately 200-300 people were detained on that date. In this civil rights putative class action, plaintiffs allege false detentions, arrests, imprisonments and injuries sustained by approximately 800 class members on March 20, 2003. Defendants deny the plaintiffs' allegations and maintain "that the police acted entirely reasonably in response to a situation where Plaintiffs, and the putative class, embarked upon a completely unauthorized and un-permitted march through the streets of Chicago, took over Lake Shore Drive, and repeatedly disregarded and violated their own agreements with police and police orders not to march in various locations." Defs' Resp. at 11.

121

Request No. 27 of Plaintiffs' Demand for Production of Documents and Tangible Things sought production of any and all documents, notes, files, and reports pertaining to any information the defendants have on the Chicago Coalition Against War and Racism, the Autonomous Zone (A-Zone), the Iraq Peace Pledge, Not in My Name, Chicago-Indy Media, Andy Thayer, Chris Geovanis, and Daniel Romero. These groups, (with the exception of the Chicago Coalition Against War and Racism) and individuals (with the exception of Daniel Romero) were named by Lieutenant David Sobczyk in a Case Supplementary Report (the "Report") prepared by Detective Tony H. Jin and submitted on April 1, 2003. The Report includes Jin's summary of interviews with eight Chicago Police Department ("CPD") members "relative to the acts of civil disobedience occurring" on March 20, 2003 and "culminating in the mass arrests of 543 individuals." Report at 3.[1]

In their Supplemental Response to Plaintiffs' Request to Produce, defendants identified three files of the Chicago Police Department which "may contain documents responsive to some of plaintiffs' production requests." Defendants identified the files as Chicago Police Department Organized Crime Division, Intelligence Section, First Amendment Investigation files numbered 193-2003-01, 193-2003-2, and 193-2003-03 (the "First Amendment Files").

## DISCUSSION

Plaintiffs seek an order directing defendants to produce documents contained in the three files and directing witnesses from the CPD to answer deposition questions regarding the details of these police investigations. Defendants object to production of the First Amendment Files on the ground of relevancy and argue that these files are subject to protection from disclosure by the law

---

[1] The Report was received by counsel in discovery in the criminal cases stemming from criminal charges brought against plaintiffs and putative class members by defendants on March 20, 2003.

-2-

enforcement privilege. Defendants state that these three files contain information relating to internal police strategies and methods and the identity of undercover police officers. Defendants argue that disclosure of these files could result in substantial interference with future investigations, invade the privacy of individuals who were involved or identified in the investigations or threaten the safety of the undercover police officers. The Court addresses defendants' objections in turn.

A.    Relevance

Federal Rule of Civil Procedure 26(b)(1) prescribes the scope of matters upon which a party may seek discovery. "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Trial courts have broad discretion in resolving matters relating to discovery. Patterson v. Avery Dennison Corp., 281 F.3d 676, 681 (7th Cir. 2002).

Plaintiffs argue that the First Amendment Files are "relevant to show that Defendants did not arrest and/or prosecute Plaintiffs and putative class members for any illegal conduct on March 20th, but rather to punish and retaliate against them for exercising their First Amendment rights and expressing their opposition to the war in Iraq." Pls' Reply at 1. Specifically, plaintiffs argue that the First Amendment Files are relevant to their claims that: 1) their rights to speak freely and assembly were harmed in violation of their First Amendment and Illinois Constitutional rights; 2) defendants have a *de facto* policy and practice of infringing on individuals exercising their First Amendment rights as alleged in plaintiffs' *Monell* count; and 3) defendants conspired and agreed amongst each other to harass, intimidate, and retaliate against plaintiffs and putative class members for expressing their First Amendment rights and political beliefs as alleged in the state law

-3-

conspiracy count. Plaintiffs also argue that information contained in the First Amendment Files may illustrate defendants' state of mind which is relevant to plaintiffs' request for punitive damages. <u>See</u> <u>Marshall v. Teske</u>, 284 F.3d 765, 772 (7th Cir. 2002) (holding plaintiff entitled to punitive damages in § 1983 false arrest case where it can be shown that a defendant officer's conduct was motivated by "evil intent or callous indifference to the plaintiff's federally protected rights."). Finally, plaintiffs contend that the defendant officers' states of mind are relevant to plaintiffs' state law claim for malicious prosecution. <u>See Rodgers v. People's Gas, Light & Coke Co.</u>, 733 N.E.2d 835, 842 (Ill. App. 2000) (stating on a claim of malicious prosecution, "[i]t is the state of mind of one commencing the prosecution, and not the actual facts of the case or the guilt or innocence of the accused, which is at issue.").

In response, defendants assert that the criminal investigations are irrelevant to the conduct that occurred on March 20, 2003 which provided the probable cause to make arrests at Chicago and Michigan Avenues. Defendants argue that a review of the documents reveals that the First Amendment investigations were directed solely at potential criminal behavior and not designed to interfere, harass, punish or retaliate against anyone for engaging in conduct protected by the Constitution. Defendants contend that there is nothing in the documents "that would even tend to show that Defendants have a *de facto* policy and practice of infringing on First Amendment rights." Defs' Sur-Reply at 6.

The withheld 2003 First Amendment Files are relevant to plaintiffs' First Amendment, *Monell*, conspiracy, and malicious prosecution claims and their request for punitive damages. The files pertain to organizations identified by defendants as being present on March 20, 2003. Defendants may deny that the First Amendment files are relevant, but plaintiffs are entitled to

-4-

discovery to test that denial. In finding these files relevant for purposes of discovery, the Court emphasizes that Lieutenant David Sobczyk noted in his interview with Detective Tony Jin "relative to the acts of civil disobedience" occurring on March 20, 2003 that the A-Zone, Not in Our Name, Iraqi Peace Pledge and Andy Thayer and Chris Geovanis of Chicago-Indymedia were present at the Federal Plaza on March 20, 2003 and that the A-Zone is "an affinity organization promoting radical civil disobedience." Plaintiffs are therefore entitled to any information defendants possess regarding the A-Zone which may form the basis for Lieutenant Sobczyk's opinion that it "promot[es] radical civil disobedience." Lieutenant Sobczyk stated in his affidavit dated June 25, 2004 that his opinion is based on his "personal observations of the conduct of persons representing themselves to be affiliated with the A-Zone at previous protests, including protests about the Trans-Atlantic Business Dialogue, and most importantly, during the events of March 20, 2003." Sobczyk Aff. at ¶ 27. Plaintiffs are not required to take Lieutenant Sobczyk's word for it when he claims that his opinion was not based on any information contained in the First Amendment Files. Rather, plaintiffs are entitled to information defendants possess regarding the A-Zone to test Sobczyk's credibility on cross-examination regarding his statements.

Defendants also argue that reports in the files at issue which were generated after March 20, 2003 and reports on events occurring after that date are irrelevant to plaintiffs' claims that their rights were violated on March 20, 2003. Defendants note that none of the post-March 20, 2003 reports relates to any of the events that occurred on March 20, 2003. Defendants overlook the fact that the criminal prosecutions from March 20, 2003 were not dismissed until June of 2003. Post-March 20, 2003 documents may be relevant to plaintiffs' claim that defendants acted maliciously when

prosecuting hundreds for charges of reckless conduct.[2]

B.    Law Enforcement Privilege

Defendants also object to production of the First Amendment Files on the basis of the law enforcement privilege. The purpose of the law enforcement privilege is to "prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." Ostrowski v. Holem, 2002 WL 31956039, *2 (N.D. Ill. Jan. 21, 2002) (quoting Hernandez v. Longini, 1997 WL 754041, at *3 (N.D. Ill. Nov. 13, 1997)). The law enforcement privilege is not absolute; rather it is a qualified privilege under which the need for secrecy must be balanced against the plaintiffs' need for access to the information. Lepinka v. The Village of Franklin Park, 2004 WL 626830, at *2 (N.D. Ill. March 26, 2004).

The parties agree that in determining whether the law enforcement privilege applies, the Court must consider and weigh the following ten factors: (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the

---

[2] Defendants further argue that disclosure is unwarranted because they will not rely on any information from the First Amendment Files in defending this case and will only rely on what occurred on March 20, 2003. Defendants further state that while they "may offer some evidence relating to background information about plans for the protest and the potential for illegal behavior or outright violence," this evidence will be based on personal observations of police in other contexts and information gathered from public sources such as the internet. Defs' Resp. at 12 n.6. Defendants cannot limit discovery in this manner. Plaintiffs are entitled to discover these files to determine whether an argument can be made that information collected in the investigations impacted defendants' actions on March 20, 2003 and to cross-examine Lieutenant Sobczyk regarding his claim that evidence relating to background information was not received through these investigations.

degree to which government self-evaluation and consequent program improvement will be chilled

by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether

the party seeking the discovery is an actual or potential defendant to any criminal proceeding either

pending or reasonably likely to follow from the incident in question; (6) whether the police

investigation has been completed; (7) whether any intradepartmental disciplinary proceedings have

arisen or may arise from the investigation; (8) whether plaintiff's suit is non-frivolous and brought

in good faith; (9) whether the information sought is available through other discovery or from other

sources; and (10) the importance of the information sought to plaintiff's case. Kampien v.

Individuals of Chicago Police Department, 2002 WL 238443, *4 (N.D. Ill. Feb. 19, 2002). The

claim for application of the privilege is "somewhat stronger" when law enforcement is seeking to

protect ongoing investigations as contrasted with closed files, decisions to prosecute as contrasted

with decisions not to prosecute, confidential informant identities as contrasted with names of

incidental witnesses, confidential law enforcement methods and tactics as contrasted with simple

interview materials, and evaluative opinions as contrasted with facts. G-69 v. Degnan, 130 F.R.D.

326, 332 (D. N.J. 1990).

In the present case, each of the above factors weigh in favor of disclosure of the First

Amendment Files to the extent indicated below.

1.      The extent to which disclosure will thwart governmental processes by discouraging citizens
        from giving the government information

With respect to the first factor, defendants admit that the investigations "did not rely

extensively on information provided by private citizens." Defs' Resp. at 7. Nevertheless, defendants

assert that this factor should carry considerable weight in the Court's determination because many

witnesses provide law enforcement with information to solve and prevent crimes with the

expectation that their identities will be not be released to the public. Defendants fear that disclosure of information relating to these investigations will discourage citizen participation in future law enforcement efforts. Because defendants have not specifically identified any information within these files that was gathered from a private citizen, this factor weighs heavily in favor of disclosure. This Court's review of the files reveals that no "citizen statements" are involved and the information contained in the files was substantially given or gathered by law enforcement. Defendants' fears are unfounded. Disclosure here where no citizen statements are involved and the investigations did not rely extensively on information provided by private citizens should not intimidate potential witnesses from disclosing information to law enforcement officials.

2.    The impact upon persons who have given information of having their identities disclosed

The second factor also weighs in favor of disclosure. Defendants concede that the files in question here contain no information relating to "confidential informants" or "cooperating individuals." Therefore, confidential informants' identities will not be sacrificed by disclosure of these investigation files. Defendants argue, however, that the files should not be disclosed because the identities of uncover police officers will be revealed. Defendants have a valid interest in preserving the anonymity of undercover intelligence officers. The effectiveness and safety of undercover officers may be compromised if their identities are disclosed. See Aff. of Lieutenant D. Sobczyk at ¶ 11 (stating it is "crucial to keep [the] identities [of undercover police officers] confidential so that they can be used in future investigations, if necessary, and to protect personal safety."). Moreover, plaintiffs have not articulated any specific need for the names of undercover officers. Defendants may redact the names of all undercover intelligence officers as well as any identifying information contained in the files.

-8-

Defendants further seek to protect documents in Categories A, B, & D from File No. 193-2003-01, Categories A & B from File No. 193-2003-002, and Categories A & B from File No. 193-2003-03 from disclosure because they contain documents which reveal the targets of the investigations and other persons involved or identified. Law enforcement has a legitimate interest in maintaining the confidentiality of the targets of its investigations. Plaintiffs correctly point out that the targets of police investigations may likely desire to know that they were targets, but that desire does not override defendants' interest in confidentiality. Moreover, individual persons mentioned in the investigative files have a legitimate expectation of privacy. These law enforcement and privacy concerns do not, however, justify denying discovery altogether. As discussed below, a protective order limiting disclosure of these files to plaintiffs' attorneys in this case will adequately protect these concerns.

As to Category D of File No. 193-2003-01 or Category B of File No. 193-2003-02, the Court finds that plaintiffs are not entitled to discover the documents contained therein. These documents consist of a comprehensive background report on a possible target (Category D of File No. 193-2003-01) and three license plate background reports on potential targets (Category B of File No. 193-2003-02). The CPD has a valid interest in maintaining the confidentiality of potential targets and the contents of non-public background reports on them. The documents at issue contain private information which is not necessary or relevant to plaintiffs' case. The fact that the CPD generates background reports on potential targets in First Amendment investigations is not a confidential law enforcement technique. In fact, defendants' privilege log, which was filed in the public record, indicates that these categories of documents contain background reports on possible targets of the investigations. It is sufficient that plaintiffs know that background reports were conducted in

-9-

connection with the three First Amendment investigations at issue. The actual names of the targets and the contents of the documents are not relevant here.[3]

3.   The degree to which government self-evaluation and consequent program improvement will be chilled by disclosure

The next factor also weighs in plaintiffs' favor. Defendants argue that disclosure of the First Amendment Files will reveal the CPD's techniques and methods of conducting intelligence investigations and "would only serve to compromise public safety." Defs' Resp. at 8. Defendants have not pointed to any governmental self-evaluation or consequent program improvement that will be chilled by disclosure here. Moreover, defendants' sweeping conclusion that public safety will be compromised by revelation of CPD's techniques and methods of conducting First Amendment investigations is insufficient to justify non-disclosure. Plaintiffs correctly point out that the procedures for initiating as well as the investigative techniques that may be used in First Amendment investigations by the CPD are matters of public record. See CPD's Addendum to General Order 02-10 attached to Defs' Resp. at Exhibit E. The use of undercover police officers to collect information about a group or organization engaged in First Amendment conduct is not a novel technique requiring protection from disclosure by the law enforcement privilege. See 2/19/04 Chicago Sun Times article titled "Police Infiltration of Protest Groups Has Civil Rights Activists Fuming," attached as Exh. E to Plfs' motion.

---

[3] The Court notes that neither of the individuals mentioned by Lieutenant Sobczyk in the Report (Andy Thayer and Chris Geovanis) were the subject of the comprehensive background report nor are they mentioned in the license plate background reports.

4.    Whether the information sought is factual data or evaluative summary

The fourth factor weighs in favor of disclosure. Defendants contend that the documents contained in Category A from File No. 193-2003-001, Category A from File No. 193-2003-002 and Categories A & B from File No. 193-2003-003 are evaluative in nature and should not be disclosed. These categories contain actual reports generated in the investigation. Plaintiffs state that they are entitled to any factual data in the files, including officers' observations, collection of materials, and statements from individuals.

The entire portion of the materials in the cited categories does not consist of evaluative comments. Moreover, many facts are so intertwined within the evaluative discussions that they cannot be separated.[4] In any event, the fact that the actual reports generated in the investigations may contain evaluative material is not an absolute bar to disclosure. Such information may be highly relevant to defendants' state of mind. As the Court noted in Anderson v. Marion County Sheriff's Dept., 220 F.R.D. 555, 566 (S.D. Ind. 2004):

> Typically, courts require reports containing both factual and evaluative materials to be disclosed in civil rights actions brought pursuant to 42 U.S.C. § 1983. In such cases, the evaluative materials may be the best evidence available of the state of mind of the defendant and exempting the evaluative materials from discovery "might well bar jury scrutiny of highly relevant evidence which cannot adequately be developed in any other way."

See also Rodriquez, 1987 WL 17466 at *2 (noting that evaluative comments may reflect the attitude of police officers which is relevant in cases alleging a pattern and practice of illegal conduct).

---

[4] Courts have recognized that as a practical matter, it is difficult to separate factual material within a report from evaluative discussions. See King v. Conde, 121 F.R.D. 180, 193 (E.D. N.Y. 1988) (stating "[c]ourts should not expend too much effort trying to distinguish 'factual' from 'evaluative' information . . . This distinction is likely to be elusive and often arbitrary."); Rodriquez v. City of New York, 1987 WL 17466, at *2 (E.D. N.Y. Sept. 22, 1987) (noting the difficulty of distinguishing between factual data and evaluative material).

-11-

Plaintiffs are asserting, among other things, that the CPD has a policy and practice of infringing on individuals exercising their First Amendment rights. Plaintiffs are entitled to the information in defendants' possession regarding the groups and individuals mentioned by Lieutenant Sobczyk in the Report to determine what impact, if any, the gathered information had on defendants' actions on March 20, 2003. Defendants' state of mind is also directly relevant to plaintiffs' malicious prosecution claim as well as their request for punitive damages.

Finally, defendants have failed to make any showing of specific harm to law enforcement efforts that would occur by disclosure of any evaluative comments to plaintiffs' counsel. In fact, knowledge that reports generated in First Amendment investigations might be disclosed to plaintiffs' civil rights lawyers may lead the CPD to maintain or improve its First Amendment investigations, not impede or compromise the investigatory process.

Defendants also contend that documents contained in Category E from File No. 192-2003-001 and Category C from File No. 193-2003-002 should be protected from disclosure. These documents were gathered in the course of the investigations and evaluated by law enforcement officers. Quoting Doe v. Hudgins, 175 F.R.D. 511, 514 (N.D. Ill. 1997), defendants note that "[t]he common law has generally recognized . . . a privilege protecting information gathered in the course of an enforcement investigation." Defs' Resp. at 9. The Court rejects the suggestion that the law enforcement privilege creates a blanket exemption from disclosure for all materials gathered in a law enforcement investigation without an analysis of the specific types of information gathered in each case and a specific showing of harm from disclosure. The categories highlighted by defendants here consist of pamphlets, newsletters, a series of internet postings, an advertisement, and essays which were distributed at public events that were the subject of the investigations. Defendants do not

-12-

contend in their Amended Privilege Log that disclosure of materials distributed at public events that were the subject of investigations will reveal confidential law enforcement techniques, procedures, and methods of evaluation. Moreover, defendants fail to make any showing of specific harm from disclosure of documents gathered at a public event and that exist in the public domain.

5.    The remaining factors

The fifth factor weighs in favor of disclosure. Plaintiffs and putative class members are not defendants in any actual or pending criminal proceeding either pending or reasonably likely to follow from the incident in question. The sixth factor also favors disclosure as defendants acknowledge that all three First Amendment investigations have been completed. Defendants contend that disclosure of these completed investigations will seriously impair future investigations if CPD's methods and procedures and the identity of undercover officers are revealed. Defendants' contention is unpersuasive given that novel and confidential investigative techniques are not at issue here and the identity of undercover officers will not be revealed. There is also no evidence that any intradepartmental disciplinary proceedings have arisen or may arise from the First Amendment investigations. As to the eighth and ninth factors, defendants do not contend that plaintiffs' lawsuit is frivolous and brought in bad faith or that the information sought is available through other discovery or from other sources. Finally, as discussed above, plaintiffs have demonstrated a sufficient need for the withheld information.

6.      The Modified Consent Decree

Defendants point out that the investigations were conducted pursuant to the Modified Consent Decree entered in Case Nos. 74 C 3268 and 75 C 3295 and this fact favors non-disclosure. The Modified Consent Decree contemplates confidentiality of certain information but does not prevent disclosure under the circumstances presented here. The Modified Consent Decree bars auditors from access to "information specifically identifying confidential information" or "to current criminal investigations that the Superintendent of Police states might be compromised by disclosure to the auditors." Modified Consent Decree at ¶ 5. The Modified Consent Decree also provides that the Chicago Police Board cannot disclose "in any manner details that specifically identify any investigations except as otherwise permitted by law, nor shall it disclose in any manner information that would reveal the identify of a confidential informant, compromise an ongoing criminal, regulatory, or employee disciplinary investigation, or constitute an invasion of a person's privacy." Id. These terms do not prevent disclosure of relevant investigative material in a civil case. Moreover, the Modified Consent Decree's concerns about revealing the identities of confidential informants and compromising or interfering with ongoing investigations are not implicated here.[5]

C.      Protective Order

The Court finds that good cause exists to enter a protective order limiting the disclosure of the First Amendment Files to plaintiffs' counsel in this case. Lieutenant David Sobczyk states in his affidavit that as the supervisor responsible for these investigations, he anticipated that they would

---

[5] Defendants' claim that plaintiffs' motion is "actually a thinly-veiled attempt to attack the propriety of the First Amendment Investigations pursuant to the Modified Consent Decree" is unavailing. Defs' Sur-Reply at 2. Plaintiffs are not seeking to enforce or punish any violation of any provision of the Modified Consent Decree. Plaintiffs only sought the withheld information in response to statements made by Lieutenant Sobczyk in the post-arrest police report.

-14-

"remain confidential pursuant to the Modified Consent Decree, and that [] information gathered would not be disclosed except as necessary to comply with the audit procedures." Sobczyk Aff. at ¶ 9. CPD's General Order 02-10 which incorporates the Modified Consent Decree into the CPD's operating policies and procedures requires all closed First Amendment investigation files be forwarded to the General Counsel to the Superintendent in a sealed file. <u>See</u> General Order 02-10, Addendum 1A, VI.B.7. Sobczyk's expectation of confidentiality from public disclosure is not unreasonable given the limitations on disclosure contemplated by the Modified Consent Decree and General Order 02-10. A protective order limiting the disclosure of the First Amendment Files to plaintiffs' counsel will adequately address the CPD's legitimate expectation of privacy in its investigatory files and its valid concern that disclosure of these investigation files will reveal to the public where Unit 193 has been focusing its investigative efforts which may compromise its ability to conduct future investigations. Also, a protective order preventing the public disclosure of names of the persons involved or identified in the files will adequately protect the privacy of these private individuals.

<b><u>CONCLUSION</u></b>

For the reasons explained above, plaintiffs' second motion to compel is granted in part and denied in part.

<b>E N T E R :</b>

<i>Nan R. Nolan</i>

**Nan R. Nolan**
**United States Magistrate Judge**

Dated: 9 / 8 / 04

-15-

EXHIBIT J

| | **ADDENDUM TO:** | DATE OF ISSUE | **A.** CTIVE DATE | NO. |
|---|---|---|---|---|
|  | General Order 02-10 | 03 September 2003 | 04 September 2003 | 1A |

| SUBJECT | DISTRI-BUTION | RESCINDS |
|---|---|---|
| INVESTIGATIONS DIRECTED AT FIRST AMENDMENT-RELATED INTELLIGENCE | C | Addendum 1 |

I. **PURPOSE**

This addendum:

A. identifies and explains types of investigations which trigger First Amendment considerations and implicate the modified First Amendment consent decree.

B. establishes responsibilities and procedures relative to investigations directed toward First Amendment-related intelligence.

C. continues the use of the First Amendment Worksheet (CPD-11.440).

D. introduces the First Amendment Investigation Unit Log (CPD-11.387).

E. provides members with a copy of the modified consent decree which is included as Attachment No. 1 to this directive.

II. **DEFINITIONS AND EXPLANATIONS**

A. **Criminal Investigation**

1. A criminal investigation is any police action which is intended to determine, through the use of any lawful technique including criminal intelligence gathering, whether an individual or entity has violated, is violating, or is intent on imminently violating any federal, state, or local law based on an articulable reason. Therefore, even though **First Amendment-related activity may be involved, such investigation is not directed toward First Amendment-related intelligence within the meaning of this directive and all conventional investigations of** criminal conduct will proceed as directed by relevant Department directives.

2. Examples

   a. Pursuant to an investigation of a bombing of a church whose members are predominately of one race, members of a race-based hate group active in Chicago are interviewed to determine if they have any knowledge that may assist in the investigation. These interviews are undertaken as part of an investigation of a violation of law and are not directed toward First Amendment-related intelligence.

   b. An undercover police officer enters a bar at which music and dancing occurs to determine if underage persons are obtaining alcoholic beverages. This investigation is intended to determine if a violation of law has occurred and is not directed toward First Amendment-related intelligence.

B. **First Amendment-Related Intelligence**

First Amendment-related intelligence is the process of information gathering and analysis which is:

1. undertaken on the basis of the political, religious, social, or other views expressed by any individual or group either verbally, in writing, or otherwise, or any artistic or musical expression and;

2.   not directly part of a criminal investigation.

C.   **Informant**

An informant is an agent who collects information without disclosing to the source of the information his or her function as an agent.

D.   **Infiltrator**

An infiltrator is an informant or authorized Department member who, while posing or acting as a member or participant in a group or organization without disclosing to the group or organization and its members his or her function is an agent, inhibits or redirects the exercise of the group's or a group member's First Amendment rights.

E.   **Mail cover**

Mail cover is the acquisition of information from the outside surface of mail.

F.   **Minimization Procedures**

Minimization procedures are reasonable precautions taken to ensure a proportionate response to a perceived threat which will not be likely to materially impair the success of the investigation but which will avoid interfering with the rights of all individuals, groups, and entities to speak, worship, write, and otherwise communicate free from governmental interference. Minimization procedures will be employed in all investigations directed toward First Amendment-related intelligence and the need to minimize governmental interference will be considered in such decisions as selecting an investigative technique, when disseminating information, and when retaining intelligence data.

G.   **Proper Law Enforcement Purpose**

1.   A proper law enforcement purpose varies with each situation, and different facts may justify either an investigation, a detention, a search, an arrest, or no action at all. Proper law enforcement purpose means that, in every situation, officers will act reasonably within the limits of their authority as defined by statute and judicial interpretation.

2.   An improper police purpose is explicitly prohibited by the modified consent decree and is a police investigation, prosecution, interference, disruption, or harassment intended to punish, retaliate, or discriminate against persons based upon First Amendment conduct.

H.   **Undercover Officer**

An undercover officer is an authorized Department member who, while posing or acting as a member or participant in a group or organization without disclosing to the group or organization and its members his or her function as an agent, takes no action which will inhibit or redirect the exercise of the group's or a group member's First Amendment rights.

I.   **Unit**

For purposes of this directive, a unit is any subdivision of the Department which is commanded by a member of exempt rank.

### A. All Police Action

All police action will be conducted for a proper law enforcement purpose and in accordance with the modified consent decree, a copy of which is included as Attachment No. 1 to this directive. The consent decree provides that no agent or agency of the City of Chicago will:

1. investigate, prosecute, disrupt, interfere with, or harass any person for the purpose of punishing or retaliating against that person for engaging in conduct protected by the First Amendment or for the purpose of preventing them from engaging in such conduct;

2. discriminate against any person on the basis of conduct protected by the First Amendment, except as may be permitted by law;

3. authorize, assist, or encourage any person to violate the modified consent decree, or to commit an act that would violate it if committed by a City agent.

### B. Public Gatherings and First Amendment Conduct

1. An event or gathering in public may be held for the purpose of or concerning ideas or beliefs about public or social policy, or political, educational, cultural, economic, philosophical, or religious matters. However, the First Amendment does not necessarily apply to gatherings or public assemblies unrelated to the right to hold and express the above ideas and beliefs. For example, a public fireworks display need not have any First Amendment significance but Department members must be aware that an individual or group choosing to attend a public gathering may spontaneously engage in First Amendment conduct.

2. All Department members present at public gatherings will be courteous and respectful. Members will not harass, intimidate, or make comments about the views expressed by persons attending public gatherings. Members will not interrogate or otherwise question participants concerning their views unless essential to an investigation of an apparent violation of law, or as part of an investigation directed toward First Amendment-related intelligence that has been authorized as provided below.

3. Any sworn Department member may initiate a preliminary investigation of a public gathering, for public safety purposes, without authorization, as follows:

   a. Members may gather published announcements of future public gatherings and review permit applications.

   b. Members may investigate and communicate overtly with the organizers of a public gathering or any other person concerning the number of persons expected to participate and similar information regarding the time, place, and manner of a public gathering.

   c. Members may investigate prior public gatherings when useful to determine what police resources will be necessary to adequately protect demonstrators, bystanders, the general public, and to enforce all applicable laws.

d.  Information obtained during the course of such a preliminary investigation will be made the subject of an Information Report (CPD-11:461). That report, along with pertinent attachments, will be forwarded to the First Deputy Superintendent.

4.  Filming and photographing at public gatherings is appropriate.

    a.  Filming and photographing of events on the public way is generally appropriate and may be conducted for any proper law enforcement purpose. For example, filming and photographing events on the public way is generally appropriate in order to document violations of law and police misconduct, to defend against baseless allegations of police misconduct, as an aid in the future coordination and deployment of multiple police units, and for training purposes.

    b.  Filming or photographing at a public gathering is not an investigation directed toward First Amendment-related intelligence within the meaning of this directive.

    c.  Filming or photographing at a public gathering must be approved by a unit commanding officer of exempt rank.

    d.  The officer in charge at the public gathering will:

        (1)  ensure that film and photographic equipment are available and are used as appropriate under this and other Department directives.

        (2)  determine, based on the operational needs, whether the Organized Crime Division or the Education and Training Division shall conduct the filming and/or photographing.

        (3)  will consult with the Department of Law, Municipal Prosecutions Division, for guidance when practical.

           NOTE: If the officer in charge has not been predetermined in a Department directive pertaining to the public gathering/event, the highest ranking member of the Patrol Division assigned to the public gathering will be the officer in charge.

    e.  Filming and/or photographing of public gatherings shall not include audio recording, unless specifically authorized by the approving command member or court order.

5.  After a public gathering has been concluded, the unit commanding officer of exempt rank will direct a report to the First Deputy Superintendent describing:

    a.  the nature of the event,

    b.  the number of participants,

    c.  any violations of law or police misconduct during the course of the event, and

    d.  any additional information that may be useful in planning police response to similar public gatherings in the future.

NOTE: Copies of such reports may be provided to the Department of Transportation from the First Deputy Superintendent's Office (after being edited for sensitive law enforcement-only information) for its use in acting upon future applications for permits for public gatherings.

6. The Coordinator of Special Events may:

a. provide a staff review of all proposed public gathering and dignitary protection matters brought to his or her attention.

b. perform and provide staff supervision of all such authorized activities which may require resources beyond those available at the unit level.

C. Any Department member having knowledge that another member is engaged in activity prohibited under the modified consent decree will have the duty to report such activity to his or her supervisor. All supervisory and command personnel will ensure that the complaint register process as prescribed in the Department directive entitled "Complaint and Disciplinary Procedures" is followed when activity by a Department member involves a violation of any First or Fourth Amendment right or consent decree.

## IV. THE FIRST AMENDMENT AND INTELLIGENCE GATHERING

A. The United States Constitution, as well as applicable federal, state, and municipal law, permit investigations of individuals for any proper governmental purpose, even when:

1. those individuals are engaged in political, social, or religious advocacy, or other communicative activities protected by the United States and Illinois Constitutions, and

2. there is no reason to believe that those individuals have as yet committed a crime.

B. Advocacy of violence or unlawful acts is protected by the First Amendment until such advocacy presents an imminent and credible threat. However, law enforcement has a duty to gather information about groups and individuals that advocate violence or that have been associated with violence or unlawful conduct, even absent evidence of an imminent and credible threat. Intelligence gathering is thus a legitimate law enforcement function as long as it is conducted for proper purposes,

C. Investigations directed toward activities protected by the First Amendment which are undertaken solely for intelligence gathering will violate the First Amendment if undertaken for anything other than a proper law enforcement purpose.

D. Investigations directed toward activities protected by the First Amendment which are undertaken solely to gather intelligence will require a proper law enforcement purpose and authorization as provided in this directive. However, even authorized First-Amendment investigations will not be used to punish, retaliate, or discriminate against any person based upon the content of any person's views, speech, or writings, nor will the investigations disrupt, interfere with, or harass any person or group engaged in First Amendment conduct.

Examples:

1. A person is standing on a street corner in the Loop, violating no laws, but is offering passers-by literature supporting the bombing of targets in the United States. A plainclothes officer accepts the literature. An ensuing investigation of the source of the literature is directed toward First Amendment-related intelligence and for a proper law enforcement purpose.

2. An officer monitors a website promoting the views of a pro-life group which seems to approve of the use of violence in pursuit of its goals. Members of the group have not been suspected of committing any crimes, but the officer nevertheless wishes to monitor the number of hits the website receives. Such an investigation of the website is directed toward First Amendment-related intelligence, and may be continued for a proper law enforcement purpose.

E. If an investigation that gathers information with intelligence value is conducted for a proper purpose and is not more extensive or intrusive than is justified by its proper purpose, the investigation is consistent with the First Amendment and the modified consent decree.

## AUTHORIZATION FOR INVESTIGATIONS DIRECTED TOWARD FIRST AMENDMENT-RELATED INTELLIGENCE

A. Authorization to conduct First Amendment-related intelligence gathering that is not part of a criminal investigation must be obtained from a unit commanding officer of exempt rank. Such authorization will be for a period not to exceed 120 days and may be approved in increments of less than 120 days in order to ensure minimization and a proportionate response to the basis and purpose of the investigation. Prior to the expiration of the initial or succeeding period, application may be made for an additional period of up to 120 days, beginning upon the expiration of the preceding period.

B. No member may conduct an investigation which is directed toward First Amendment-related intelligence without authorization except as provided in this addendum.

C. Investigative Techniques

1. The investigative techniques used in any particular instance shall use minimization procedures proportional to the anticipated gravity of the crime or potential threat to public safety, the evidence of past or present criminal activity, and the likely effectiveness of a particular investigative technique.

2. For purposes of this directive, the following levels of techniques are established.

    a. Level I Techniques:

        (1) Examination of public records and other sources of information available to the general public;

        (2) Examination of Chicago Police Department files and records;

        (3) Examination of records and files of other government or law enforcement agencies;

        (4) Interviews of any person;

(5) Physical surveillance from pla[ ] s open to the public or otherwise legally made available.

(6) Department members are authorized overtly to visit any place and attend any event that is open to the public, on the same terms and conditions as members of the public generally are and as long as members have a proper law enforcement purpose, such as detecting threats to public safety, and for the purpose of detecting or preventing unlawful activity.

b. Level II Techniques:

(1) Lawful electronic surveillance of persons not on the public way such as the use of covert videotape, body wire, or audiotape.

(2) The use of mail covers, informants, undercover officers, or infiltrators.

3. Department members may use Level I investigative techniques in an authorized investigation directed toward First Amendment-related intelligence as long as the investigation is being conducted for a proper purpose.

4. Members will request the use of a Level II investigative technique in an authorized investigation directed toward First Amendment-related intelligence and receive approval from the unit commanding officer of exempt rank prior to the use of any such technique.

NOTE: Level II techniques may require a judicial order prior to implementation.

5. The use of an infiltrator in an authorized investigation directed toward First Amendment-related intelligence will be requested from and approved by the Superintendent prior to the use of the infiltrator in increments of time to be determined by the Superintendent. Progress reports will be filled out and sent to the Superintendent, Attention: General Counsel for each segment granted. Any infiltration request approved for 30 days or greater shall be the subject of a progress report directed to the Superintendent every 30 days.

VI. PROCEDURES FOR AUTHORIZING THE INITIATION OR CONTINUATION OF INVESTIGATIONS DIRECTED TOWARD FIRST AMENDMENT-RELATED INTELLIGENCE

A. Department Member's Procedures to Initiate or Continue an Investigation

1. Initiating an Investigation

a. Any sworn member may initiate and conduct an investigation which is known or suspected to be directed toward First Amendment-related intelligence, without prior exempt Department member approval, by notifying a supervisor, for a period not to exceed 24 consecutive hours from the time the investigation is started. The initiating member will notify his or her unit commanding officer of exempt rank of the initiation of such an investigation by submitting a To-From-Subject report as soon as possible but no later than 24 hours from the time of initiation of the investigation. The To-From-Subject report will be addressed to the Superintendent of Police, Attention: General Counsel, and will contain an approval line for the member's district or unit

commanding officer. The report will contain the following information:

(1) the date and time the investigation was initiated;

(2) the basis, purpose, and methods of the investigation, including the source of the information which prompted the investigation, and the anticipated use of any Level II investigative techniques;

(3) a recommendation to continue or terminate the investigation.

2. Continuation of an Investigation

a. Members must continually assess authorized First Amendment intelligence gathering investigations and determine if the investigation has evolved into a criminal investigation.

b. Members conducting the investigation will submit to their unit commanding officer of exempt rank To-From-Subject reports detailing the progress of the investigation at 30 day intervals or at shorter intervals as directed by the commanding officer. Such reports will include details regarding:

(1) information uncovered, investigative methods employed, including the use of Level II techniques;

(2) the minimization procedures followed;

(3) a recommendation to continue or terminate the investigation based upon an analysis of information gathered.

c. Requests by members to continue investigations directed toward First Amendment-related intelligence will be reviewed by their unit commanding officer of exempt rank consistent with Item VI-B-2-a and b of this directive.

(1) If continuation is authorized, it will be conducted within the parameters set forth in the report of the exempt unit commanding officer authorizing the investigation and in accordance with this directive.

(2) If the investigation is to be reassigned to another unit, the initiating member will make notifications as instructed and will forward all materials collected or generated in connection with the matter to his unit commanding officer of exempt rank.

(3) If the investigation is terminated, the initiating member will refrain from further investigation and will forward all materials collected or generated in connection with the matter to his unit commanding officer of exempt rank.

B. District/Unit Commanding Officer of Exempt Rank

1. The responsibility of unit commanding officers of exempt rank for investigations directed at First Amendment-related intelligence begins at the time they receive a To-From-Subject report from a member of their command who is or was conducting such an investigation or otherwise learns that such an investigation is under way or has been conducted.

**NOTE:** In the absence of a unit commanding officer of exempt rank, the on-duty Assistant Deputy Superintendent, Operations Command, will assume this responsibility.

2. Upon receipt of the To-From-Subject report requesting the initiation of an investigation known or suspected to be directed toward First Amendment-related intelligence, the unit commanding officer of exempt rank will personally and promptly:

    a. review the report to determine whether to authorize the investigation.

    b. consult with the Office of Legal Affairs, which will assist the commanding officer to determine whether the contemplated action is related to First Amendment-related intelligence or merely to a criminal investigation.

        (1) If the determination made at this point is that the contemplated action is related to a criminal investigation, the constraints outlined in this addendum do not apply. The investigation may proceed according to normal investigative procedures as outlined in relevant Department directives.

        (2) If the determination is made at this point that the contemplated action is directed at First Amendment-related intelligence, the unit commanding officer of exempt rank will consult with the Commander of the Intelligence Section of the Organized Crime Division for the purpose of conducting further analysis of the information which prompted the investigation as well as determining whether reassignment of the investigation should be recommended.

3. Examples of First Amendment-related investigations and appropriate authorizations:

    a. Literature is distributed supporting the bombing of targets in this country. An investigation identifying those responsible for this literature may have intelligence value and may be authorized.

    b. A race-based hate group associated with unlawful acts in other jurisdictions opens a chapter in Chicago. An investigation that identifies its members and their goals and means of support may have intelligence value and may be authorized.

    c. An organization advocating worldwide disarmament opens an office in Chicago and a sworn member suggests raiding its office to determine if it advocates violence. This raid could not be authorized, as there is no evidence to even suggest that a violation of any law has or will occur. Additionally, if literature reflecting the group's views can be obtained through other means, the raid would violate this directive's requirement of minimization procedures. Any search of nonpublic areas would also violate the Fourth Amendment if performed without a warrant and in the absence of consent or exigent circumstances.

4. **Initial Request to Investigate Authorized**

Upon determining that the investigation will be authorized, the unit commanding officer of exempt rank will:

a. ensure that the investigation will employ minimization procedures.

b. ensure that there is no indication that the investigation is being conducted for a purpose other than a proper law enforcement purpose.

c. assign a First Amendment Investigation Tracking Number to the investigation, generated in the following manner:

(1) the requesting unit's number, followed by a dash;

(2) the calendar year, followed by a dash;

(3) a sequential number of the investigation for that unit, as evidenced by that unit's First Amendment Investigation Unit Log. For example, a First Amendment Investigative Tracking Number of 188-2002-03 will represent the third such investigation in the year 2002 by members of Unit 188.

d. prepare a First Amendment Worksheet describing the basis, purpose, and methods of the investigation.

e. provide written authorization for the investigation to the initiating member in the form of a copy of the completed First Amendment Worksheet which will include:

(1) the date on which authorization for the investigation will expire;

(2) the required minimization procedures;

(3) authorization or non-authorization of Level II investigative techniques, other than the use of an infiltrator.

f. attach a copy of the initiating member's report to the First Amendment Worksheet.

g. forward these reports and copies of any other supporting documents pertinent to the initiation of the investigation to the Superintendent, Attention: General Counsel in a sealed file by messenger.

5. **Initial Request to Investigate Not Authorized**

If the investigation is not authorized by the unit commanding officer of exempt rank, that commanding member will:

a. cross out the word "Approved" above the corresponding signature line on the To-From-Subject report and write "Disapproved" over it;

b. sign his or her name, and

c. order the initiating member to:

(1) terminate the investigation and

(2. immediately submit any and all materials already generated under the investigation to that unit commanding officer of exempt rank who disapproved the investigation.

d. forward the initiating member's disapproved To-From-Subject report and any related materials received from the initiating member to the General Counsel to the Superintendent by messenger in a sealed file.

6. Reviewing Progress Reports of Investigations

a. District/unit commanding officers of exempt rank will review all progress reports submitted to them and make determinations whether to continue, terminate, or possibly reassign the investigation to another Department unit.

(1) Each decision to continue, terminate, close, or reassign a First Amendment investigation will be documented on a new First Amendment Worksheet in the narrative section entitled "Factual Basis for Investigation."

(2) District/unit commanding officers of exempt rank must:

(a) be mindful of the sensitive nature of First Amendment related intelligence gathering investigations and their on-going obligation to remain fully informed and assured that the nature, scope, and conduct of the investigators is within the limitations of the investigation as authorized and;

(b) reassess the investigation in consultation with the Office of Legal Affairs and the Intelligence Unit when receiving progress reports and on an as needed basis.

(3) The unit commanding officer of exempt rank will forward:

(a) originals of all First Amendment Worksheets and periodic progress reports to the General Counsel to the Superintendent.

(b) copies of all materials pertaining to any investigation directed toward First Amendment-related intelligence which arises from a threat to the physical safety of a dignitary or from a public gathering to the Coordinator of Special Events, regardless of whether initiation of any such investigation has been authorized.

7. Upon the completion or termination of an investigation directed at First Amendment-related intelligence, all reports, files, or other materials generated in connection with that investigation will be forwarded to General Counsel to the Superintendent by messenger in a sealed file.

C. If any unit commanding officer of exempt rank determines that the continuation of a First Amendment-related investigation should be assigned to a unit within the Bureau of Investigative Services other than the unit currently conducting the investigation, the exempt member will forward a report recommending such action, along with the First Amendment Worksheet and any materials received from the initiating member, to the Deputy Superintendent of the Bureau of Investigative Services.

Upon becoming aware of an investigation directed toward First Amendment-related intelligence and determining that such investigation may more appropriately reside within the responsibilities of the Bureau of Investigative Services, the Deputy Superintendent, Bureau of Investigative Services will, in consultation with the General Counsel to the Superintendent, make a written recommendation to the Superintendent of Police as to the assignment of that investigation.

E.    General Counsel to the Superintendent

1.    The General Counsel will review all submitted First Amendment Worksheets and indicate a concurrence or non-concurrence with the investigation.    If the General Counsel does not concur with the authorization of an investigation directed at First Amendment intelligence-gathering, the General Counsel will document the reasons for such non-concurrence in a To-From-Subject report directed to the appropriate Deputy Superintendent and/or the Superintendent.

2.    The General Counsel will provide advice to the Superintendent regarding the compliance of such investigations with the modified consent decree and this directive.

3.    The General Counsel will ensure that all materials relating to an investigation directed at First Amendment-related intelligence are forwarded to the Commander of the Intelligence Section in a secure and timely manner.

F.    All Deputy Superintendents

Upon receiving a report from the General Counsel detailing reasons for the non-concurrence with a district or unit investigation directed at First Amendment intelligence-gathering, the affected Deputy Superintendent will:

1.    make a determination to continue or terminate the investigation.

2.    document his or her decision in a To-From-Subject report to the General Counsel to the Superintendent.

3.    forward a copy of said report, along with specific instructions, to the commanding officer of the unit conducting the investigation.

G.    Superintendent of Police

The Superintendent of Police:

1.    retains the ultimate authority for the approval of all investigations directed toward First Amendment-related intelligence and may:

a.    notify other Department members of the existence of an investigation which is directed toward First Amendment-related intelligence,

b.    direct Department members to participate in or to monitor an investigation which is directed toward First Amendment-related intelligence,

c.    cause such an investigation to be reassigned to another unit, or

d.    direct the termination of such an investigation.

2.    will per   ially approve or deny in writing   ry infiltration request for a period of time to be determined by  ne Superintendent.  After approval of an investigation, progress reports to the Superintendent are required for each investigation segment granted.  Any infiltration request approved for 30 days or greater shall be the subject of a progress report directed to the Superintendent every 30 days or sooner, as the Superintendent deems necessary.

3.    will specifically authorize and limit access to information kept in files maintained by the General Counsel which pertain to investigations directed toward First Amendment-related intelligence.

4.    will ensure that the Commander of the Auditing and Internal Control Division conducts an annual Departmental audit of investigations directed toward First Amendment-related intelligence.

5.    will submit copies of the audit report to the Mayor, the Police Board, and the court with jurisdiction over the cases in which the modified consent decree was entered.

6.    will ensure that proper training and supervision is provided to members in accordance with the provisions of the modified consent decree.

H.    The Intelligence Section, Organized Crime Division

1.    The Intelligence Section will be responsible for the analysis of all materials (written or electronic files or notes, photographs, video-tapes, audiotapes, etc.) generated in investigations directed at First Amendment-related intelligence.

2.    Designated members of the Intelligence Section will determine if the materials have a continuing police purpose.

    a.    Materials deemed to have no First Amendment relationship will be returned to the unit of creation, with the instructions to review the materials, in consultation with members of the Education and Training Division, to determine if they may be suited for training purposes.

    b.    Materials deemed to have a First Amendment relationship but no continuing police purpose will be destroyed and the destruction order and documentation of actual destruction will be retained for five years.

    c.    Materials deemed to have a continuing police purpose will be retained for a period not to exceed five years. Within the five year period, the Commander of the Intelligence Section will ensure that a periodic analysis is completed. If in the opinion of the Commander:

        1.    these materials no longer have a continuing police purpose, they will be destroyed, with documentation to record the destruction order and actual destruction.

        2.    a longer retention period is appropriate, the Commander will prepare a report addressed to the Superintendent, specifying the reasons for the continued retention. Justification for the continued retention will be consistent with federal and state law relating to the retention of information.

3.  The Intelligence Section will complete the analysis described in Item
    VI-H-2 within 120 days of receipt of the material.

Acting Superintendent of Police

Indicates new or revised material.
02-132 LMT

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on April 25, 2005 he served a copy of the foregoing AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS AND AMERICAN FRIENDS SERVICE COMMITTEE'S PETITION TO ENFORCE MODIFIED CONSENT DECREE, causing the same to be placed in an envelope with first-class postage affixed thereto and deposited in the United States mail at or before 5:00 p.m., addressed as follows:

Thomas Forgue
William Macy Aguiar
City of Chicago Law Department
30 North LaSalle Street – Suite 900
Chicago, Illinois 60602

Harvey Grossman