IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 75 C 3295 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ACLU PLAINTIFFS' RESPONSE TO CITY'S MOTION
TO DISMISS PETITION TO ENFORCE MODIFIED CONSENT DECREE**

Harvey Grossman
Adam Schwartz
**Roger Baldwin Foundation of ACLU, Inc**.
180 N. Michigan Avenue
Suite 2300
Chicago, IL 60601
(312) 201-0740

Edward W. Feldman (#061877541)
Thomas M. Staunton (#06217164)
Jennifer Smiley (#6275940)
**MILLER, SHAKMAN & HAMILTON LLP**
180 North LaSalle St., Suite 3600
Chicago, Illinois 60601
(312) 263-3700

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.     Improper Disclosure of AFSC as a Subject of a Police Investigation and
Infiltration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.     The Irregularities of the AFSC Investigation and AFSC's Request for
Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.     The Improper Destruction (or "Partial Destruction") of the First
Amendment Investigation File, and the City's Revised General Order
Permitting Destruction of First Amendment Investigation Files. . . . . . . . . . . . . 5

      D.     Procedural Posture. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT

I.     THE PETITION VALIDLY STATES AN "IDENTIFICATION CLAIM." . . . . . . . . . . 6

      A.     The AFSC Has Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            1.     Three Court of Appeals Cases Support Standing Here. . . . . . . . . . . . . . . 7

            2.     The inherent stigmatization and resulting threat of harm from public
disclosure is reasonable, objective and recognized in several areas of the
law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            3.     Neither *Tatum* nor the City's other cases support its position. . . . . . . . 12

            4.     The City's argument conflicts with notice pleading standards. . . . . . . . . 15

            5.     The "redressability" element of standing is met here. . . . . . . . . . . . . . . 17

      B.     The Public Disclosure of the Investigation of AFSC Violated the
First Amendment and the Modified Consent Decree. . . . . . . . . . . . . . . . . . . . . 18

II.    THE CITY'S DESTRUCTION OF DOCUMENTS PRESENTS A JUSTICIABLE
QUESTION OF WHETHER THE DECREE HAS BEEN VIOLATED. . . . . . . . . . . . 20

      A.     Plaintiffs Have Standing and the Destruction of the Files Violates . . . . . . . . . . 22

1.      The duties of the City regarding the conduct of an
        independent audit have not changed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

2.      The Auditors have warned the Department of the need for
        formal documentation of investigative activity. . . . . . . . . . . . . . . . . . . . . 24

3.      A complete review of all First Amendment investigation files
        in their entirety is essential to the independent audit. . . . . . . . . . . . . . . . 25

4.      The Auditors have previously informed the City not to destroy
        investigative files prior to their Audit. . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

5.      The Department changed its policy to permit destruction of
        First Amendment investigative files prior to external audits.
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

B.      Petitioners' Claims Regarding Document Destruction are Ripe for Review . . . . 29

III.    THE CITY'S OBJECTION TO DISCOVERY IS MOOT AND MERITLESS. . . . . . . . 34

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## INTRODUCTION

Petitioners and original named plaintiffs American Friends Service Committee (the "AFSC") and American Civil Liberties Union ("ACLU") (AFSC and ACLU, collectively, "Petitioners"), respectfully ask the Court to deny the Motion to Dismiss Petition to Enforce the Modified Consent Decree ("Motion to Dismiss" or "MD") filed by the City of Chicago ("the City").  The Petition to Enforce Modified Consent Decree ("Petition") alleges serious and troubling conduct by the Chicago Police Department ("CPD") that in three instances clearly violated the Decree.  It also raises reasonable grounds to believe a fourth violation occurred in connection with the CPD's investigation of AFSC.  In particular:

- The CPD infiltrated the AFSC, a Nobel Peace Prize-winning international organization dedicated to securing peace and justice throughout the world, without a legally sufficient predicate and in an overly intrusive manner;

- The CPD, without justification, disclosed the identity of AFSC as a target of an intelligence investigation in its publicly filed 2002 audit;

- The CPD obstructed the performance of the independent audit mandated by the Modified Consent Decree ("MCD" or "Decree") by intentionally destroying substantially all of its documentation regarding the AFSC investigation prior to a review by an independent auditor, and abruptly reversed a two-decade's old policy by promulgating a new policy allowing such destruction in the future.

The City now seeks to avoid any accountability for this conduct.  In its Motion to Dismiss it raises a host of procedural and substantive arguments that, if accepted, would insulate it from liability for any baseless infiltration of peaceful, law abiding groups; condone its reckless and

stigmatizing public identification of that group as the target of an investigation; excuse its willful destruction of the very documentation that permits the Court to determine whether the CPD is obeying the Decree; and prevent plaintiffs from assisting the Court by monitoring the CPD's compliance.

Of equal concern is the view expressed by the City in its papers regarding monitoring and enforcement.  Relying on selectively quoted language in a fee decision, the City insists plaintiffs have no role to play in monitoring or enforcing the Decree.  (City Br. at 2 & n.1).  This is fundamentally in error.  The Court of Appeals explicitly stressed the continued independent function of judicial enforcement of the MCD in which Petitioners and outside auditors play pivotal roles:

> Modification is not abrogation.  The modified decree will leave the Chicago police under considerably greater constraints than the police forces of other cities.  A violation of the constitutional rights of any person whom the Chicago police investigate will be a violation of the decree and not just the Constitution itself and so <u>will invite summary punishment by the exercise of the contempt power, while the requirement of outside audits will make it more difficult for the Chicago police than for their counterparts in the other big cities to commit constitutional violations undetected</u>.

<u>Alliance to End Repression v. City of Chicago</u>, 237 F.3d 799, 802 (7th Cir. 2001) (emphasis added). Clearly, plaintiffs retain the right to enforce the decree and the audit is intended to detect violations. For the reasons that follow, the Motion to Dismiss should be denied.

## SUMMARY OF FACTUAL ALLEGATIONS

On March 23, 2001, this Court entered the MCD, which regulates the manner in which the City of Chicago conducts investigations of First Amendment activities.  Petition at 1.  The City has or may have violated the Decree in at least the following three ways.

**A.    Improper Disclosure of AFSC as a Subject of a Police Investigation and Infiltration.**

Plaintiff AFSC is a Nobel Peace Prize-winning international organization dedicated to securing peace and social justice throughout the world.  Petition ¶ 1.  In connection with the Trans-

Atlantic Business Dialogue ("TABD"), which Chicago hosted in November 2002, AFSC intended to engage in lawful, non-violent expressive activities, including a lawful, non-violent parade in the Chicago Loop on November 7, 2002.  Petition ¶¶ 1-3.

In February 2004, the City made public the fact that the AFSC was the subject of a CPD intelligence investigation during the TABD in 2002.  The City filed with this Court a copy of CPD's 2002 internal audit of its implementation of and compliance with the Decree.  That audit expressly identifies AFSC as the subject of a police intelligence investigation that included the use of undercover agents.  Petition ¶¶8-9.

The audit states that the CPD Intelligence Section ("Intelligence") conducted Investigation 193-2002-01.  Based on the file submitted to the auditor, Investigation 193-2002-01 was an investigation into protest activity associated with the TABD.  As part of that investigation, Intelligence infiltrated several organizations, including AFSC, by sending undercover Intelligence officers to meetings, rallies, and/or fundraisers.  The infiltrating officers participated in small group sessions organized and attended by AFSC during which the bulk of planning and development of the First Amendment protest activities associated with the TABD took place.  AFSC did not invite government agents to attend the meetings, and at all times reasonably considered staff communications to be confidential.  The infiltrators never revealed their identities as police officers during the group planning sessions.  Petition ¶¶5-7, 9.

Although past CPD audits had noted the existence of First Amendment investigations, the 2002 audit (and the disclosure of AFSC) represented the first time the CPD had publicly disclosed the identity of any organization or individual that was the subject of a First Amendment investigation.  As a result of the City's disclosure of the investigation of AFSC, including the use of undercover agents, the AFSC has been stigmatized and harmed in its future association with individuals

3

and organizations and thus had its rights violated under the Decree as well as the First Amendment. Petition ¶¶ 8-9.

**B.    The Irregularities of the AFSC Investigation and AFSC's Request for Discovery.**

The CPD's internal auditor expressed a number of concerns about the manner in which Investigation 193-2002-01 (the investigation of AFSC) was conducted.  Among other things, the auditor determined that Intelligence had failed in the investigation to follow the City's general orders regarding documentation, minimization, written authorizations, and periodic progress reports.  The auditor also determined that the file only identified and contained written authorization for investigation of one group, Chicago DAN.  The file did not contain documentation of any legitimate police purpose served by investigating groups other than DAN (including AFSC), and there was no evidence that those other groups intended to engage in any unlawful conduct.  Recommendations by general counsel to the CPD that Intelligence conduct further investigation to justify the infiltration of the other groups were not followed.  The auditor also expressed concern about the role played by infiltrating officers – their participation in small group planning sessions could be construed as an effort to inhibit or interfere with or redirect First Amendment conduct.  Petition ¶¶ 10-20.

Notwithstanding all of these irregularities and concerns, the internal audit concluded, apparently based solely on an interview with the commander of Intelligence, that the investigation complied with the Decree.  However, some of the more critical explanations and purported justifications for initiating and conducting the intrusive infiltration and investigation of the AFSC appear to be without documentary support, despite representations that such documents should have existed.  Moreover, there is insufficient evidence to support infiltration of the AFSC, a long-established peaceful organization that was contemporaneously involved in face-to-face discussions with the CPD and its General Counsel.

In view of these circumstances, plaintiffs seek discovery into the adequacy and nature of the
basis for, as well as the scope of, the investigation and infiltration of the AFSC.  Petition ¶¶ 21.

**C.      The Improper Destruction (or "Partial Destruction") of the First Amendment
Investigation File, and the City's Revised General Order Permitting
Destruction of First Amendment Investigation Files.**

Counsel for plaintiffs has made repeated efforts to obtain the City's files regarding the inves-
tigation of AFSC.  But after more than six months of attempts by the plaintiffs to obtain the
documents, the City has produced only a small portion of the file to plaintiffs.  The City has
acknowledged the existence of the investigation file, but it has refused to produce the entire file,
arguing, at various times that (a) such production would violate the Decree and (b) most of the file
was destroyed pursuant to a police order.  The City has admitted that it has not been able to locate
the documentation required to support its destruction of the investigation file.  Petition ¶¶ 22-34.

In September 2003, the same month in which the CPD internal auditors interviewed officers
in Intelligence about the irregularities in the AFSC investigation file, the CPD revised its general
orders governing the destruction of files.  Shortly thereafter, the commander of the Intelligence
section approved the destruction of the AFSC investigative file prior to performance of the
independent audit.  Under the new general order, Revised Order 02-10 Addendum 1A, Intelligence
is responsible for the analysis of all materials generated in investigations directed at First
Amendment-related intelligence, and those materials are to be destroyed if they have "no continuing
police purpose," a term that is undefined.  The CPD interprets the new order to allow destruction of
First Amendment investigative files, including the AFSC investigation, prior to external audit.  The
destruction of the AFSC file and the new codified policy violate the Decree.  Petition ¶¶ 33-42.

**D.      Procedural Posture.**

Through this enforcement petition, Petitioners seek a supplementary order that includes, among other things, a declaration confirming that the City's actions violated the Decree and an order enjoining the City from taking such actions in the future.   This Court has the power to issue any order necessary to enforce the Decree.   See, e.g. Wisconsin Hospital Ass'n v. Reivitz, 820 F.2d 863, 868 (7th Cir. 1987).   Remedies for violations may take the form of a contempt judgment or, more commonly, as here, a supplementary order in support of the decree.   See, e.g, Cook v. City of Chicago, 192 F.3d 693, 695 (more common remedy for violation of consent decree is a supplementary order); Reivitz, 820 F.2d at 868 (entering equitable supplement to decree as method of enforcing decree).   Because plaintiffs' primary objective is to bring the City into compliance with the Decree, not punishing it for any violations of the Decree, they have not yet sought any contempt sanction. However, they reserve the right to do so.[1]

## ARGUMENT

### I.

### THE PETITION VALIDLY STATES AN "IDENTIFICATION CLAIM."

The City labels as the "Identification Claim" that portion of the Petition arising from the CPD's decision to disclose in its public filing of the 2002 Audit that the AFSC was a subject of investigation and infiltration.   City Br. at 4.   Contrary to the City's contentions, the AFSC has standing to assert this claim and the Petition states a claim for violation of the First Amendment and the Decree.

---

[1]      The Decree provides that the Court retains jurisdiction "to enable the parties to the Decree to apply to this court for the enforcement of compliance with the provisions contained herein, and for the punishment of any violation of such provisions."   (Decree, Retention of Jurisdiction, Petition Ex.A.)

**A.      The AFSC Has Standing.**

The City's standing argument rests on the premise, derived from <u>Laird v. Tatum</u>, 408 U.S.

1 (1972), that the CPD's infiltration of the AFSC and public disclosure of its investigation caused

no more than a "subjective chill" on AFSC's associational rights and no injury-in-fact required to

meet standing requirements.  The City is wrong.

**1.      Three Court of Appeals Cases Support Standing Here.**

Three Court of Appeals cases show why the City is wrong.  <u>See</u> <u>Philadelphia Yearly Meeting</u>

<u>of the Religious Society of Friends v. Tate</u>, 519 F.2d 1335 (3d Cir. 1975); <u>Paton v. LaPrade</u>, 524

F.2d 862 (3d Cir. 1975); <u>Presbyterian Church (U.S.A.) v. United States.</u>, 870 F.2d 518 (9th Cir.

1989).

<u>Philadelphia Yearly</u> is factually close to this case and rejected the position the City takes.

In that case, Philadelphia police photographed and performed other surveillance of political groups

without a legitimate law enforcement purpose and then publicly disclosed the fact that these groups

were targets of surveillance.  The Third Circuit held that these actions gave rise to more than a mere

"subjective chill" of the sort found inadequate to confer standing in <u>Laird v. Tatum</u>, but rather "show

immediately threatened injury to plaintiffs by way of a chilling of their rights of freedom of speech

and associational privacy."  <u>Philadelphia Yearly</u>, 519 F.2d at 1338.  The Court explained (<u>id.</u>):

> Some examples of immediately threatened harm come readily to mind.  The general
> availability of such materials and lists could interfere with the job opportunities,
> careers or travel rights of the individual plaintiffs and such practical consequences
> may ensue without any specific awareness on plaintiffs' part.  The mere anticipation
> of the practical consequences of joining or remaining with plaintiff organizations
> may well dissuade some individuals from becoming members, or may persuade
> others to resign their membership.  We therefore conclude that, except for the
> allegation concerning the availability of the material to other law enforcement
> agencies, the allegations of paragraph 3 above state a claim sufficient to withstand
> a motion to dismiss.

Similarly, the Third Circuit's decision in Paton found Tatum inapplicable where the FBI had investigated a high school student's mailing of a letter to the Socialist Worker's Party.  The student was later "cleared" and the investigation was "closed," but the fact of the investigation had leaked to the public.  The Court held that the student had standing to sue the FBI agent who conducted the investigation.  Following Tate, the Court found that the investigation threatened future injury to plaintiff, which was sufficient to distinguish Tatum and confer standing.  524 F.2d at 868.

Both Philadelphia Yearly and Paton found standing because the stigma associated with disclosure of an investigation of a person or group threatened imminent injury to associational rights. In another infiltration and disclosure case, Presbyterian Church, the Ninth Circuit rejected the City's position where there was both threatened and actual injury.  In that case the INS had infiltrated four Arizona churches as part of an investigation of the "sanctuary movement," an effort by clergy and laity to aid refugees from El Salvador and Guatemala.  Agents taped worship services and bible study classes.  The covert surveillance was later publicly revealed during a criminal prosecution of others. Applying Laird, the district court dismissed the First Amendment claim brought by the churches. The Ninth Circuit reversed, holding that there was more alleged than "subjective chill" since the churches had alleged that individual congregants had been deterred from attending church, which interfered with the churches' ability to carry out their ministries.  870 F.2d at 522.

This case is similar to Philadelphia Yearly, Paton and Presbyterian Church, and the Motion should be denied for reasons stated in those cases.  As in Philadelphia and Presbyterian Church, here the CPD covertly sent undercover officers to meetings and rallies and participated in small group planning sessions.  Petition ¶7.  The police action was directed to protected First Amendment associational conduct.  The fact of this infiltration and investigation was later publicly revealed.  "As a consequence, the AFSC has been stigmatized and harmed in its future association with individuals

8

and other organizations." Id. ¶9.  These allegations suffice for precisely the reasons the Third Circuit

found similar allegations sufficient in Philadelphia and in Paton.  The essential teaching of these

cases is that public disclosure that a particular individual or group was the subject of a law

enforcement investigation is inherently stigmatizing and poses a sufficient threat of imminent harm

to association to generate standing.

>   **2.    The inherent stigmatization and resulting threat of harm from public
>          disclosure is reasonable, objective and recognized in several areas of the law.**

The principle of these cases – that the stigma of disclosure threatens injury to associational

rights – comports with common sense and is recognized in other areas of the law.  In this case, the

police infiltration was directed to AFSC's associational activities.  Members of AFSC thought they

were meeting with others planning to engage in protected expression, not with covert police

operatives. The fact of that police operation has now been made public.  The resulting injury to

reputation and threat to future association is obvious.  It is quite likely – and on a motion to dismiss

AFSC is entitled to a reasonable inference – that persons who might want to associate with AFSC

for other activities would be deterred from doing so for fear that they will be spied upon by covert

police operatives.  The message is clear: stay away from AFSC and their demonstrations.  They are

a suspect group that has been investigated and infiltrated by the police for their activities.

"The Supreme Court has long recognized that an injury to reputation will satisfy the injury

element of standing." Gully v. National Credit Union Admin. Bd.,  341 F.3d 155, 161-62 (2d Cir.

2003) (agency opinion that plaintiff was unfit for her position caused reputational injury creating

standing), citing Meese v. Keene, 481 U.S. 465, 472-77 (1987) (plaintiff, who wished to exhibit

foreign films, had standing to challenge Justice Department requirement that he label the films as

"political propaganda" because "his personal, political, and professional reputation would suffer"

and his ability "to practice his profession would be impaired"); Joint Anti-Fascist Refugee Comm.

v. McGrath, 341 U.S. 123, 139 (1951)  (charitable organizations designated as "Communist" by

Attorney General had standing to challenge their designations because of, inter alia, "damage [to]

the reputation of th[e] organizations in their respective communities"); United States v. Accra Pac,

Inc., 173 F.3d 630, 633 (7th Cir.1999) ("being put on a blacklist . . . is treated as immediately

redressible harm because it diminishes (or eliminates) the opportunity to practice one's profession

even if the list . . . does not impose legal obligations").  Similarly, the disclosure here that AFSC was

the target of an intrusive, infiltrating law enforcement investigation has damaged its reputation,

causing actual and threatened injury-in-fact.

The obvious threat of imminent injury to associational rights is recognized in other laws,

which are designed to prevent such injury.  Thus, there are strict requirements regarding grand jury

secrecy, which are designed not only to facilitate law enforcement investigation, but also to

"protect[ ] . . . the innocent accused from disclosure of the accusations made against him before the

grand jury."  Douglas Oil Co. of California v. Petrol Stops Northwest, 441 U.S. 211, 218, n.8 (1979).

"[B]y preserving the secrecy of the proceedings, we assure that persons who are accused but

exonerated by the grand jury will not be held up to public ridicule."  Id. at 219.[2/]  These cases

establish that the stigma associated with public disclosure that a person or organization was

investigated by law enforcement is objectively real and substantial, and the resulting "chill" cannot

be deemed merely subjective.

Freedom of Information Act standards embody the same public policy of preventing the

objective threat of harm that results from public disclosure.  The federal Freedom of Information Act

---

[2/]    See also  Matter of Grand Jury Proceedings, 942 F.2d 1195, 1198 (7th Cir. 1991) (stating that
assuring that the accused is not held up to "public shame or ridicule" is "perhaps" the "most fundamental[]"
interest to be protected by grand jury secrecy); Lucas v. Turner, 725 F.2d 1095, 1100 (7th Cir. 1984) ("[o]ne
of the principal reasons for preserving the secrecy of grand jury proceedings is to protect the reputations of
both witnesses and those under investigation").

exempts the disclosure of "records or information compiled for law enforcement purposes" that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).  In United States Dep't of Justice v. Reporters Committee for Freedom of Press, 489 U.S. 749, 109 S.Ct. 1468, 1476-80 (1989) (emphasis in original), the Court applied this provision and held that the disclosure of an FBI criminal identification record (a.k.a. "rap sheet") to a third party would be an unwarranted invasion of personal privacy because "FOIA's central purpose is to ensure that the *Government's* activities be opened to the sharp eye of public scrutiny, not that information about *private citizens* that happens to be in the warehouse of the Government be so disclosed."[3/]

Similarly, federal regulations concerning criminal databases prevent public disclosure of information therein.  28 C.F.R. § 23.20 governs criminal intelligence systems operating with support of federal funding.  The relevant subsections provide that:

> (e) A project or authorized recipient shall disseminate criminal intelligence information only where there is a need to know and a right to know the information in the performance of a law enforcement activity.

> (f)(1) Except as noted in paragraph (f)(2) of this section, a project shall disseminate criminal intelligence information only to law enforcement authorities who shall agree to follow procedures regarding information receipt, maintenance, security, and dissemination which are consistent with these principles.

> (2) Paragraph (f)(1) of this section shall not limit the dissemination of an assessment of criminal intelligence information to a government official or to any other individual, when necessary, to avoid imminent danger to life or property.

---

[3/]   See also Baez v. United States Dept. of Justice, 647 F.2d 1328, 1338 (D.C. Cir. 1980) (quoting with approval from an FBI affidavit stating that "[t]here can be no clearer example of an unwarranted invasion of personal privacy than to release to the public that another individual was the subject of an FBI investigation"); Ferguson v. Kelley, 448 F.Supp. 919, 922-923 (N.D. Ill.1978) (holding that agency redaction of "names and information identifying third persons as subjects of FBI investigation" was authorized by Section 552(b)(7)(C)), modified on other grounds on motion to reconsider, 455 F.Supp. 324 (N.D. Ill.1978).

28 U.S.C. § 23.20(e)-(f).[4/]

Taken together, these statutes, regulations and cases establish that protecting innocent parties from public disclosure of the fact that they are being investigated by law enforcement is a matter of important public policy.  The harm or threat of harm resulting from such disclosure is self-evident and is recognized in this authority.  The City's assertion that the disclosure of its infiltration and investigation of AFSC causes a mere "subjective chill" is simply wrong and contrary to the public policy discussed above.

### 3.    Neither *Tatum* nor the City's other cases support its position.

Against this background, it is easy to see that the City reads far too much into Laird v. Tatum. There was no stigma or imminent threat of harm in Tatum.  The plaintiffs there had never been investigated or infiltrated.  There was no public disclosure of any law enforcement investigation of them.  They were complaining merely of "the existence and operation" of an Army investigative program that *might* some day investigate them (but also might not).  Tatum, 408 U.S. at 3 (emphasis added).  They alleged that this mere potentiality chilled associational rights.  The Court found the alleged chill too remote and "subjective" to confer standing.  Id. at 13-14.  Here, as in Philadelphia, Paton and Presbyterian Church, the AFSC does not complain of the mere existence of an investigative unit that might (or might not) some day investigate it.  Rather, AFSC complains that it was in fact investigated and infiltrated and that that investigation was in fact publicly disclosed by the government.  The resulting chill on associational rights is not merely subjective, but the obvious, inevitable and objective outgrowth from those facts.  No one wants the police intruding on his or her poli-

---

[4/]      Additionally, § 23.20(g) states that "[a] record indicating who has been given information, the reason for release of the information, and the date of dissemination outside of the project shall be kept" and that "[e]ach project must establish written definitions for the need to know and right to know standards for dissemination to other agencies as provided in paragraph (e) of this section."  Finally, § 23.20(m) states that "[a] project shall adopt sanctions for unauthorized access, utilization, or disclosure of information contained in the system."

tical activities, and the fact that AFSC was targeted for just such an investigation threatens an objective chill.  See also Ozonoff v. Berzak, 744 F.2d 224, 229 (1st Cir. 1984) (distinguishing Tatum on ground that no action was taken against the plaintiff in Tatum, whereas the government had taken action against plaintiff requiring him to pass loyalty standards that chilled his associational rights).

Also irrelevant is this Court's decision in 2000 concerning *Tribune* columnist John Kass, discussed in City Br. at 4-5.  The Kass enforcement petition concerned a City official eavesdropping on conversations in a public hallway between Kass and Aldermen and other City officials.  There was no law enforcement investigation and no stigma.  Kass had not complained that he was injured. Applying Tatum, this Court held that any violation of the Consent Decree was technical and *de minimus*, and that the ACLU's allegations of chill did not give rise to a reasonable inference of a reasonable or objective chill.  May 25, 2000 Opinion at 3-4, attached as Ex.A to City Br.  In contrast, as shown above, here the alleged facts – an intrusive investigation directed to protected association involving covert infiltrators, later publicly disclosed – do give rise to a reasonable inference of objective chill.

The City's reliance on two additional cases is misplaced.  In Gordon v. Wade Consolidated Bd. of Educ., 706 F.2d 778 (6th Cir. 1983), school officials had consented to the placement of an undercover policewoman in two high school classes to investigate possible drug trafficking.  No drug sales were uncovered and the investigation ended.  No particular group or individual was targeted. The investigation was directed to possible criminal activity (drug sales), not first amendment conduct. The fact of the investigation was later made public.  In upholding the dismissal of the students' first amendment claim for lack of standing under Tatum, the Court distinguished Tate and Paton because the "chill" was subjective in Gordon.  The Court found significant the fact that the surveillance had a legitimate law enforcement purpose of investigating possible illegal drug activity

and was terminated promptly when no such activity was uncovered.  There was no indication that the investigation had any tangible effect on students' expression of political viewpoints in class.  706 F.2d at 781.  Neither did the disclosure stigmatize any individual or organization.  In contrast, here it was a particular organization, AFSC, that was subjected to investigation and infiltration, and it was that particular organization that was needlessly and gratuitously identified publicly as a police target for its associational activities.  Moreover, the investigation here was directed to protected first amendment rights of association and speech, and AFSC has alleged more than a mere subjective chill of its associational rights.  It has sufficiently alleged that others, as a result, are presently deterred from associating with the organization, a violation of its association rights.  Petition ¶ 9.

Similarly, the City misreads <u>Wade v. Goodwin</u>, 843 F.2d 1150 (8th Cir. 1988).  <u>Wade</u> involved a state police list of people believed to be "survivalists" who might pose a threat to law enforcement personnel.  The list was later released to the press via the Arkansas FOIA statute.  Such disclosure would *not* be proper under the federal or Illinois FOIA.  (<u>See</u> above at 10-11.)  The plaintiff, who was on the list, complained that the compilation of the list violated, *inter alia,* his associational rights and its publication violated his privacy rights.  The Court found he lacked standing under <u>Tatum</u> to complain about being named on the list, holding that his allegations that the compilation of the list damaged his reputation and hurt his employment chances were remote and speculative.  843 F.2d at 1152.

<u>Wade</u> does not apply here because it was a summary judgment case, in which proof of facts supporting standing is required, and in which the plaintiff not only had offered no facts showing actual or threatened injury to associational rights, he conceded that he had no "real damages" and "primarily wanted a 'name clearing' hearing."  843 F.2d at 1153.  In contrast, in this case we are at the notice pleading stage and plaintiffs have pleaded real injury to associational interests sufficiently,

14

as more fully discussed in the next section.  Further, <u>Wade</u> is an aberrational opinion.  It is predicated

upon the state attorney general's legal opinion that the state FOIA statute compelled the publication

of the list, a legal predicate absent here, where the disclosure was wholly gratuitous.[5/]  Additionally,

<u>Wade</u> does not discuss <u>Philadelphia Yearly</u>, <u>Paton</u> or <u>Presbyterian Church</u>, and, if read to support

the City's argument, conflicts with those cases.  Its analysis of the publication issue is cursory, and

fails to recognize, as those cases did, that <u>Tatum</u> involved no actual activity directed to the plaintiff,

while the fact of an actual investigation coupled with disclosure does work tangible harm or threat

of harm on the persons or groups investigated.  For those reasons, the Court should not follow <u>Wade</u>

to the extent, if at all, its holding is applicable here.

### 4.    The City's argument conflicts with notice pleading standards.

The City characterizes AFSC's allegations as "scant," and charges that AFSC has not

"alleged facts showing that the AFSC has suffered a decrease in membership," City Br. at 6.  This

argument is inappropriate at the pleading stage, but, in any event, AFSC has alleged sufficient facts

to establish standing.

As the Court knows very well, AFSC merely needs to plead enough to "'give the defendant

fair notice of what plaintiff's claim is and the grounds upon which it rests.'"  <u>Swierkiewicz v.</u>

<u>Sorema N.A.</u>, 534 U.S. 506, 507 (2002) (Title VII plaintiff not required to plead *McDonnell Douglas*

prima facie case) (<u>quoting Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)).  <u>Accord Leatherman v. Tarrant</u>

<u>County Narcotics Intelligence and Coordination Unit</u>, 507 U.S. 163, 168-69 (1993) (there is no

heightened pleading standard for § 1983 claims against municipal corporations).  Thus, a "'court

may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that

---

[5/]      Indeed, the <u>Wade</u> court criticized the state FOIA statute as construed by the attorney general for permitting publication of the list.  843 F.2d at 1151 n.3.

could be proved consistent with the allegations.'" <u>Swierkiewicz</u>, 534 U.S. at 514 (<u>quoting</u> <u>Hishon</u> <u>v. King & Spalding</u>, 467 U.S. 69, 73 (1984)).

Consistent with the federal system of notice pleading, the requirements for pleading standing are minimal. The Supreme Court has repeatedly held that while specific facts must be marshaled to support each element of Article III standing at the summary judgment stage, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." <u>Bennett v. Spear</u>, 520 U.S. 154, 168 (1997) (internal quotations omitted) (reversing dismissal of complaint on standing grounds because general allegation of potential injury rendered it "easy to presume specific facts under which petitioners will be injured"). <u>See also</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992); <u>ASPCA v. Ringling Bros.</u> <u>Barnum & Bailey Circus</u>, 317 F.3d 334, 336 (D.C. Cir. 2003). The Seventh Circuit applied this principle in <u>Alliant Energy Corporation v. Bie</u>, 277 F.3d 916, 919-20 (2002) (Easterbrook, J.), in reversing the district court's dismissal of a case for lack of standing: "A complaint need only state the nature of the claim; details can wait for later stages . . . and in this respect injury (and thus standing) is no different from any other matter that may be alleged generally." <u>See also</u> <u>id.</u> at 920 (emphasis in original) ("[i]t is easy to imagine facts *consistent with* this complaint and affidavits that will show plaintiffs' standing, and no more is required"); <u>Lac Du Flambeau Band of Lake Superior</u> <u>Chippewa Indians v. Norton</u>, 422 F.3d 490, 496-99 (7th Cir. Sept. 1, 2005); <u>Dixie Gas & Food, Inc.</u> <u>v. Shell Oil Co.</u>, No. 03 C 8210, 2005 WL 1273273, at *4 (N.D. Ill. May 25, 2005) (Gottschall, J.) (applying notice pleading standards to standing allegations).

As shown earlier, plaintiffs' allegations are similar to those found sufficient in <u>Philadelphia</u> and <u>Paton</u>, and they support standing under the <u>Bennett</u>-<u>Lujan</u>-<u>Alliant</u> standard. The investigation,

16

infiltration and subsequent public disclosure has caused actual or real threatened harm to AFSC's associational interests, harm that is recognized by <u>Philadelphia</u>, <u>Paton</u>, and <u>Presbyterian Church</u>, as well as by the statutes, regulations and cases cited earlier.  As in <u>Bennett</u> and <u>Alliant</u>, it is "easy to presume specific facts under which [AFSC] will be injured," and AFSC is not required to proffer such facts at this stage of the proceeding.  For example, among the "set of facts" that support standing are that prospective employees might be deterred from working for AFSC for fear of being investigated, <u>cf.</u> <u>Clark v. Library of Congress</u>, 750 F.2d 89, 93 (D.C. Cir. 1984) (FBI investigation of library employee based solely on his associational activities resulted in concrete harms to his reputation and employment opportunities); <u>Socialist Workers Party v. Attorney General</u>, 510 F.2d 253, 257 (2d Cir. 1974) (upholding portion of preliminary injunction barring dissemination of names of attendees of convention infiltrated by FBI), or others might be deterred from attending meetings or planning sessions in which AFSC participates.  <u>Cf.</u> <u>Presbyterian Church</u>, <u>supra</u> (decrease in church attendance was harm).  "A plaintiff need not put all of the essential facts in the complaint.  He may add them by affidavit or brief – even a brief on appeal."  <u>Hrubec v. Nat'l R.R. Pass. Corp.</u>, 981 F.2d 962, 963-64 (7th Cir. 1992).  <u>See</u> also <u>Steeves v. McGrath</u>, No. 99 C 4567, 2000 WL 198895, at *3 (N.D.Ill. Feb. 11, 2000) (Gottschall, J.) (considering facts proffered with plaintiffs' brief in denying motion to dismiss).  The City's standing argument should be denied.

     **5.**     **The "redressability" element of standing is met here.**

The City argues in a footnote that plaintiffs do not satisfy the <u>Lujan</u> requirement that it be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Lujan</u>, 504 U.S. at 561, cited at City Br. n.4.  As one might surmise by the City's decision to relegate this argument to a footnote, it is transparently wrong.

17

The City argues that the requested relief, a declaration, would not redress the wrong because the declaration will not undo the stigma caused by its public disclosure that the AFSC was infiltrated. Its argument proves too much because it ignores that an injunction was violated.  Under such logic, the very act of violating an injunction defeats standing to challenge it, by operation of the truism that history cannot be changed.  That the past cannot be undone does not mean that redress is unavailable. A declaration cannot wholly erase the stigma caused by the City's violation of the decree, but it can, as a predicate to and along with the requested injunction against future publications (absent compelling justification) to third parties of the names of subjects of any First Amendment investigations (see Petition at 18 ¶(2)a.), provide meaningful redress both to AFSC and the plaintiff class. The declaration and the injunction will benefit AFSC in that any investigations into its future associational activities will not be disclosed, thereby reducing the likelihood of stigma and the deterrence of others from associating with AFSC.  And plaintiffs may still choose to seek contempt sanctions as well, including compensatory relief, which also provide redress.

**B.     The Public Disclosure of the Investigation of AFSC Violated the First Amendment and the Modified Consent Decree.**

The City complains (City Br. at 8-9) that AFSC has not pointed to any specific provision that explicitly prohibits the disclosure of the identity of groups investigated by the CPD.  But the City ignores the most important term of the Decree, the central purpose of the decree: the First Amendment.[6]  As the City concedes in its Brief at 2, compliance with the First Amendment is at the

---

[6]     The City also misinterprets paragraph 5 of the Injunction portion of the decree, which the AFSC cited in its Petition.  Contrary to the City's Brief, the Decree does not simply state that it does not require the identification of the subjects of First Amendment investigations.  Paragraph 5 states that the CPD Board shall not "disclose in any manner details that specifically identify any investigations except as permitted by law" or "disclose in any manner information that would . . . constitute an invasion of a person's privacy."  The City's disclosure here was not permitted by law – the First Amendment, as discussed below.  It also constituted an invasion of AFSC privacy.  The City's suggestion in its Brief at 8 n.5 that the prohibitions in paragraph 5 apply only to the CPD Board and external audits, and not to internal audits, is an unreasonably
(continued...)

core of the Decree.  See also Decree at 1 (Injunction).  Any action by the City that violates the First

Amendment also violates the Decree.  The City's unnecessary disclosure of the identity of its

investigative target, AFSC, violated the First Amendment, and thus violated the Decree.

When a law enforcement agency discloses the identity of the subject of an intelligence inves-

tigation without any legitimate law enforcement purpose, it violates the First Amendment.  In Phila-

delphia Yearly, 519 F.2d at 1338-39, the plaintiffs alleged, inter alia, that the Philadelphia Police

Department had made public disclosure of the identities of certain named individuals and groups

who were the subject of police investigations and on whom the Department had kept police intelli-

gence files.  The Third Circuit held that the disclosure had not served any law enforcement purpose:

> It is not apparent how making information concerning the lawful activities of
> plaintiffs available to non-police groups or individuals could be considered within
> the proper ambit of law enforcement activity, particularly since it is alleged that
> plaintiffs are subject to surveillance only because their political views deviate from
> those of the "establishment."

It also held that, in the absence of a law enforcement purpose, such allegations of disclosure were

sufficient to state a claim for violation of the plaintiffs' rights to associational privacy and freedom

of speech.  Philadelphia Yearly Meeting, 519 F.2d at 1338-39.  See also Alliance to End Repression

v. City of Chicago, 627 F. Supp. 1044, 1049 (N.D. Ill. 1985) ("[e]ven police dissemination of

truthful but stigmatizing information, such as police statements that certain individuals are the

subjects of police intelligence files, if done without any lawful purpose, may be justiciable").

Similarly, in this case, the AFSC has alleged that the City took the unnecessary and unprecedented

step of disclosing AFSC as the subject of an intelligence investigation.  The City has not provided,

---

6/      (...continued)
narrow reading of the Decree and should be rejected.

and cannot provide, a law enforcement purpose for that disclosure.  AFSC has properly alleged a claim for violation of the First Amendment and the Decree.

Moreover, using the filing of the internal audit to identify AFSC clearly implicates the Decree and cries out for a judicial ruling on the propriety of the City's conduct.  Here, in contrast to its offer to stop destroying investigative files prior to external audits (City Br. at 13), the City actually argues that the disclosure of investigative targets "furthers the purposes of the Decree" (City Br. at 8), and that it was appropriate to disclose AFSC under the monitoring provision of the Decree.  (Id. at 8-9.) Thus, the City affirms the existence of a controversy over the meaning of the Decree and declares its likelihood of injuring plaintiffs and class members in the future.  While plaintiffs believe such disclosures violate the First Amendment and, therefore, the Decree, at a minimum, the Court has the power to interpret the Decree and resolve the parties' dispute on whether the City may use the public filings of audits to disclose targets of First Amendment investigations.[7]

## II.

## THE CITY'S DESTRUCTION OF DOCUMENTS PRESENTS A JUSTICIABLE QUESTION OF WHETHER THE DECREE HAS BEEN VIOLATED.

In order to insure the likelihood of compliance with the terms of the MCD, the police department and the Police Board each are required to conduct audits.[8]  Plaintiffs charge in the

---

[7]      The City's interpretation of the Decree, that its disclosure of AFSC or other investigative targets, actually "further[s] the purposes of the MCD," is wholly unreasonable.  The City cannot possibly further the purposes of a decree that was designed to protect citizens' First Amendment rights by violating those very rights.  But the City has not demonstrated and cannot demonstrate that the *public* disclosure of the identities of the parties being investigated advances the monitoring process in any way, as evidenced by its own twenty-year past practice of not making such disclosures.

[8]      The MCD provides, in relevant part:

3.      In each of the next five years, the Superintendent of Police shall conduct a departmental audit of the Police Department's compliance with this Decree, and submit copies of the audit report to the Mayor, the Police Board, and this court for filing as a public record.  The annual report shall include a summary of any internal disciplinary complains concerning compliance with this Decree and the
(continued...)

Petition that the intentional destruction of the AFSC investigative file after review by an internal

police department auditor, but before review by an independent auditor engaged by the Police Board,

violates the MCD because it obstructs and prevents the Court from obtaining a complete and accu-

rate assessment of the City's compliance.  Plaintiffs further charge that the City has promulgated a

general order on which it relied in destroying the AFSC file and which, as interpreted by the City,

will allow the future destruction of First Amendment investigative files prior to independent audit.

The City submits that until the independent auditor it hires states that he or she is unable to

prepare the required outside audit, plaintiffs have suffered no injury sufficient to establish standing

(City Br. at 9-11) and, in any event, this same circumstance renders the alleged violation unripe for

review (*Id*. at 11-13).  The City also argues that its destruction of the files prior to independent audit

---

8/      (...continued)
        findings made and the actions taken on such complaints.

4.      The Chicago Police Board shall review the Superintendent's audit annually, and may request such
        additional information as it deems necessary to monitor compliance with this Decree, and shall
        report to the Mayor, the Superintendent of Police, and the public concerning its findings.

5.      The Chicago Police Board shall also cause an audit of the City's compliance with the terms of this
        Decree to be performed by a national independent public accounting firm within five years of the
        entry of the order adopting this modified Decree.  The audit report shall contain a description and
        evaluation of any conduct believed by the auditors to constitute a probable violation of the Decree.
        The Police Board may require further investigation of any such possible violations.  The audit report,
        together with any additional findings or recommendations made by the Board, the Superintendent
        of Police, or the Mayor shall be made public.  For the purpose of these audits, or for any other
        investigation that the Board may wish to conduct to investigate compliance with this Decree, the
        Board and the auditors engaged by the Board shall have access to all relevant data in the possession
        of the City except that the auditors shall not have access to information specifically identifying
        confidential informants or to current criminal investigations that the Superintendent of Police states
        might be compromised by disclosure to the auditors.  The auditors shall not disclose any information
        to anyone but the Board, the Superintendent of Police, or (upon his request) the Mayor.  The Board
        shall not disclose in any manner details that specifically identify any investigations except as
        otherwise permitted by law, nor shall it disclose in any manner information that would reveal the
        identity of a confidential informant, compromise an ongoing criminal, regulatory, or employee
        disciplinary investigation, or constitute an invasion of a person's privacy.  See Exhibit A, MCD, ¶3,
        4, 5, p. 2.

does not violate the Decree (*Id.* at 15-17) and that this destruction claim should be stayed. (*Id.* at 14-15.)

The City is wrong on all counts. As shown below, plaintiffs have standing to bring their claims regarding the intentional destruction of AFSC's First Amendment investigative file and the City's written policy providing for future pre-audit destruction of First Amendment investigations. Further, these claims are ripe, the City has violated the Decree, and judicial review of its document destruction should not be stayed.

**A.      Plaintiffs Have Standing and the Destruction of the Files Violates the Decree.**

After substantial concern by its own in-house auditors over the propriety of the AFSC investigation and its compliance with the MCD, the Police Department intentionally destroyed substantially all of the investigative file before independent auditors could review it. AFSC has been injured by this intentional act of document destruction: it has reasonable grounds to believe the investigation violated the substantive provisions of the Decree, and the City's destruction of the file impairs this Court's ability to review and remedy any such violation. Thus, AFSC's injury grants it standing to seek an order declaring the City to have violated the Decree and ordering it to comply with the Decree in the future by not destroying files prior to audit. Additionally, federal law provides for civil and criminal sanctions for noncompliance with the MCD (Alliance to End Repression, 237 F.3d at 800) and plaintiffs have reserved the right to seek "any and all additional relief as may be appropriate." (Petition at 18, § (5))

As discussed earlier at 15-17, on a motion to dismiss for lack of standing, the well-pleaded allegations of the Petition must be accepted as true, the Court must construe the complaint in favor of the complaining party, and general factual allegations of injury resulting from the City's conduct may suffice because the Court should "presum[e] that general allegations embrace those specific

facts that were necessary to support the claim." Lujan, 504 U.S. at 561 (internal quotation omitted).

Therefore, this Court must fully credit plaintiffs inherently reasonable assertion that the destruction

of the source documents of a First Amendment investigation prevents this Court from obtaining a

complete and accurate and independent audit and determination of compliance with the Decree.[9/]

With no factual basis, the City argues that plaintiff's position – that destruction of the file

is an obstruction to this Court's requirement of a full and accurate accounting of the City's

compliance with the MCD – is conjectural. We show below, based on the historical record of the

duties, procedures and previous audits performed in this case, as well as common sense, that nothing

could be more firmly and reasonably established, and it must certainly be deemed true for purposes

of the motion to dismiss.

### 1.    The duties of the City regarding the conduct of an independent audit have not changed.

The original decree provided that the Police Board "shall cause management audits to be

conducted, by a national independent public accounting firm, of the implementation of and

compliance with this Judgment…" See Alliance to End Repression v. City of Chicago, 561 F. Supp.

537, 569 ¶ 5.2 (N.D. Ill. 1982). It further provided that the audit include not only "a description and

evaluation of such implementation and compliance," but also "a discussion of any substantial

violations observed or detected." (Id.)

Similarly, the MCD in relevant part requires the Police Board to "cause an audit of the City's

compliance with the terms of this Decree to be performed by a national independent public

accounting firm within five years of the entry of the order adopting this Modified Decree. The audit

report shall contain a description and evaluation of any conduct believed by the auditors to constitute

---

[9/]      An inaccurate audit also obstructs plaintiffs' enforcement of the Decree, as one purpose of the audit, as affirmed by the Seventh Circuit, is to detect non-compliance with the Decree. Alliance, 237 F.3d at 802.

a probable violation of the Decree." (Petition Ex. A, at ¶ 5). Thus, the independent audits required

in both decrees are essentially the same.

> **2.     The Auditors have warned the Department of the need for
>          formal documentation of investigative activity.**

It also has been clear to the City for over 20 years that the auditors could not adequately perform the

audits for compliance with the court decree if investigative activity which was to be the subject of

audit was not documented.  Noting that while verbal commands may be an effective method for day-

to-day control in chain of command type organizations, the independent auditors warned the City

that "it does not provide for the auditability required by the Judgment Order if such methods are

extended to assignment and control of investigative activity." (Ex. 1 hereto, 1984 Management Audit

Report, Touche Ross & Co., at 25.)

Notwithstanding this explicit admonition, and contrary to the Police Department's newly

promulgated General Order 02-10, oral commands deviating from written procedure were used to

"control investigative activity" in this case.  And while documents were supposed to corroborate

these oral commands, these documents have been destroyed.  (Petition at ¶33 & Ex. B, 2002 Audit,

at 57-58.)  The result is a complete loss of outside oversight of the most sensitive undertaking of all

of the investigative intrusions – the infiltration of the demonstration planning meetings hosted by

AFSC.   While the undercover police officers were to be debriefed under the ad hoc procedures

supposedly put in place during the investigation – there is no documentation of what they did, what

they heard, or their degree of participation.  (*Id.*)

24

**3.     A complete review of all First Amendment investigation files
in their entirety is essential to the independent audit.**

The City has known that the First Amendment investigative files were considered critical to

the independent auditor's detailed review since the entry of the original consent decree and nothing

has changed with the subsequent modification of the decree.

In its audit released December 1985 (for the years 1983 and 1984) Touche Ross & Co. first

notified the Police Board and Police Department that part of its audit procedures included

determining the level of scrutiny it would use in examining files.  While the auditors "commonly"

sampled only 10% of some files, based on the likelihood of exposure to First Amendment activity

and potential decree violations, other files were examined in their entirety – 100%.  (Ex. 1, 1984

Audit, at 6-8.)  The First Amendment investigative files were reviewed at the 100% level and

"reviewed for content." (*Id.* at 120.)

The same determination of the need to examine First Amendment investigative files was

made by the firm of Deloitte Touche, the successor auditors in the 1990 audit (for the period 1985-

89).  Deloitte stated, "Certain files which were determined to have high potential exposure were

sampled 100% and are listed as 'file read in entirety'" (Ex. 2 hereto, 1990 Audit, Management

Summary at 5).  The audit identifies First Amendment Investigative files as such documents (*Id.*, at

Exhibit D).[10/]

Most recently, in Deloitte Touche's audit dated 2002 for the period 1996 through 2000, it

determined that due to the "potentially higher First Amendment exposure," certain entities within

---

[10/]     Specifically, the examination revealed:  All of the documents contained in each of the five purged
cases were read and audited for compliance violations.  Each was initiated in accordance with the Judgment
Order and served one of the four valid governmental purposes.  Each case was properly authorized.  The
investigative methods used were documented in each case.  There were no infiltrations authorized or
conducted.  (Id., Results of Interviews and File Audits, p. 2)

the police department would have files examined in addition to simply reviewing policies and proce-

dures. (Ex. 3 hereto, 2002 Audit of 1996-2000, at 1)  This included the Office of the First Deputy

Superintendent within the Bureau of Operations Services (*Id.*) where First Amendment investiga-

tions were stored, and the Deputy Superintendent in the Bureau of Investigative Services (Id. at 4)

where "purged" First Amendment investigative files were to be stored. (*Id*. at 5.)  While the auditors

had a range of options available to them in terms of the depths of their examination, they chose to

employ the highest level of scrutiny to the actual First Amendment investigative files – reading the

file "in its entirety."  (See Ex. 4 hereto, Compliance Examination Workplan, indicating an "A" for

"read in its entirety" under the heading "Document and Report Examinations" for the First

Amendment Purge File in the Office of the Deputy Superintendent (p. 6); and, the same level of

review for the First Amendment Investigation Sealed File in the Office of the First Deputy in

Operational Services (p. 8)).

> **4.     The Auditors have previously informed the City not to destroy
> investigative files prior to their Audit.**

In December, 1985, Touche Ross identified as its first of six "Key 1984 Recommendations"

that the Police Department remedy "conflicts between existing document retention schedules and

future auditability." (Ex. 1 at 25.)  The firm specifically advised that if an investigative file was not

maintained until the time of the independent audit, the result would be "only a partially auditable

record."  (*Id.*)

Addressing this recommendation, the Department responded that each departmental unit had

been advised to "retain the contents of all files that will be needed by the auditors in their next

review" and the internal auditing division of the Department was to verify the retention of these

documents in each of their future annual internal audits. (Ex. 5 hereto, Nov. 1985 CPD Response

to 1984 Touche Ross Audit at 2.)  The Police Department inexplicably breached this 20-year-old

commitment when it destroyed the AFSC file and promulgated the document destruction provision in General Order 02-10.

> ### 5. The Department changed its policy to permit destruction of First Amendment investigative files prior to external audits.

In monitoring compliance in this case, the documentation, maintenance, and review and audit of First Amendment investigations has, since the entry of the original consent decree, been the essential safeguard to ensure the propriety of police activity at its intersection with the rights of free speech and association.

General Order 82-10, issued August 13, 1982, was the first internal police order directed toward implementing and complying with the original decree. (Ex. 6 hereto.) One of the stated purposes of the order was that it "establishes responsibilities and procedures relative to investigations and the retention and security of records directed toward First Amendment conduct." (*Id*., p. 1, Section I.C.). Specifically, the order provided that information about a person's First Amendment conduct in an investigation was to be retained for a period of ten years. (*Id*., p.8, Section 3.1.7).

This retention period remained in force through the duration of the original consent decree and facilitated the external audits performed by the independent auditors in 1982 and 1984 and every five years thereafter, as required by the decree.

In October 2002, the Police Department promulgated General Order 02-10, to implement the Modified Consent Decree. (Petition Ex. D.) First Amendment-related files were to be retained, as they had been for the past 20 years, under the provisions of new General Order 82-10, for a period of ten years. (*Id*., p. 11, Section VI. B. 7.).

Then, in September, 2003, the same month as the internal auditor brought the irregularities of the investigative file to the attention of the Commander of the Intelligence Division, the General

Order's requirement of a 10-year retention of these files was suddenly extinguished.  In its place is

a new provision, which the Police Department interprets to allow destruction of the file prior to the

external audit.[11/]  The AFSC first amendment investigative file was destroyed pursuant to this new

provision. (Petition ¶ 33 & Ex. J §VI.H.2.b.-c.)

    In summary, plaintiffs' claim that the intentional destruction of the investigative file obstructs

effective independent monitoring is well grounded not only in common sense, but in the historical

record of this case.  The speculative and conjectural position belongs to the City, not petitioners.

Perhaps, some day in the unspecified future, independent auditors for the City will produce an audit,

and perhaps the destruction of the documents in the opinion of those auditors will not prevent them

from issuing an opinion on whether the AFSC investigation was in compliance with the decree.  But

plaintiffs' allegation, which must be accepted as true, is that the intentional destruction of the file,

under the circumstances shown, prevents the preparation of a complete and accurate independent

audit.  Plaintiffs therefore have sufficient injury and have standing.

    This is equally true as to plaintiffs' challenge to the policy allowing future destruction of

investigative files.  First, plaintiffs have shown above, and properly alleged, that the files are

essential to determining compliance.  Second, because of that fact, plaintiffs have been injured by

past destruction of the file.  And third, plaintiffs have a right to ensure future compliance with the

Decree in the face of an express policy providing for non-compliance.

    Finally, the notion that plaintiffs have no injury because they supposedly have no monitoring

duties (see City Br. at 17-18) is wrong and irrelevant.  Our interest is in ensuring that no one,

including our own organizations, are injured by non-compliance with the MCD.  We have standing

_____

[11/]     Under the new order, the file, even if it had a "First Amendment relationship," could be destroyed
if the file had "no continuing police purpose," a phrase undefined in the order.  Revised General Order 02-10,
Addendum 1A, Section VI, § 2.6 at p. 13 (Petition, ¶38).

as original plaintiffs in these circumstances, whether the injury is to third parties, or to our own organizations, to enforce compliance with a decree to which we are parties. Mem. Op. of May 25, 2000 (City Br. Ex.A) at 2.

Plaintiffs submit that in this section they also have fully responded to the City's assertion that plaintiffs have failed to state a violation of the Decree. (City Br. at 15-17.)  The violation, stated simply, is that the City's intentional destruction of the First Amendment investigative file prior to the independent audit required by the Decree violates the Decree, as does the policy allowing such document destruction in the future.  The Decree need not explicitly mandate the retention of investigative files in order for their intentional destruction to obstruct monitoring and enforcement of the decree. (Cf., City Br. at 15)  Moreover, the City's argument that the internal auditor's file is an adequate substitute for the investigative file is impermissibly arguing facts and unpersuasively at that. (*Id*.)

**B.     Petitioners' Claims Regarding Document Destruction are Ripe for Review**.

Under the two criteria of Abbott Labs v. Gardner, 387 U.S. 136, 148-49 (1967), for determining ripeness – (1) fitness of issues for judicial decision; and (2) hardship to parties of withholding court consideration – the City's destruction of investigative files is ripe for review.  The City's argument, that Petitioners' file destruction claims for declarations of non-compliance and an order requiring future compliance are unripe, is based on mischaracterizing the claim and then on attempting to contest it factually.  (City Br. at 11-12)

The simple reality is that the City's destruction of the file ripened the claim.  Our charge is that the City's intentional destruction of the file presently prevents this Court from obtaining a full and adequate independent audit of the City's compliance with the MCD. (Petition at ¶ 46).  This claim is fit for judicial review because it is based on history, not hypothetical events.  Plaintiffs

ultimately must prove this allegation, but whether an audit that fulfills the legal requirements of the MCD and conforms to relevant standards is not hypothetical. The actual investigative file has been destroyed. Plaintiffs are entitled to offer expert proof on relevant professional audit standards and establish the inability of <u>any</u> auditor to prepare a full and complete audit of the City's compliance with the MCD now. This Court will be able to then determine whether the City has violated the Decree by preventing the production of an audit as required by the MCD. The City is free to offer competing proof, including whatever audit (qualified or not) they may be able to obtain. We are free to rebut its adequacy.[12]

In any event, while the City argues that whether auditors "will find themselves hampered by document destruction that took place in the past …. and might take place in the future" are "abstract considerations that depend on a series of 'may occurs.'" (Def Br. at 12), there is nothing remotely abstract about their confessed intentional destruction of the First Amendment investigation file of AFSC and their written policy allowing future destruction of files prior to audit.

The City also misconstrues the rights of the petitioners and original plaintiffs in arguing that under the second ripeness consideration – "hardship to the parties of withholding court consideration" – ACLU and AFSC suffer no harm. (City Br. at 13). Plaintiffs do not have to have formal "monitoring" responsibilities under the decree to suffer hardship if this Court refuses to adjudicate this matter. We have been given standing to enforce the decrees under the precise language of the MCD:

> The court expressly retains jurisdiction to enable the parties to the Decree to apply to this court for the enforcement of compliance with the provisions contained herein, and for the punishment of any violation of such provisions. Application to enforce

_____

[12]    Moreover, under the allegations of the Petition, this Court should consider, given the intentional nature of the destruction of the file, whether contempt citations against the City and individuals are appropriate for an attempt to obstruct the audit even if the City could produce an adequate audit.

the provisions or to impose punishment for any such violation may be presented to
the court by any person affected by the conduct complained of.

And, as stated above at 28-29 original parties may enforce the decree so long as there is real or

threatened injury to a third party (here, AFSC).  Mem. Op. of May 25, 2000 (City Br. Ex.A) at 2.

Contrary to City Br. at 12-13, the role of the audit is not simply for the City's own use.  It is

to deter and to detect violations of the decree.  As the Court of Appeals wrote in allowing the

modification of the original decree:

> The core of the decree, which the City does not seek to modify, forbids investigations
> intended to interfere with or deter the exercise of the freedom of expression that the
> First Amendment protects, and requires the City to commission periodic audits of the
> City's compliance with the decree.  The effect of these provisions is to add the threat
> of civil and criminal contempt to the usual sanctions for infringing civil rights and,
> through the requirement of audits, to make it easier to detect such infringements.
> These are substantial enhancements of the ordinary deterrent effect of constitutional
> law.  *Id*. at 1014-15.  They annex swift and severe sanctions to the ordinary tort
> remedies (mainly 42 U.S.C. § 1983) for violations of that law.

Alliance, 237 F.3d at 800.  Thus the audit is part of the enforcement regime and plaintiffs have a

substantial, real and protectable interest in its full and accurate performance.

The City's statement that it will no longer destroy files does not alleviate the hardship caused

by the court not adjudicating the claim that the destruction of the files violates the decree. (City Br.

at 13)  Neither does this purported "voluntary discontinuation" moot the document claims.  First,

intentional efforts to obstruct a full and complete audit may be the basis for punishment of

individuals or the City itself.  An affirmation not to do it again does not vitiate the contemptuous

intentional conduct of the document shredding or the need to impose sanctions.  Second, the City

blatantly argues that it has no obligation to maintain these records for audit and thus it is free to

revert to its former practice.  Under the City's formulation of its (lack of) duties under the MCD, as

long as an auditor can reconstruct an investigation, the City is free to destroy the paper trail of its

forays into protected First Amendment activities.  By the City's lights, the audits whose detection

31

and deterrent value were repeatedly stressed by the Court of Appeals as critical in allowing modification, are simply a matter between the Police Board and its auditors.  Third, the effecs of the document destruction continue today without regard to the City's representation in its brief.

The representation not to destroy files in the future does not render the destruction issues moot, because "[v]oluntary cessation of allegedly illegal conduct does not render a case moot unless the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated." Milwaukee Police Ass'n v. Jones, 192 F.3d 742, 747 (7th Cir. 1999) (internal citations omitted); see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 189 (2000); United States v. W.T. Grant Co., 345 U.S. 629, 632-33 (1953).  Otherwise, a defendant could voluntarily cease a challenged practice to moot the lawsuit, and then immediately "return to his old ways." W.T. Grant, 345 U.S. at 632.  Voluntary cessation will only render a case moot "where there is no reasonable expectation that the putatively illegal conduct will be repeated, and there are no remaining effects of the alleged violation." Ragsdale v. Turnock, 841 F.2d 1358, 1365 (7th Cir. 1988) (citing Los Angeles County v. Davis, 440 U.S. 625, 631 (1979); W.T. Grant, 345 U.S. at 633.  Furthermore, the "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 222 (2000).

In fact, the City's behavior suggests that violations will be repeated.  First, at no time has the City conceded that the destruction of the investigative files violates the MCD or was even imprudent.  See Milwaukee Police Ass'n, 192 F.3d at 747 (finding that a controversy was not moot in a case where "at no time has [the defendant] actually conceded that those directives were unconstitutional").  Rather than conceding that the shredding was wrongful, the City states in the face of enforcement proceedings only that it acts "to alleviate any concerns that this Court may have

32

on this matter . . ." (City Br. at 13).  Moreover, it asserts that document destruction "vindicates the goals of the MCD by eliminating material from police files and thus eliminating their potential future use."  (*Id.* at 16.)  Not only has the City refused to admit that its conduct was in violation of the MCD, it fails in any way to explain how it allowed destruction of the files and why it suddenly changed a retention policy of 20 years.  The fact that a defendant steadfastly maintains total lack of culpability is an indication that judicial relief is necessary to prevent similar unlawful activity in the future.  U.S. v. Raymond, 228 F.3d 804, 814 (7th Cir. 2000) (citing U.S. v. Kaun, 827 F.2d 1144, 1150 (7th Cir. 1987)).

In addition, the City has not told the Court how it will implement its representation to hold future files for audit.  The written general order which the Police Department interprets to allow pre-audit destruction of files still exists as far as the record here is concerned.  Courts are skeptical of defendants' promises not to return to previous behavior where the policy could readily be changed again.  Sefick v. Gardner, 164 F.3d 370, 372 (7th Cir. 1988).  This is not a case where the parties have entered into a binding, judicially enforceable agreement or a settlement agreement resolving this point.  See Kidder, Peabody & Co., Inc. v. Maxus Energy Corp., 925 F.2d 556, 563 (2d Cir. 1991).  No formal order has been promulgated by the Police Department or edict by the Police Board or the Mayor prohibiting pre-audit destruction of files.  See Sefick, 164 F.3d at 372.  The City is in no way precluded from reenacting precisely the same policy it applied to the AFSC files.  See City of Mesquite v. Alladin's Castle, Inc., 455 U.S. 283, 289 (1983); Edwards v. Illinois Bd. of Admissions to the Bar, 261 F. 3d 723, 728 (7th Cir. 2001).  On this record, deference to public officials' representations of permanent change is inappropriate because they do not appear "genuine."  See Magnuson v. City of Hickory Hills, 933 F.2d 562, 565 (7th Cir. 1991).

The Seventh Circuit's jurisprudence also requires for a finding of mootness that there be "no remaining effects of the alleged violation," in addition to no reasonable expectation that the illegal conduct will be repeated.  Ragsdale v. Turnock, 841 F.2d 1358, 1365 (7th Cir. 1988).  Here, there are lingering effects: the inability to produce a complete and accurate audit of the past years as well as the chill that has radiated throughout the community that the Police Department may unlawfully intrude into the protected associational conduct of organizations and individuals and then destroy the investigative file to hide their activities from this Court.

For these same reasons, the City's request to stay the claims relating to the destruction of documents should be denied.  (City Br. at 14-15.)  The City has provided no firm date for the completion of the audit.  All we are informed of is that an "auditor will soon commence his work" and "it is entirely possible that the auditor will fin no problem."  (City Br. at 14 (emphasis added).)  These are hardly reasons to separate the document destruction claims from the investigation and publication claims and create piecemeal litigation.  But under any circumstances plaintiffs' position is that no complete and adequate audit is possible in light of the document destruction, and there is no reason to delay adjudication of this issue.

### III.

### THE CITY'S OBJECTION TO DISCOVERY IS MOOT AND MERITLESS.

The Court has already rejected the City's objection to discovery, previously ordering at a status hearing that discovery may proceed.  The Court's ruling was correct, well within its broad discretion, and should not be disturbed.  AFSC is entitled to discovery on the possible violation of the Decree it has alleged.  See, e.g. United States v. City of Northlake, 942 F.2d 1164, 1170 (7th Cir. 1991) (reversing trial court, and finding that court "must allow further discovery and fact-finding on

possible violations of the consent decree" and reversing for further discovery and "an opportunity for [plaintiff] to show its entitlement to supplemental relief").

The City cites certain undisputed facts to argue against discovery. City Br. at 17-18. The fact that it has conceded certain facts – its disclosure of AFSC, its destruction of the 2002 investigative file, and its decision  to preserve documents in the future notwithstanding the terms of its general order – does not render discovery irrelevant or improper.  Other issues remain.  First, for example, AFSC was infiltrated in a manner that the internal auditor found irregular and questionable.  See above at 4.  The infiltration may have violated the First Amendment and, hence, the Decree. Plaintiffs are entitled to discovery to develop evidence of the full extent of the investigation and infiltration of AFSC.  See Northlake, supra.  Indeed, the City's destruction of evidence makes discovery all the more imperative since it destroyed evidence of its own misconduct, requiring development of other evidence of the misconduct.  Second, discovery into the circumstances surrounding the amendment of General Order 02-10 and the destruction of the investigative file is warranted to determine whether the spoliation of evidence was intentional, warranting sanctions against the City.[13]

It is understandable that the City does not want discovery.  Its internal auditors raised serious questions concerning its compliance with the Decree, and then it destroyed key documents relevant to those questions and modified a twenty-year old internal order to give it *carte blanche* to destroy documents in the future.  It infiltrated a pacifist organization without legitimate reason.  Naturally,

---

[13] Moreover, the City's argument that the City's failure to comply its own regulation is irrelevant and not a proper subject of discovery fails to recognize that a knowing failure to comply with regulations, as well as the curious and convenient amendment of the General Order to permit document destruction, is evidence of motive – an intent to cover up knowing violations of the Decree.  Discovery into these circumstances is plainly proper.

it does not want scrutiny of its conduct and motives.  But plaintiffs are entitled to such discovery and

the Court's decision to permit it should stand.

## **CONCLUSION**

The City's Motion to Dismiss should be denied.


Dated: October 20, 2005                    Respectfully submitted,

                                           AMERICAN CIVIL LIBERTIES UNION and
                                           AMERICAN FRIENDS SERVICE COMMITTEE


                                           By:  _____/s/Edward W. Feldman_____
                                                   One of their attorneys

Harvey Grossman
Adam Schwartz
**ROGER BALDWIN FOUNDATION OF ACLU, INC.**
180 N. Michigan Avenue
Suite 2300
Chicago, IL 60601
(312) 201-0740

Edward W. Feldman (#061877541)
Thomas M. Staunton (#06217164)
Jennifer Smiley (#6275940)
**MILLER, SHAKMAN & HAMILTON LLP**
180 North LaSalle St., Suite 3600
Chicago, Illinois 60601
(312) 263-3700

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on October 20, 2005 he served a copy of

the foregoing **ACLU Plaintiffs' Response to City's Motion to Dismiss Petition to Enforce**

**Modified Consent Decree** on the party listed below by electronic means pursuant to Electronic Case

Filing (ECF):


Thomas Forgue
City of Chicago Law Department
30 North LaSalle Street - Suite 900
Chicago, Illinois 60602


and also certifies that a copy was served on October 11, 2005 by fax transmission from fax
number 312-263-3270 to 973-744-6038 with a copy by U.S. mail to:

Richard Gutman, P.C.
55 Warfield Street
Montclair, N.J. 07043-1116
(973) 744-6038

Dated: October 20, 2005

                                        _____/s/Edward W. Feldman_____